## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.: 7:18-cr-00614-KMK |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SIMON GOLDBRENNER, PERETZ | : | |
| KLEIN, SUSAN KLEIN, BEN KLEIN, | : | |
| MOSHE SCHWARTZ, SHOLEM | : | |
| STEINBERG AND ARON MELBER, | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT BEN KLEIN'S PRETRIAL MOTIONS

Of Counsel and on the Brief:

Paul B. Brickfield, Esq.
Brickfield & Donahue
70 Grand Avenue, Suite 100
River Edge, NJ 07661
(201) 488-7707

Deborah Loewenberg, Esq.
Gribetz & Loewenberg
155 North Main Street
New City, NY 10956
(845) 634-9500

*Counsel for Defendant Ben Klein*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . ii

INTRODUCTION . . . . . . . . . 1

ARGUMENT . . . . . . . . . 1

POINT ONE

A SEVERANCE IS REQUIRED . . . . . . . 1

POINT TWO

EARLY PRODUCTION OF SECTION 3500 AND
GIGLIO MATERIAL SHOULD BE ORDERED . . . . . 2

POINT THREE

THE GOVERNMENT SHOULD PROVIDE
ADDITIONAL DISCOVERY AND A BILL
OF PARTICULARS TO ENABLE BEN KLEIN
TO PREPARE FOR TRIAL . . . . . . . . 5

POINT FOUR

DEFENDANT BEN KLEIN REQUESTS
LEAVE OF COURT TO JOIN IN THE
MOTION OF THE CO-DEFENDANTS TO
THE EXTENT APPLICABLE TO HIM . . . . . . 6

POINT FIVE

DEFENDANT BEN KLEIN REQUESTS LEAVE
TO FILE ADDITIONAL MOTIONS, IF NECESSARY . . . . 6

CONCLUSION . . . . . . . . . 6

# TABLE OF AUTHORITIES

## CASES CITED

Blumenthal v. United States,
332 U.S. 539 (1947)   .   .   .   .   .   .   .   .   .   2

Cf. Farella v. City of New York,
2007 WL 193867 (S.D.N.Y. Jan. 25, 2007) .   .   .   .   .   .   5, 6

Giglio v. United States,
405 U.S. 150 (1972)   .   .   .   .   .   .   .   .   .   3, 4

Jencks v. United States,
353 U.S. 657 (1957)   .   .   .   .   .   .   .   .   .   3, 4

Richardson v. Marsh,
481 U.S. 200 (1987)   .   .   .   .   .   .   .   .   .   2

United States v. Castro,
2008 WL 5062724 (S.D.N.Y. Nov. 25, 2008)   .   .   .   .   .   5

United States v. Hinton,
631 F.2d 769 (D.C. Cir. 1980)   .   .   .   .   .   .   .   4

United States v. Holmes,
722 F.3d 37 (4th Cir. 1983)   .   .   .   .   .   .   .   .   4

United States v. Snell,
899 F. Supp. 17 (D. Mass 1995)   .   .   .   .   .   .   .   3

United States v. Tarantino,
846 F.2d 1384 (D.C. Ct 1988)   .   .   .   .   .   .   .   4

United States v Torres,
901 F.2d 205 (2d Cir. 1990) .   .   .   .   .   .   .   .   5

Zafiro v. United States,
506 U.S. 534 (1993)   .   .   .   .   .   .   .   .   .   2

## STATUTES CITED

18 U.S.C. § 3500 . . . . . . . . . 3

18 U.S.C. § 3500(a) . . . . . . . . . 3

18 U.S.C. § 3500(b) . . . . . . . . . 3

## RULES CITED

Fed. R. Crim. P. 7(f) . . . . . . . . . 5

Fed. R. Crim. P. 26.2. . . . . . . . . 3, 4

Fed. R. Crim. P. 26.2(a) . . . . . . . . 3

## OTHER AUTHORITIES CITED

ABA Standards for Criminal Justice, Section 11.2.2 . . . . 4

## INTRODUCTION

This case involves allegations of fraud relating to the federal "E-rate" program which provides Internet access and other forms of communication technology to schools in New York State and elsewhere. The indictment contains four counts: count one, an overall conspiracy and counts two, three and four, substantive wire fraud counts. Mr. Klein is named only in counts one and three.

The indictment alleges that a large number of schools were involved and that the defendants requested "over $35 million in E-rate funds and received over $14 million in E-rate funds from in or about 2010 to in or about 2016." See Paragraph 4 of the Indictment.

On information and belief, Ben Klein is a minor actor in the case. According to the prosecutor, Mr. Klein was only involved in two schools and the amount of money allegedly received was less than $500,000.00 (one-half million dollars).

## ARGUMENT

## POINT ONE

### A SEVERANCE IS REQUIRED

As noted above, Mr. Klein is a minor actor in the alleged scheme. We acknowledge that showing that there is more evidence against one defendant, that there are more charges against one defendant, or that the evidence is stronger against one defendant than against others is generally insufficient to

1

prevail on a demand for severance. See Blumenthal v. United States, 332 U.S. 539 (1947). In order to make a valid claim for severance, the defendant must show that as a result of these evidentiary disparities, there will be undue prejudice against the defendant, the jury will be unable to compartmentalize the evidence, or evidence of a codefendant's wrongdoing "erroneously could lead a jury to conclude that the defendant was guilty." Zafiro v. United States, 506 U.S. 534, 539 (1993).

While proper jury *voir dire* and curative instructions may be used to cure any possibility of prejudice or jury confusion in many cases, Richardson v. Marsh, 481 U.S. 200, 211 (1987), this remedy is not likely to succeed in this case. The evidence against the Defendant Ben Klein is small compared to the alleged evidence against the co-defendants. This extreme disparity warrants a severance. In essence, there is a substantial and unacceptable risk that a jury exposed to evidence of a broad conspiracy including millions of dollars and a large number of schools would be unable to fairly judge the guilt or innocence of Ben Klein on the issues relating solely to the two schools.

Therefore, Ben Klein's trial should be severed from the trial of the co-defendants.

### POINT TWO

#### EARLY PRODUCTION OF SECTION 3500 AND GIGLIO MATERIAL SHOULD BE ORDERED

Ben Klein moves for disclosure of Jencks Act material thirty days before

2

trial. The Jencks Act, 18 U.S.C. § 3500, permits disclosure of statements made by "a witness called by the United States [who] has testified on direct examination." 18 U.S.C. § 3500(b). The Act provides that "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness ... shall be the subject of ... discovery ... until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a); see also Fed. R. Crim. P. 26.2(a) (providing for disclosure, "[a]fter a witness ... has testified on direct examination," of "any statement of the witness that is in [the government's] possession and that relates to the subject matter of the witness's testimony").

With respect to testifying witnesses, Jencks and Giglio material should be provided to the defense thirty days before trial to allow the defendant sufficient time to examine and utilize this material in a meaningful manner before and during trial. Rule 26.2(d) states that upon delivery of Jencks material to the moving party, the court, upon application of that party, "may recess proceedings in the trial from the examination of such statement and for preparation for use at trial." The need to avoid protracted delays during trial allows district courts, pursuant to the Fifth and Sixth Amendments, and its inherent supervisory powers, to override the timing provisions set forth in the Act and in Rule 26.2. United States v. Snell, 899 F. Supp. 17, 24 (D. Mass 1995) (nothing in the statute pre-empts the court's ability, consistent with its obligations over case management, to order earlier disclosure than required by the Act). The

3

prosecution should disclose <u>Jencks</u> and <u>Giglio</u> material to defense counsel as soon as practicable following the defense request for disclosure because it will not only assist the defendant in achieving a fair trial, but also serve the public interest in expediting the fair resolution of criminal cases. <u>See</u> ABA Standards for Criminal Justice, Section 11.2.2; <u>United States v. Tarantino</u>, 846 F.2d 1384, 1415 n12 (D.C. Ct 1988); <u>United States v. Hinton</u>, 631 F.2d 769, 782 (D.C. Cir. 1980) (providing voluminous Jencks material at the suppression hearing resulted in defense counsel in failing to recognize its "critical importance" and defendant was deprived her constitutional right to the "informed, professional deliberation of counsel").

Adhering to the timing requirements in the Act and Rule 26.2 will substantially delay what promises to be an already protracted proceeding.

In addition to the obvious impact on the court's calendar, such delays will unfairly prejudice Mr. Klein's Fifth and Sixth Amendment rights because of the risk that he will be viewed by the jury as responsible for the delays and length of the trial. The remedy is for this Court, pursuant to the aforementioned powers, to order early disclosure of this material. <u>United States v. Holmes</u>, 722 F.3d 37, 40 (4th Cir. 1983) (in cases where there are many statements or where the bulk of witness statements are large, the government should agree to provide or the Court should order early disclosure).

4

## POINT THREE

**THE GOVERNMENT SHOULD PROVIDE ADDITIONAL DISCOVERY AND A BILL OF PARTICULARS TO ENABLE BEN KLEIN TO PREPARE FOR TRIAL**

Rule 7(f) of the Federal Rules of Criminal Procedure gives the Court discretion to direct the filing of a bill of particulars. United States v Torres, 901 F.2d 205, 234 (2d Cir. 1990). "The purpose of a bill of particulars is to provide sufficient information about an offense to permit a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense." United States v. Castro, 2008 WL 5062724, at *2 (S.D.N.Y. Nov. 25, 2008) (Buchwald, J.). *See unpublished opinion, attached hereto as Exhibit A.* Although the need for a bill of particulars is typically limited to circumstances in which the charges in the indictment are too general to advise the defendant specifically what crimes he has been charged with, this case poses potential circumstances in that Mr. Klein is allegedly only involved with two schools and a relatively small amount of funds. It is expected that the Government will be introducing substantial and complex evidence against the other defendants.

In light of the foregoing, if the Government intends to offer other evidence as to the existence of the offenses against Ben Klein. Mr. Klein intends, at the appropriate time, to move for a bill of particulars. The Court should exercise its "inherent power to control litigation" and order the Government to identify what, if any, evidence it has of Mr. Klein's alleged role. Cf. Farella v. City of New

York, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) (Buchwald, J.) (noting district court's "inherent power" to issue discovery orders "to control litigation"). *See unpublished opinion attached hereto as Exhibit B.* For these reasons, we respectfully request an Order compelling the Government to identify and produce any and all evidence Mr. Klein's indictment in the charged conspiracy and specific evidence relating to the schools.

## POINT FOUR

### DEFENDANT BEN KLEIN REQUESTS LEAVE OF COURT TO JOIN IN THE MOTIONS OF THE CO-DEFENDANTS TO THE EXTENT APPLICABLE TO HIM

Mr. Klein anticipates that his co-defendants will file pretrial motions. Mr. Klein respectfully requests that he be permitted to join in these motions to the extent applicable to him.

## POINT FIVE

### DEFENDANT BEN KLEIN REQUESTS LEAVE TO FILE ADDITIONAL MOTIONS, IF NECESSARY

It is anticipated that the Government will continue to produce discovery as these matters proceed forward. Mr. Klein requests leave to file any additional motion that future discovery may reveal.

## CONCLUSION

For the reasons set forth above, Defendant Ben Klein respectfully requests that his motions be granted in all respects.

Respectfully Submitted,

/s/ Paul B. Brickfield

Paul B. Brickfield, Esq.
Brickfield & Donahue
70 Grand Avenue, Suite 100
River Edge, NJ 07661
(201) 488-7707


/s/ Deborah Loewenberg

Deborah Loewenberg, Esq.
Gribetz & Loewenberg
155 North Main Street
New City, NY 10956
(845) 634-9500

*Counsel for Defendant Ben Klein*

Dated:        December 23, 2019

# Exhibit A

U.S. v. Castro, Not Reported in F.Supp.2d (2008)

2008 WL 5062724

2008 WL 5062724
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNITED STATES of America,
v.
Harold Lopez CASTRO, Defendant.

No. 08 CR 268(NRB).
|
Nov. 25, 2008.

**Attorneys and Law Firms**

Randall W. Jackson, Esq., Assistant United States Attorney,
Southern District of New York, New York, NY, for
Government.

Sam A. Schmidt, Esq., New York, NY, for Defendant.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

*1 Currently pending before this Court are defendant's
pretrial motions for a bill of particulars, for an order directing
that the government comply with its obligations under Rule
16 of the Federal Rules of Criminal Procedure, and for an
order that the government immediately disclose any Federal
Rule of Evidence 404(b), *Brady* and *Giglio* material. For the
reasons set forth below, defendant's motions are DENIED.

**INDICTMENT**

count 1 of the indictment in this case charges defendant
with participating in a conspiracy to commit robberies of
individuals believed to be in the possession of narcotics
and narcotics proceeds. Count 2 of the indictment charges
defendant with participating in a conspiracy to distribute and
possess with intent to distribute a controlled substance, to
wit, five kilograms and more of mixtures and substances
containing a detectable amount of cocaine.

The indictment also identifies a number of overt acts with
respect to each count. For Count 1, defendant is charged with
the following overt acts: (a) in the spring of 2004, robbing

with co-conspirators the home of a suspected narcotics dealer
in the vicinity of 712 47th Street, Brooklyn, New York and
taking approximately 250 grams of cocaine; (b) in or about
December 2004, in the vicinity of 712 47th Street, Brooklyn,
New York, striking a suspected narcotics dealer on the head
with a gun and robbing him of suspected narcotics proceeds;
(c) in or about November 2005, in the vicinity of 22nd Street
and 5th Avenue, Brooklyn, New York, with co-conspirators
striking a suspected narcotics dealer and robbing him of two
kilograms of cocaine and $18,000 of suspected narcotics
proceeds; (d) in or about December 2005, traveling with a
co-conspirator across the Verrazano-Narrows Bridge on route
to a planned robbery of a suspected narcotics dealer at a
restaurant in Plainfield, New Jersey; and (e) in or about April
2006, in the vicinity 60th Street and 8th Avenue, Brooklyn,
New York, robbing with co-conspirators a suspected narcotics
dealer of a bag containing approximately two kilograms of
cocaine. [1]

**DISCUSSION**

**I. Failure to Comply With Local Rule 16.1**
As an initial matter, we note that defense counsel failed to
comply with Local Criminal Rule 16.1. [2] On this basis alone,
the motions requesting additional discovery and a bill of
particulars should be denied. *See United States v. Ahmad*, 992
F.Supp. 682, 684 (S.D.N.Y.1998). Nonetheless, we proceed
to consider the merits of these motions.

**II. Bill of Particulars**
Defendant urges that we exercise our discretion under Rule
7(f) of the Federal Rules of Criminal Procedure by requiring
the government to produce a bill of particulars. Specifically,
defendant seeks the "precise" dates and times of the various
alleged robberies and his trip across the Verrazano-Narrows
Bridge to rob the narcotics dealer in Plainfield, New Jersey.
(Notice of Mot. at 1-2.) Defendant also seeks the name of the
restaurant at which that robbery was to take place, as well
as the names, dates of birth and last-known addresses of the
suspected narcotics dealers whom defendant is accused of
having conspired to rob. [3]

*2 The purpose of a bill of particulars is to provide
sufficient information about an offense to permit a defendant
to prepare for trial, to avoid unfair surprise, and to preclude
a second prosecution for the same offense. *See United States
v. Butler*, 351 F.Supp.2d 121, 134 (S.D.N.Y.2004) (citing

Fed.R.Crim.P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990); *United States v. Macchia*, 35 F.3d 662, 671 n. 1 (2d Cir.1994)). However, "a bill of particulars is not a general tool of discovery, nor is it a device to give the defense a road map to the government's case." *Id.* Thus, it is required only "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres,* 901 F.2d at 234. Further, "[a]cquisition of evidentiary detail is not the function of the bill of particulars." *Id.* An indictment need not identify all alleged co-conspirators, nor specify the nature, time and place of every overt act the defendant or others allegedly took in furtherance of a conspiracy, nor must it set forth all the evidence the government intends to introduce. *See Butler,* 351 F.Supp.2d at 134. "For that reason, requests ... for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have almost uniformly been denied." *United States v. Bin Laden,* 92 F.Supp.2d 225, 242 (S.D.N.Y.2000) (internal quotations omitted).

### A. "Precise" dates and times of alleged overt acts

Defendant's primary argument in seeking the bill of particulars is that the timeframes for the various overt acts set forth in the indictment are too broad for him to prepare an alibi defense. (Def's Mem. at 3; Oral Arg. Tr. 3.) Acknowledging that the government already has represented that it has provided the most specific information it currently possesses regarding the timing of the overt acts, defendant now demands that the government (1) further question its prospective witnesses regarding the timing of the alleged acts so as to provide defendant with more precise timeframes (Oral Argument Tr. 14-15) and (2) if such questioning yields no further information, provide defendant with an affidavit or other sworn document stating that greater precision regarding timing is not possible (*id.* at 3; 12-13). Defendant argues that he could use such an affidavit to impeach a government witness who testified at trial with greater specificity regarding timing than had previously been disclosed. (*Id.* at 3-4; 12-13.) If the government is not required to take these steps, defendant argues that, given his appointed lawyer's limited resources, it will be impossible for him to determine defendant's precise whereabouts for all the dates falling within the timeframes set forth in the indictment, thereby preventing defendant from asserting a viable alibi defense. Indeed, defendant goes so far as to argue that "[t]he failure of specificity renders any attempt of the defendant to adequate[ly] investigate or prepare his defense useless." (Def's Mem. at 3.)

\*3 Defendant's argument is unpersuasive. Given that all the dates at issue were two or more years ago, it seems unlikely that defendant could reconstruct his schedule on a day-by-day basis for purposes of preparing an alibi. In any case, acquisition of evidentiary detail in the form of exact times of the acts alleged in the indictment for purposes of establishing an alibi is not the function of a bill of particulars. *See, e.g., United State v. Ayodele,* 07 CR 40055-02, 2008 WL 558050, at \*1 (D.S.D. Feb. 29, 2008) (citing *United States v. Long,* 449 F.2d 288, 294-95 (8th Cir.1971)). The government has represented here that it has provided the timeframes for the various overt acts in the indictment with as much specificity as currently possible. Although it might be true that the government could narrow these timeframes through further questioning of prospective witnesses, and although such additional information might very well be useful to defendant, the government is not under any obligation to conduct such further inquiries now. [4]

### B. Victims' names, dates of birth and last-known addresses

Defendant also seeks the names, dates of birth and last-known addresses of the narcotics dealers whom he allegedly robbed so that he may investigate whether those individuals were possibly incarcerated at the time of the alleged robberies and whether they are cooperating with authorities because they themselves are facing charges. (Oral Arg. Tr. 19.) Defendant argues that, because the government has indicated it does not anticipate calling these individuals to testify at trial, disclosure of such information is not governed by 18 U.S.C. § 3500. (*Id.*)

We agree with the government that, given the violent crimes alleged here, defendant is not entitled at this time to the disclosure of victim information because those individuals might be endangered by the early disclosure. *See United States v. Gotti,* No. S4 02 CR 743(RCC), 2004 WL 32858, at \*9 (S.D.N.Y. Jan. 6, 2004); *United States v. Sindone,* No. 01 CR 517(MBM), 2002 WL 48604, at \*1-\*2 (S.D.N.Y. Jan. 14, 2002) ("The stakes in a criminal case are high, and temptations of perjury, subordination and intimidation are ever present. Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him ... to see to it that the government's proof is not presented."). Although the government may not currently intend to call these victims as witnesses, ultimately, every victim is a potential witness, and the government is not obligated to disclose a witness list to

defendant at this time. *See United States v. Ordaz-Gallardo,* 520 F.Supp.2d 516, 521 (S.D.N.Y.2007) (" 'in the absence of a specific showing that disclosure [of a witness list] was both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case,' the request for a witness list should be denied." (quoting *United States v. Bejasa,* 904 F.2d 137, 139-40 (2d Cir.1990))).

\*4   In sum, we find that the indictment here is facially sufficient to advise defendant of the charges against him, to avoid surprise at trial, and to enable defendant to interpose pleas of double jeopardy if necessary. The motion for a bill of particulars is therefore denied.

### III. Discovery Motions
Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, defendant also requests (1) notice of all expert witnesses and a summary of any expert testimony; (2) a list of all audio and video tapes the government intends to offer into evidence; and (3) the identity of or access to all documents, photographs, papers, data, tangible objects or other items the government intends to introduce at trial. (Notice of Mot. At 2-3.) Defendant also seeks immediate notice if the government intends to use evidence falling under Federal Rule of Evidence 404(b), as well as immediate disclosure all *Brady* and *Giglio* material. (*Id.* at 3.)

### A. Rule 16 disclosures
With regard to defendant's requests for disclosure under Rule 16, the government represents that it already has provided defendant with all appropriate Rule 16 discovery. (Govt. Mem. at 4.) We proceed on the premise that the government is well-aware of its Rule 16 obligations, including its obligation under Rule 16(c) to provide additional discovery if and when it becomes available. Given that premise and in the absence of any specific suggestion that there exist documents that have not been produced, we have no reason to believe that the government has not acted in good faith compliance with those obligations, and thus are satisfied with the government's representations that it will continue to do so. *See Ordaz-Gallardo,* 520 F.Supp.2d at 518.

### B. Federal Rule of Evidence 404(b) material
We likewise deny defendant's request for immediate disclosure of any evidence admissible under Federal Rule of Evidence 404(b). The government has represented that it will provide defendant with notice of any 404(b) evidence

it intends to offer at least two weeks before trial (Govt. Mem. at 4.), thereby satisfying the rule's requirement that the government provide "reasonable notice in advance of trial, or during trial, if the court excuses pretrial notice on good cause shown." Of course, there may be advantages to all parties if the government makes 404(b) disclosures even earlier, as such disclosures may enhance the defendant's ability to evaluate the outcome of a trial.

### C. *Brady* material
Defendant also seeks the government's immediate production of material evidence as to guilt or punishment that is favorable or exculpatory to the accused. *See Brady v. Maryland,* 373 U.S. 83, 87 (1963). Such materials must be disclosed "no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *United States v. Coppa,* 267 F.3d 132, 142 (2d Cir.2001). Thus, due process requires only that *Brady* material be disclosed "in time for effective use at trial." *Id.* Here, the government has represented that currently it is not aware of any *Brady* material in this case. (Govt. Mem. at 5-6.) As the government has, in good faith, asserted that it has met and will continue to meet its obligations, there is no reason to compel disclosure of *Brady* material at this time. *See Ordaz-Gallardo,* 520 F.Supp.2d at 522. Of course, the government should keep in mind that, under *Coppa,* it will bear the consequence of any failure to make timely *Brady* disclosures.

### D. *Giglio* material
\*5   Defendant also seeks immediate production of evidence that may be used to impeach the credibility of any government witness pursuant to *Giglio v. United States,* 405 U.S. 150, 154 (1972). Again, the government is required to produce *Giglio* material only "in time for effective use at trial." *Ordaz-Gallardo,* 520 F.Supp.2d at 522-23. Here, the government has represented that it intends to produce *Giglio* material the day before the corresponding witness will testify, or, if additional time is reasonably required to review such material, sufficiently in advance of the witness's testimony so as to avoid any delay at trial. (Govt. Mem. at 7.) We trust that the government will meet its obligation to produce *Giglio* material "in time for effective use at trial" such that there will be no need for a request for adjournment of a scheduled trial or a mid-trial continuance. We thus find that there is no reason to compel disclosure of *Giglio* material at this time.

2008 WL 5062724

### CONCLUSION

For the reasons stated above, defendant's motions for a bill of particulars, for an order directing that the government comply with its obligations under Rule 16 of the Federal Rules of Criminal Procedure, and for an order directing that the government immediately disclose any Federal Rule of Evidence 404(b), *Brady* and *Giglio* material are DENIED. The parties are directed to appear in Courtroom 21A for a pretrial conference on December 1, 2008 at 3:00 pm. Speedy trial time is excluded until that date pursuant to 18 U.S.C. § 3161(h)(8)(A) to permit the parties time to consider these rulings prior to the next conference.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 5062724

Footnotes

1    All of the above overt acts except (b) also support Count 2 of the indictment.

2    Local Criminal Rule 16.1 provides that: "No motion addressed to a bill of particulars or answers or to discovery and inspection shall be heard unless counsel for the moving party files with the court simultaneously with the filing of the moving papers an affidavit certifying that said counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the court and has been unable to reach such an agreement. If some of the issues raised by the motion have been resolved by agreement, the affidavit shall specify the issues remaining unresolved."

3    Curiously, defendant's motion papers also request "the approximate date that Mr. Arreaga is alleged to [have] entered in the conspiracy." (Notice of Mot. at 2.) We could not locate any reference to a co-conspirator named "Arreaga" in the indictment and thus assume this request was made in error.

4    Although defendant cites *United States v. Bin Laden* in support of his argument for a bill of particulars, we find that case clearly. distinguishable. There, the court noted that the indictment's scope was "unusually vast," alleging overt acts in Afghanistan, Pakistan, the Sudan, Somalia, Kenya, Tanzania, Malaysia, the Philippines, Yemen, the United Kingdom, Canada, California, Florida, Texas and New York occurring over a period of nearly ten years. *Bin Laden,* 92 F.Supp.2d at 234. Further, while the court granted defendants' request for a bill of particulars with respect to overt acts described only in terms as general as engaging in "travel" and conducting "business" in furtherance of the conspiracy, *id.* at 236, it found that other "open-ended" allegations not setting forth exact dates and locations were sufficiently precise such that defendants "would be able sufficiently to focus their response preparations." *Id.* at 239. The indictment in this case, which contains much more specific allegations and is far narrower in scope, is likewise "sufficiently concrete and particular as to permit a reasonably focused investigation" by defendant. *Id.*

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

**Farella v. City of New York, Not Reported in F.Supp.2d (2007)**

2007 WL 193867

KeyCite Yellow Flag - Negative Treatment
Distinguished by Ottoson v. SMBC Leasing and Finance, Inc., S.D.N.Y., July 13, 2017

2007 WL 193867
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Rocco FARELLA, et al. Plaintiffs,

v.

CITY OF NEW YORK, Defendant.
John P. MCDERMOTT, et al. Plaintiffs,

v.

CITY OF NEW YORK, Defendant.

No. 05 Civ. 5711(NRB), 05 Civ. 8264(NRB).
|
Jan. 25, 2007.

MEMORANDUM AND ORDER

BUCHWALD, J.

\*1 Plaintiffs, [1] twenty seven current and former New York City police officers, firefighters, and Police Department employees, allege that they suffered a variety of medical problems [2] as a result of lead exposure from the firing range at the New York City Police Department's 24th Precinct, located at 151 West 100th Street on Manhattan's Upper West Side, between 1984 and 2001. [3] They bring this action for negligence, fraudulent concealment, violation of New York Business Law § 349, and violation of New York General Municipal Law § 205-e. Federal jurisdiction is supported by plaintiffs' claims that defendant's conduct deprived them of their right under 28 U.S.C. § 1983 to be free from conduct by a governmental employer that "shocks the conscience" as well as their "rights of full access to courts and property interest in full value of a lawsuit." Farella Compl. ¶ 4; McDermott Compl. ¶ 4.

Specifically, plaintiffs allege that defendant City of New York ("City") acted grossly negligently and/or recklessly in: (1) exposing its employees to illegally high levels of lead while knowing that plaintiffs would suffer adverse consequences; (2) failing to warn its employees about the exposure; and (3) failing to conduct required medical monitoring on plaintiffs.

Farella Compl. ¶ 2; McDermott Compl. ¶ 2. Additionally, plaintiffs allege that the City's "negligent loss or wrongful destruction" of lead exposure evidence which was mandated to be retained under New York Labor Law § 27-a, the Public Employees Health and Safety Act ("PESHA"), "substantially impairs Plaintiffs' ability to establish the dose levels of the toxins (lead) to which they were exposed at the subject premises." Plaintiffs' Joint Memorandum of Law Dated May 18, 2006 ("Plaintiffs' Br.") at 1. [4]

As a remedy, plaintiffs now move this Court to use its "inherent power and broad discretion," Plaintiffs' Br. at 1, to adopt a relaxed burden of proving general causation (i.e., the required showing that exposure to lead can cause the types of injuries suffered by plaintiffs), and a shift in the burden of demonstrating specific causation (i.e., the required showing that exposure to lead in this case led to the actual injuries suffered by the plaintiffs themselves).

Defendant raises four objectives to plaintiffs' motion. First, they contend that PESHA does not provide a basis for spoliation sanctions because only the New York State Commissioner of Labor can make the initial required determination of whether there has been a violation of PESHA. Second, they assert that the sanctions sought to be imposed are outside this Court's power to control the litigation. Third, they maintain that there was no spoliation of evidence in this case, and thus, fourth, they assert that a relaxed and shifted burden of proving causation would be improper.

Because plaintiffs cannot establish that the evidence they allege was spoliated ever existed in the first place, their motion fails.

DISCUSSION

I. Spoliation Generally

\*2 Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999); *see also Byrnie v. Town of Cromwell, Board of Education,* 243 F.3d 93, 107 (2d Cir.2001). Spoliation sanctions may serve one of three purposes: (1) to deter parties from destroying evidence; (2) to place the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) to restore the

party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation. *West,* 167 F.3d at 779. The spoliation of evidence useful for "proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998); *see also Byrnie,* 243 F .3d at 107.

A party seeking spoliation sanctions must establish three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004) (citing *Byrnie,* 243 F.3d at 107-12). Thus, for sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed.*

If the requisite showing is made, sanctions may be proper under Fed.R.Civ.P. 37(b) when a party spoliates evidence in violation of a court order. *See, e.g., John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988). However, even in the absence of a discovery order, a district court may nonetheless impose sanctions under its inherent power to control litigation. *See, e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-45 (1991). [5]

II. Spoliation Sanctions in This Case

Plaintiffs allege in this case that the City failed to "preserve substantial evidence pertaining to lead exposure data at the 24[th] Precinct in violation of its statutory duties," Plaintiffs' Br. at 5 (emphasis removed), and cite PESHA for the City's duty to " 'make, keep, and preserve' a plethora of evidence and data relating to public employees' exposure to lead." Plaintiffs' Br. at 6. However, whether or not the City violated the provisions set forth in PESHA is simply not at issue in this motion. Indeed, it is apparent that plaintiffs fundamentally misunderstand the concept of spoliation, as they presuppose that spoliation sanctions are appropriate in the absence of any evidence showing that the "missing" evidence ever existed. For elucidation on this point, we need look no further than the pronouncement in *Riddle v. Liz Claiborne, Inc.,* No. 00 Civ. 1374(MBM)(HBP), 2003 WL 21976403, at \*2 (S.D.N.Y. Aug. 19, 2003):

\*3 The principal problem with plaintiff's [argument] is that plaintiff offers no evidence whatsoever that the allegedly missing documents ever existed and, thus, she has failed to offer any evidence suggesting that they were destroyed by LCI.... [E]ven if I assume that LCI has failed to maintain documents in accordance with either its own policies or with applicable federal regulations, such a shortcoming is simply not the destruction or alteration of evidence which is central to the doctrine of spoliation. Whatever relevance the failure to maintain files may have for the fact-finder, it simply does not rise to the level of spoliation.

Though the teaching of *Riddle* is squarely on point, plaintiffs seek to distinguish that case on two grounds. Neither effort is persuasive. First, they argue that in contrast to *Riddle,* this case "involves a statutory [or regulatory] duty to make, keep and preserve the requisite evidence" and thus "it matters not whether the lost or destroyed evidence was ever reduced to writing" because this evidence "(i.e., air quality at premises) existed and by statutory mandate needed to be tested, recorded and preserved." Plaintiffs' Br. at 13 (brackets in original). As a result, plaintiffs argue, the "City is just as negligent if it never took the requisite lead exposure tests and measurements, than if it conducted said tests, recorded the results, and subsequently lost or destroyed the requisite data." *Id.*

This argument fails for two reasons: not only *did* the *Riddle* defendants have a statutory duty to "make and maintain" records, but, more fundamentally, we are unwilling to subscribe to the notion that the evidence itself in this case would be comprised of the air quality at the 24th Precinct. Any statutory duty and/or any evidentiary submission would involve records, not the air quality itself. Correlatively, any spoliation analysis must focus on the records.

Second, plaintiffs assert that because the "absence of those records ... did not impair the *Riddle* plaintiff from proving the *prima facie* elements of her employment discrimination

**Farella v. City of New York, Not Reported in F.Supp.2d (2007)**
2007 WL 193867

case," *Riddle* does not control here. Plaintiffs' Reply Memorandum of Law ("Reply") at 5. However, the doctrine of spoliation, quite simply, has to do with the destruction of evidence. Here, plaintiffs' inability to state a *prima facie* claim because the sought-after evidence never existed does not create a spoliation issue. In short, *Riddle* is squarely on point; none of the cases cited by plaintiffs in an effort to avoid its impact effectively do so.[6]

Perhaps recognizing this fundamental problem with their spoliation argument, plaintiffs argue for the first time in their reply brief that "neither Plaintiffs nor this Court are able to ascertain for certain whether the ambient concentration evidence at issue was destroyed, lost, or never created in the first place" because deposition testimony by two former heads of the Police Department's Occupational Safety and Health Unit indicates that the PESHA-required monitoring actually took place. *See* Reply at 5-6.

*4 Though Jeanine Prud'Homme did testify that the required monitoring took place between 1992 and 1998, *see* Mulhearn Aff. Exh. O at 238-239, she nonetheless unequivocally replied "no" when asked: "Do you have any knowledge of any written compliance documents or appendices being destroyed or discarded at any period of time from 1992 to the present?" Amir Rasheed, her successor, was similarly asked: "You have no recollection of any of those reports being discarded or destroyed ... either accidentally or on purpose?"; he replied, simply, "No, no". *See* Mulhearn Aff. Exh. P at 158-59. In short, this deposition testimony does not sustain plaintiffs' spoliation argument. Moreover, we note that plaintiffs have had a full and ample opportunity for discovery. If records ever existed, it is likely that there were several locations in which they would have been maintained. All such locations were the subject of discovery requests. Indeed, in response to plaintiffs' interrogatories, City has identified witnesses from various city-wide agencies, including: the Citywide Office of Safety and Health, the Department of Health and Mental Hygiene, and the Environmental and Occupational Disease Epidemiology Department. Moreover, the city has made witnesses available from several departments within the NYPD, including: Firearms and Tactics, Forensic Investigations Division, Occupational Safety and Health, and the Building and Maintenance Section. *See* City Letter Dated October 28, 2005.

III. Sanctions Without Spoliation

Plaintiffs do not only attempt to hitch their sanctions wagon to the star of spoliation. Rather, they argue in the alternative that "this Court may construct the causation/burden of proof framework proposed by Plaintiffs even absent a finding that City's conduct constitutes spoliation of evidence." Plaintiffs' Br. at 21 n. 11. We decline to do so.

As support for this rather novel suggestion, plaintiffs cite two cases, neither of which provide any meaningful support. The first case, *Allen v. United States,* 588 F.Supp. 247 (D.Utah 1984), *rev'd on other grounds,* 816 F.2d 417 (10th Cir.1987), was brought by 1200 plaintiffs seeking damages for leukemia and cancer caused by radioactive fallout by the United States' nuclear bomb testing in the Nevada desert. Though the amount of radioactive material that the *Allen* plaintiffs were exposed to was unknown in that case, that rightly did not preclude a showing of causation:

> Where [cancer and leukemia] are concerned ... the importance of dose rate seems greatly diminished.... At the level of the individual cell, ionization is ionization, and a linear energy transfer is a linear energy transfer. If a single alpha particle does carcinogenic damage to the genetic machinery of a cell, it may be irrelevant whether additional particles crash through the cell chemistry or not.... The failure of the human epidemiological studies to persuasively identify a "threshold" dose below which the risk of cancer is not at all increased lends additional support to the view that even at low doses, critical biological injuries accumulate.

*5 *Id.* at 326.

Proving specific causation due to exposure to radioactivity is markedly different from proving detrimental exposure to lead. Though plaintiffs contend that "there is now a general consensus amongst the scientific community that no threshold has been identified at which lead exerts an adverse effect," Reply at 8, their own evidence clearly demonstrates that there *is* a level of lead exposure below which it is acceptable

to expose people. As set forth in OSHA's 1978 Executive Summary,

> [t]he evidence in this record demonstrates that prevention of adverse health effects from exposure to lead throughout a working lifetime requires that blood (PhB) lead levels be maintained at or below 40ug/100g.... Feasibility constraints prevent OSHA from establishing a standard which would eliminate all physiological changes, reproductive effects or mild signs and symptoms but the agency believes the vast majority of workers will be protected by this standard.

Mulhearn Aff. Exh. R at 2-3.

The second case, *Green v. McAllister Brothers, Inc.*, Nos. 02 Civ. 7588, 03 Civ. 1482(FM), 2005 WL 742624 (S.D.N.Y. March 25, 2005), is of no greater help to plaintiffs. There, plaintiff sued for respiratory ailments resulting from exposure to dust from the World Trade Center site. Defendant proposed a showing of general causation which would have required that plaintiff "determine the dose to which [he] was exposed and then demonstrate that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries he alleges." *Id.* at *12 (internal quotations omitted). Magistrate Judge Maas rejected defendant's suggestion and held that general causation could be established without plaintiff showing that he was exposed to toxins in quantities that "according to scientific literature ... can cause the specific types of injuries [plaintiff] alleges." *Id.*

Magistrate Judge Maas reached that decision for several reasons, none of which is applicable here. First, in *Green*, it was clear that plaintiff was harmfully exposed to large quantities of the dust. By contrast, the record demonstrates that only two plaintiffs, Desiree Lyons and Joseph Caivano, make any showing of elevated blood lead levels.[7] The other twenty five plaintiffs make no showing that they were actually harmfully exposed to large quantities of lead.

Plaintiffs attempt to blame the absence of additional similar test results on the City by arguing that the "City provides no evidentiary support whatsoever which indicates that potential risk of lead exposure at the subject premises was ever conveyed to *any* of the Plaintiffs in these consolidated cases by any union, private club or other party or entity," Reply at 8 n. 3 (emphasis in original). However, plaintiffs' own papers make it clear that plaintiffs-or at least their peers-were independently aware at least as early as November 27, 1995 of the conditions at the precinct when the 24th Precinct Club received the results of testing by an independent laboratory which the Club had hired. *See* Mulhearn Aff. ¶¶ 33-36. This report found that the "lead level in your sample is ... approximately 500 times higher than allowable, suggesting the potential for high level exposure to this contaminant both through inhalation and ingestion. *We strongly recommend clinical testing* for persons exposed to this contamination to determine blood and/or bone levels of lead." Mulhearn Aff. Exh. H at 1 (emphasis in original). In light of this report, the fact that twenty five of the twenty seven plaintiffs make no showing of the effects of lead exposure on their bodies (via blood levels, bone levels, or otherwise) means that they may not benefit from a relaxed burden now.

*6 Second, in *Green*, Magistrate Judge Maas concluded that "the first of several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed." *Id.* (internal quotations omitted). This is simply not a concern here: the potential dangers of lead exposure at certain levels have long been well-documented.

Third, *Green* was a case in which the chemical contents of the dust-and thus the specific toxins that led to plaintiff's injury-were unknown. Magistrate Judge Maas thus rejected the defendant's request that the plaintiff be required to make a showing of the content of the *specific* toxins contained in the dust because "the notion that 'dust' itself can trigger asthma seems reasonably well established." *Id.; see also* Plaintiffs' Br. at 16. This factor plays no role here: the specific toxin at issue here is not in question, nor is it difficult to discern.

In sum, the cases cited by plaintiffs simply do not support their effort to avoid the introduction of proof of causation. Moreover, we note that plaintiffs' proposed burden shift on specific causation to the *Allen* court's standard, in addition to being wholly misplaced, is hardly "limited," as they claim.[8]

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for spoliation sanctions and a shifting of the burden of proof is denied. We need not, and do not, deal with defendant's other arguments.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 193867

## Footnotes

1   These two cases have been consolidated for discovery purposes only. *See* Scheduling Order Dated December 28, 2005.

2   These problems include schleroderma, Bell's Palsy, asthma, respiratory problems, lead poisoning, brain tumor, aneurism, reproductive damage, miscarriage, myositis, lethargy, joint pain, memory loss, and neurological impairments. Affirmation of Kevin T. Mulhearn ("Mulhearn Aff.") ¶ 73; Affirmation of Bartholomew T. Russo ¶ 7.

3   This building also apparently contains a fire station which houses Engine 76 and Ladder 22. Farella Complaint ¶ 1.

4   Plaintiffs allege the evidence was destroyed willfully, or, at a minimum, grossly negligently. *See* Plaintiffs' Br. at 7-10.

5   Defendant disputes whether we have the authority to issue sanctions in this case, arguing that "[i]t would be an abuse of the court's power to control litigation if it provided any relief, labeled 'sanctions' or otherwise, based on PESHA violations." Defendant City of New York's Memorandum of Law in Opposition Dated June 9, 2006 ("Opp'n") at 7. Because we decline to impose sanctions, we need not decide this issue.

6   Plaintiffs cite *Byrnie* for support for the proposition that "a federal regulation which requires the retention of evidence 'can create the requisite obligation to *retain* records, even if litigation is not reasonably foreseeable.'" ' Plaintiffs' Br. at 5; *Byrnie,* 243 F.3d at 109 (emphasis added). As the *Byrnie* court noted, however, that was a case in which "a party [had] violated an EEOC record-*retention* regulation." *Id.* (emphasis added). That alone is enough to make clear that *Byrnie* is inapposite. Nor is plaintiffs' citation to *Silvestri v. General Motors Corp.,* 271 F.3d 583 (4th Cir.2001) of any aid. Plaintiffs quote out of context the proposition that to "require General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice." *Id.* at 594; Plaintiffs' Br. at 13 n. 4; Reply at 5. However, this sentence must be read in its proper context as it is preceded by: "Thus, not only was the evidence *lost* to General Motors, but the evidence that was preserved was incomplete and indefinite." *Id.* (emphasis added). In other words, as the court clearly noted, the issue of reliance on existing measurements necessarily *followed* a determination that the evidence itself was first spoliated: "we agree with the district court that Silvestri failed to preserve material evidence in anticipation of litigation or to notify General Motors of the availability of this evidence, thus breaching his duty not to spoliate evidence." *Id.* at 592.
    Plaintiffs' references to *Welsh v. United States,* 844 F.2d 1249 (6th Cir.1988) and *Public Health Trust of Dade County v. Valcin,* 507 So.2d 596 (Fla.1987) are even more unavailing. *Welsh* is manifestly inapposite, as it makes clear: "When, as here, a plaintiff is unable to prove an essential element of her case due to the negligent *loss or destruction of evidence* by an opposing party ... it is proper for the trial court to create a rebuttable presumption that establishes the missing elements of the plaintiff's case that could only have been proved by the availability of the missing evidence." 844 F.2d at 1248 (emphasis added). While *Valcin* adopted a shifted "burden of producing evidence when essential records are found to be either missing or inadequate through the defendant's negligence," 507 So.2d at 599, the Florida Supreme Court took pains to make clear that this shift is limited to "the context of medical malpractice." *Id.* at 600. We similarly decline to extend this holding as plaintiffs desire.

7   Indeed, even though Ms. Lyons' test results, which indicate that her "tibia lead concentration is 82% higher than the average 'normal' concentration expected for someone her age," *see* Reply Exh. B, the box indicating "elevated blood lead" on the summary is *not* checked. Rather, Dr. Stephen Levin checked the box reading "Blood results were all in the normal range." *Id.*

8   Specifically, plaintiffs wish the instruction on specific causation to read:
    Where a defendant who negligently creates a [lead] hazard which puts an identifiable population group at risk, and a member of that group at risk develops a biological condition which is consistent with having been caused by the hazard [lead, lead dust and/or lead fumes] to which he [or she] has been negligently subjected, and such consistency [has] been demonstrated by substantial, appropriate, persuasive and connecting factors, a fact finder may reasonably conclude that the hazard caused the condition, absent persuasive proof to the contrary offered by defendant.

Plaintiffs' Br. at 22 (brackets in original). Moreover, plaintiffs' suggested burden shift on differential diagnosis (i.e., a certain way of showing causation) is equally substantial. *See id.* at 25.

---

**End of Document**                                   © 2019 Thomson Reuters  No claim to original U S  Government Works.