UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
UNITED STATES OF AMERICA,


    – against –                                 No. 18-cr-614 (KMK)


ARON MELBER,

                        Defendant.
-----------------------------------------------------------------------x

---

**SENTENCING MEMORANDUM OF DEFENDANT ARON MELBER**

---

**MEISTER SEELIG & FEIN, LLP**
*Attorneys for Aron Melber*
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   ARON'S UNIQUE DEVOTION TO HIS STUDENTS' WELL BEING, AND THEIR
      RELIANCE ON ARON WARRANT A SENTENCE OF SIX MONTHS HOME
      CONFINEMENT FOLLOWED BY SUBSTANTIAL COMMUNITY SERVICE .......... 3

      A.    Aron Became Involved in Imrei Shufer's Administration ███████
            ████████████████████████ ................................................................. 4

      B.    Under Aron's Guidance, Imrei Shufer Prioritizes Educating Children with Special
            Needs who were Rejected by Other Community Schools ...................................... 6

      C.    Aron Ensures that Imrei Shufer Provides Students with a Well-Rounded Education,
            which is Unusual in his Community ................................................................... 12

      D.    Aron's Pathbreaking Leadership Comes at a Steep Price in the Hasidic Community
            .............................................................................................................................. 14

      E.    Imrei Shufer Would Struggle to Survive Without Aron's Dedicated Leadership 16

III.  ARON SUFFERED THROUGH A DIFFICULT CHILDHOOD BUT GREW INTO AN
      EXCEPTIONALLY DEVOTED FAMILY MAN ........................................................ 17

      A.    ████████████████████████████████████████
            ████████████ .......................................................................................... 18

      B.    Although Aron had a Painful Childhood he Cares Tirelessly for his Parents and In-
            Laws ...................................................................................................................... 20

      C.    Aron is an Exceptionally Involved Father: His Animating Principle is Ensuring that
            His Children Never Suffer the Neglect he Did ................................................... 23

IV.   A CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE DETERRENCE .... 29

V.    PROBATION RECOMMENDED A SUBSTANTIAL VARIANCE FROM THE
      ADVISORY GUIDELINES BASED ON ARON'S § 3553(a) FACTORS, BUT FAILED
      TO ACCOUNT FOR THE MITIGATING CIRCUMSTANCES SURROUNDING
      ARON'S OFFENSE ................................................................................................ 34

VI.   ARON'S FORFEITURE JUDGEMENT SHOULD BE JOINT AND SEVERAL WITH
      HIS CO-DEFENDANT SHOLEM STEINBERG ........................................................ 35

VII.  CONCLUSION ....................................................................................................... 36

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007) ............................................................................................ 2

*Honeycutt v. United States*,
   137 S. Ct. 1626 (2017) ................................................................................... 35

*Peugh v. United States*,
   569 U.S. 530 (2013) ........................................................................................ 2

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) .......................................................... 3

*United States v. Baldassarre*,
   No. 11-CR-801-02, 2013 WL 3466562 (E.D.N.Y. Mar. 27, 2013) .......... 33

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) .......................................................... 3

*United States v. Hamilton*,
   323 F. App'x 27 (2d Cir. 2009) .................................................................... 32

*United States v. Hodges*,
   No. 07-CR-706, 2009 WL 36231 (E.D.N.Y. Feb. 12, 2009) .................... 31

*United States v. Nehmad*,
   No. 16-CR-829, 2020 WL 4586798 (S.D.N.Y. Aug. 10, 2020) ................ 33

*United States v. Sanchez*,
   No. 99-CR-338, 2007 WL 60517 (S.D.N.Y. Jan. 8, 2007) ....................... 31

*United States v. Slater*,
   No. 04-CR-48-036, 2012 WL 6808470 (S.D.N.Y. Dec. 28, 2012) ............ 3

*United States v. Sloane*,
   308 F.R.D. 85 (E.D.N.Y. 2015). .................................................................. 18

*United States v. Tanner*,
   942 F.3d 60 (2d Cir. 2019) ........................................................................... 35

*United States v. Zukerman*,
   897 F.3d 423 (2d Cir. 2018) ......................................................................... 33

*United States v. Salvador*,
   No. 98-CR-484, WL 2034637 (S.D.N.Y. July 19, 2006) .......................... 18

**Statutes**

18 U.S.C. § 3553(a) ............................................................................. 1, 3, 18, 37

**EXHIBIT LIST**

| |
|---|
| **Exhibit A: Aron Melber Letter** |
| **Exhibit B: Letters from Family** |
| Shifra Dirnfeld Letter |
| Izzy Green Letter |
| Shmuel and Malky Green Letter |
| Basya Melber Letter |
| Chaya Melber Letter |
| Goldy Melber Letter |
| Malky Melber Letter |
| Rivka Melber Letter |
| Simon Melber Letter |
| Yeedle Melber Letter |
| **Exhibit C: Letters from Friends and Community Members** |
| Shia Beck Letter |
| Rabbi Chaim Berger Letter |
| Mordechai Binder Letter |
| Joseph (Yossi) Fried Letter |
| Rabbi Hersh Horowitz Letter |
| Raizy Klein Letter |

| |
|---|
| Chaim Hersh Lebowitz Letter |
| Dovi Lichter Letter |
| Isaac L. Muller Letter |
| Shimon Rolnitzky Letter |
| Rabbi Mayer Schiller Letter |
| Yoel Sterngold Letter |
| Yitty Spira Letter |
| Aron B. Wieder Letter |
| Yehuda Weissmandl Letter |
| Rabbi and Mrs. B. Weltz Letter |
| **Exhibit D: Letters from Parents of Students at Imrei Shufer** |
| Yoel Yitzchok Bodek Letter |
| Elky Fekete Letter |
| Eti Kozlovsky Letter |
| Yoel Zvi Lichtman Letter |
| Abraham and Bina Mendlowitz Letter |
| Yehuda Sicherman Letter |
| Rivka Weltscher Letter |
| **Exhibit E: Aleph Institute Report** |

Defendant Aron Melber respectfully submits this sentencing memorandum in support of his request for a sentence of six months home confinement and 300 hours of community service.

## I.   INTRODUCTION

The sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary."   18 U.S.C. § 3553(a).   The arc of Aron's life merits a non-custodial sentence.

████████████████████████████████████████, Aron has committed himself to caring for others.  ████████████████████████████████████████████ ████████████████████████████████████████████████████.  As an adult, Aron vowed to do everything in his power to prevent others from enduring similar traumas.

As such, Aron has devoted himself to Imrei Shufer, a Hasidic school in Rockland County uniquely focused on providing educational opportunities for children from troubled homes and children with disabilities, who are otherwise alienated from the private Hasidic education system. Aron has experienced the importance of this work firsthand: ██████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████ One school, Imrei Shufer, welcomed Aron's son with special care.  And Aron has worked tirelessly to do the same for other children. He has given each of his students an opportunity to thrive.  But implementing Aron's vision has not been easy.   His notoriously conservative and closed Hasidic community has frequently opposed Imrei Shufer's welcoming philosophy.   The established community fundraising apparatuses have been unavailable to Imrei Shufer, causing the school to suffer several brushes with financial ruin.   Although Aron lacks formal training in fundraising or education, his persistence and dedication to maintaining Imrei Shufer's caring and open philosophy have

nevertheless been crucial to navigating these obstacles.  By all accounts, the school would not have survived without Aron's steadfast leadership.  Aron knows that his crimes risked undoing the stability he achieved for his students and their family; he is deeply sorry that his crime has jeopardized not only his own future, but also theirs.

Aron has also shown unflinching commitment to his large family.  He dotes on his nine children, giving each child the attention they need.  His older children, who are in their twenties, rely on Aron for his wisdom and guidance as they navigate young adulthood.  Aron gives his youngest child, who is just two, patience and care even in the mundane tasks of getting dressed or eating a healthy meal.  Throughout the COVID-19 crisis, and particularly during the darkest days of the lockdown in the spring of this year, Aron's children have leaned on him more than ever—some of Aron's children still wake up in the middle of the night with nightmares about the pandemic crying for their father to console them.  Indeed, the acute terror that Aron's children still feel is understandable.  While everyone has endured previously unimaginable living conditions during the COVID-19 pandemic, Aron's family has suffered more than most.  His entire family contracted the virus in March.  Aron himself was seriously ill, and continues to have trouble breathing.  His brother was hospitalized.  His father in law was among the tens of thousands of New Yorkers who perished.  And Aron's mother still requires a ventilator to breath.  Throughout the crisis Aron has tended to his children, parents, and in-laws with kindness, putting others' needs before his own.  Plainly, Aron's personal circumstances are a crucial mitigating factor in determining the contours of just punishment here.

Thus, while the Court's sentencing analysis must begin "by correctly calculating" the applicable advisory United States Sentencing Guidelines ("Guidelines") range, *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)), that

calculation has not—and cannot—capture Aron's humanity and the good he has done in his life for his family and students.   The advisory Guidelines range, in this case 18-24 months' imprisonment, is but one element of the Court's consideration.   And they vastly overstate a reasonable sentence in this case.   Particularly given Aron's critical roles in maintaining stability for his family and hundreds of students, a sentence of six months home confinement and 300 hours of community service is sufficient but not greater than necessary punishment for Aron's crime. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

## II.   ARON'S UNIQUE DEVOTION TO HIS STUDENTS' WELL BEING, AND THEIR RELIANCE ON ARON WARRANT A SENTENCE OF SIX MONTHS HOME CONFINEMENT FOLLOWED BY SUBSTANTIAL COMMUNITY SERVICE

The first statutory factor that the Court is instructed to consider is "'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Slater*, No. 04-CR-48-036 (JSR), 2012 WL 6808470, at *1 (S.D.N.Y. Dec. 28, 2012) (quoting 18 U.S.C. § 3553(a)(1)).   "The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).   As discussed more fully below, Aron's pathbreaking leadership at Imrei Shufer and his unflinching commitment to his students, especially those with special needs or who have experienced trauma in their young lives, is truly unique in his Hasidic community. Many of the challenged students who Aron welcomes into his school have faced countless rejections from other Hasidic schools.   They simply have nowhere else to go within their cultural milieu.

██████████████████████████████████████████████████████

███████████████████████; Aron's family discovered that only Imrei Shufer would give his young

son special care.  Since then, Aron has given the school his all, guiding Imrei Shufer through

tumultuous financial periods, to realize his vision of a welcoming Hasidic school that continues to

protect its students—just as the school did for Aron's own son.  Aron's vision and devotion are

rare in the Hasidic educational community.  His current and future students rely on him to secure

the warm educational opportunities that only he and Imrei Shufer provide.  To avoid permanent

damage to this special school, the Court should sentence Aron to six months' home confinement

and 300 hours of community service, permitting Aron to continue supporting Imrei Shufer's

students and families.

A.    **Aron Became Involved in Imrei Shufer's Administration After** ████████████
████████████████████████████

Aron's initial involvement with Imrei Shufer was born of necessity.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████        So, Aron did not just transfer his son to a different school, he volunteered at his son's new school, Imrei Shufer, so he could personally protect his boy.

During that time, Imrei Shufer faced existential trouble when the head of the school abruptly moved abroad for family reasons.  Rudderless, the school was on the brink of collapse. (*See* Ex. B, Rivka Melber Letter at 8.)   Although Aron had no experience with school administration, after the school had been a savior for his son, Aron simply could not let Imrei Shufer fail, leaving the students to suffer the consequences.  In his wife's telling, "[b]ecause this school was a life saver for our son and a necessity for the community, Aron dove in head first to rescue the sinking ship."  (Ex. B, Rivka Melber Letter at 8.)

In the years since, Aron has continued to work tirelessly on behalf of Imrei Shufer, to ensure that it continues to provide both a safe haven and unique educational opportunities for the

Hasidic children enrolled.  He "never forgot his vision and never gave up in his mission to save young lives in the community."  (Ex. B, Rivka Melber Letter at 8; *accord* Ex. C, Isaac Muller Letter at 1 ("I know Mr. Melber as the only person who came to the rescue of my children's school. When it seemed like the school was about to fail financially Mr. Melber stepped up to the plate. He went far beyond the call of duty, for no personal gain, to engage good hearted people to come to the rescue of the school.  I can't imagine how this great school would have survived without Mr. Melber.").)

### B.   Under Aron's Guidance, Imrei Shufer Prioritizes Educating Children with Special Needs who were Rejected by Other Community Schools

Imrei Shufer's caring and welcoming philosophy has guaranteed a well-rounded education even to children who were turned away from other schools in the Hasidic community.  For many of Aron's students, "Yeshiva lmrei Shufer is the only source of emotional support to the children who fill its many classrooms."  (Ex. C, Yoel Sterngold Letter at 1.)

"Aron's motto is 'Every kid deserves a chance' and as such he goes out of his way to admit . . . kids that have experienced hardships in their young lives, and who aren't easy to work with . . . . But Aron is committed to giving them the chance at an education that he believes they deserve - just like any other child."  (Ex. C, Yossi Fried Letter at 1; *accord* Ex. C, Chaim Hersh Lebowitz, Principal of Imrei Shufer school Letter at 1 ("Rabbi Melber set fourth his vision for the school, he put it down very clear, each child and family that wants to join the Imrei Shufer family, is welcome, no matter of their past, disadvantages and struggles.").)

Eti Kozlovsky, for example, recounts that after her husband suffered a severe episode of depression, Aron's school, Imrei Shufer, was the only Hasidic school that accepted her children. Eti recalls: "none of the [other] private Chasidic schools in all of Rockland County would accept our children as students because of my husband's difficulties. All I heard from schools was no no

no!" (Ex. D, Eti Kozlovsky Letter at 1.)  Eti had the opposite experience when she approached

Aron about enrolling her children in Imrei Shufer:

> The only person who responded to my cry for help was Mr. Melber. When I had
> my interview with him [I] was literally shaking awaiting a list of personal questions,
> that I thought would lead to another rejection. That's not what Mr. Melber did
> though. I will never forget his first question, Mrs. Kozlovski does your family have
> food to eat at home? How are the gas & electric and water bills being paid? All Mr.
> Melber cared about was making sure my children had a stable home and a good
> education.

(Ex. D, Eti Kozlovsky Letter at 1.)  Aron was also instrumental in getting Eti's family back on

their feet:

> Not only did Mr. Melber accept my kids into his school, but for over 4 years until
> my husband got himself together, Mr. Melber quietly made sure that my family was
> provided for. He made sure we had food on the table. The moment we received a
> utility bill disconnection notice, he literally went so far out for my husband and
> family to get it paid or to make a payment plan with the utility company.

(Ex. D, Eti Kozlovsky Letter at 2.)  The impact Aron had on Eti and her family simply cannot be

overstated.  To Eti, Aron "was sent as an angel from above in the most difficult years of my life."

(Ex. D, Eti Kozlovsky Letter at 2.)

Aron is also committed to educating children with disabilities, which is unusual among

Hasidic schools in Rockland County.  Imrei Shufer's openness is similarly transformative for these

students and their families.  Aron's childhood friend, Yehuda Weissmandl, who is their local

school board president, explains: "In my capacity as school board president I got to know all the

different schools and administrators in the community. Aron's school is one of a kind, and serves

a niche for those who need it most." (Ex. C, Yehuda Weissmandl Letter at 2.)  Whereas "[p]rivate

schools generally cater to achievers and the ones that the school administration believes can and

will easily succeed, Aron has a school that gives every single child that chance." (Ex. C, Yehuda

Weissmandl Letter at 2.)  Yehuda finds it "hard to imagine how [their] community would function

without Aron's school serving as a refuge for children from distressed backgrounds and high needs

and who need the extra nurturing that Aron's school uniquely provides."   (Ex. C, Yehuda Weissmandl Letter at 2; *see also* Ex. C, Rabbi Mayer Schiller Letter ("Monsey has one school which accepts all applicants, the academically challenged, the victims of broken homes and abuse, many who have failed elsewhere, and those whose true potential has yet to be evoked [t]o keep a school-of this type running demands a unique individual. Rabbi Aron Melber is that man and lmrei Shufer is that school."); Ex. C, Rabbi Chaim Berger Letter ("Aron . . . has opened the doors of his school and his heart to these children, with utmost warmth and dedication.  These kids didn't stand a chance with any other school in our community").)

Rivka Weltscher, "a parent of a child with cerebral palsy," who attends Imrei Shufer, personally experienced Aron's dedication to creating educational opportunities for every child. Rivka recounts the pivotal role Imrei Shufer has played in guaranteeing her son's progress:

> Although, my son is very bright and verbal he is unable to self-ambulate and has uncontrolled movements. Every developmental, cognitive, and social milestone that my son reaches comes after a lot of work from everyone involved in my child's team. As a parent of a child with special needs rejection and exclusion become the norm but the pain of it never decreases. It was with fear and trepidation and a lot of bravery that my husband and I started to look into a regular education school for our child. As prepared as we were, the rejection was extremely painful as people saw our child for his disability over all his other abilities and sweetness. And then we met Rabbi Melber. He welcomed us into his office as he met our child and interacted with him. Finally, someone was able to see my son for who he really was and all the potential that he had. With his warm heart and love for every child, he warmly accepted my son and welcomed him into the school. My son has been in the school for 4 years. Rabbi Melber has advocated for our child numerous times and ensured that he was being treated fairly. My son and us as parents were never made to feel different or that anyone was doing us a favor.
>
> The school has done everything in their power to ensure that our son is learning and thriving emotionally. My son is now just a regular boy in a wheelchair and is confident with his place in society, and all that is an attestation of all the hard work that Rabbi Melber has put into the school and our child.

(Ex. D, Rivka Weltscher Letter.)

Yoel Lichtman had a similar experience with Aron and Imrei Shufer.  Both Yoel and his wife are disabled.  Mr. Lichtman shares that their "joy was indescribable when we were gifted with a healthy baby boy," but,

> The bliss would later be marred when the time came to enroll him in school.  Seeing such handicapped parents turned everyone away. Our dear son ████ was being rejected. The pain was immense. Writing about those days, the feelings of shame, loneliness, helplessness, and deep humiliation resurface. My mother, trying to help out, walked into the Imrei Shufer School office and asked for an application for her grandson. Rabbi Melber inquired where the child's parents are. Holding back tears my mom explained to Rabbi Melber the child's history. Rabbi Melber cried along and soothingly told my mom that her grandson is gladly welcome to join the school. ████ was accepted, no strings attached.
>
> Obviously, ████ needed lots of help. Rabbi Melber went above and beyond his job title and always stood behind our son getting him the necessary treatments. Like the school is his second home, Rabbi Melber is his second Dad. He's always there to advocate for our son.

(Ex. D, Yoel Lichtman Letter.)

The parents of a legally blind student at Imrei Shufer likewise describe how "Aron Melber has been a godsend to [their] family."  (Ex. D, Yoel Bodek Letter.)  They relate that:

> About two years ago, our 12-year-old son ████ who is legally blind had started acting out and misbehave in his previous school . . . . Our ████ utilizes extra-large print, magnifying devices and other technological equipment as tools to help him lead a life of independence just like any other boy his age. His special needs along with his reported behavioral issues at his previous school made several school administrators and principals nervous about taking on the challenge of accepting ████ into their school . . . . . Thankfully, this was not the case with the Imrei ████ school-Mr. Melber head of the school along with the principal Rabbi Lebovits willingly took on the challenge of trying to meet ████ needs with grace and enthusiasm. They have worked closely with ████ and us to not only accept him but also ensure that his teachers are prepared to help him develop and grow . . . . Much of the credit for ████ journey at this time and in the future will be credited to Imrei Shufer and Mr. Aron Melber.

(Ex. D, Yoel Bodek Letter.)

Countless other families have had comparable experiences with Aron's devotion to educating all children with care and kindness. (*See, e.g.,* Ex. D, Abraham and Bina Mendlowitz

Letter ("When [their son] ███ was diagnosed with ADHD and suffered from cognitive issues, Rabbi Melber insisted that he stays in the school, and assured us that the school will do whatever is necessary to provide him with a proper education."); Ex. C, Mordechai Binder Letter at 2 ("There was a 10-year-old boy from a divorced home whose father suffered from severe mental illness. This young ███ was living with his aunt in Spring Valley and needed a school that would accept him despite his emotional baggage. Aron jumped to the challenge and accepted Shimon to his school and helped him grow to the mature and successful adult he is today.").)

Aron also provides a safe haven for children faced with profound crises—both educational and emotional.   Aron's friend, Mordecai Binder, who is "a former member of a voluntary emergency service organization, Chaverim of Rockland," and is "a mental health professional," recalls an incident where he was called as an emergency responder when the police discovered an RV where:

> a family of 2 adults and 5 children living there. The smell was unbearable, there was no working bathroom, the children had not showered in days or weeks. Together with CPS of Rockland, the children were immediately removed from this unsafe environment, and were placed in homes where they can be cared for properly.

(Ex. C, Mordechai Binder Letter at 1.) But,

> [a]s Chasidic Orthodox children . . . it was very hard to find a school that would take them in and work with their educational and social issues. Knowing that Aron Melber is always ready to help anyone in need, I reached out to him to see if maybe he has an idea. He made immediate plans to meet the boys and it didn't take long before they were accepted into his school.  Not only was there no tuition charged, he also arranged private tutors and extracurricular activities for these boys through the school.

(Ex. C, Mordechai Binder Letter at 1-2.)

Aron is also determined to welcome into Imrei Shufer children who were otherwise ostracized from the Hasidic community.   For example, Aron gave Abraham and Bina Mendlowitz's "children education[al] opportunities when the rest of the community refused," as

when their family "moved away from being ultra Orthodox Jews and became orthodox Jews, most schools shut their doors to my kids. Being shunned by our community was painful, and we had no where to go," but Aron provided their children with an educational refuge, "happily accept[ing] their] kids into his school," he "gave them a proper education with Jewish studies and secular studies." (Ex. D, Abraham and Bina Mendlowitz Letter.)

Yehuda Sicherman, an NYPD officer whose children are enrolled in Imrei Shufer had a comparable experience. Because "[b]eing from a Hassidic heritage and being a police officer is a very rare combination in our community," when Mr. Sicherman "applied to place [his] children into yeshiva, every institution in Rockland County denied [his] application because of [his] profession." (Ex. D, Yehuda Sicherman Letter.) Aron's school was the only school to gladly accept Mr. Sicherman's children: "Only Rabbi Melber, who expressed to me that he understands and respects law enforcement, accepted my children into his school with open arms and with a smile." (Ex. D, Yehuda Sicherman Letter.)

Aron's devotion to maintaining an open Hasidic school that prioritizes educating ***every child*** is exceptional, standing out even to those in the field of Jewish education. Dovi Lichter, Director of Ancillary Services at Achieve Behavior Health, a childcare and developmental center in Monsey, explains that although he is "privileged to meet many devoted and dedicated people in the school system," Aron's "selfless approach to his work," and his "extraordinary commitment and with unapparelled devotion," remain rare. (Ex. C, Dovi Lichter Letter.) Mr. Lichter has observed firsthand Aron's "love to his students and the drive that he has to see them progress in school and grow up to be better people." "Almost on a weekly basis," Mr. Lichter receives "phone calls" from Aron, "long after school hours . . . inquiring about his students' progress and always seeking 'what else can we do about this student?' or 'Is there anything else the school as a whole

11

can do to make this child's life better.'"  (Ex. C, Dovi Lichter Letter.)  Mr. Lichter can attest that Aron's "selflessness knows no-bounds, it keeps him up at nights and motivates him during the day.  Many students of the school that he has established and created from scratch with untold hurdles and obstacles, with blood, sweat and tears need that extra care and devotion.  For many of them Mr[.] Melber is the only one to provide it for them."  (Ex. C, Dovi Lichter Letter.)

Aron's dedication has transformed the lives of many Imrei Shufer students and their families.  Imrei Shufer's principal, Chaim Hersh Lebowitz emphasizes the impact Aron has had on his students:

> I can personally attest to many families who straightened out their path in life because of Rabbi Melber accepting them to be a part of the School, thereby giving them a sense of being a part of society. Seeing their kid coming home from school with a beaming smile and pride, brings sunlight and infusing hope into the whole family.

(Ex. C, Chaim Hersh Lebowitz, Principal of Imrei Shufer school Letter at 2.)  Aron's essence is truly his devotion to his students.  He is "a master educator and a selfless individual," and the last line of support for countless struggling students and their families.  (Ex. C, Mordechai Binder Letter at 2.)  Imrei Shufer's students and their families would bear the brunt should Aron face imprisonment, and forcing him to separate from the school.

### C.    Aron Ensures that Imrei Shufer Provides Students with a Well-Rounded Education, which is Unusual in his Community

Under Aron's leadership, Imrei Shufer is also committed to providing a strong secular education, in addition to the school's religious studies, which is unusual in Rockland County's extremely conservative Hasidic community.  Aron "recognized the great need in [the Hasidic] community for a school that would provide [Hasidic] children a well-rounded education, including teaching them, both traditional Jewish studies and the traditional way of life, as well as rigorous secular studies."  (Ex. C, Yossi Fried Letter at 1.)  Because "Aron's goal as an educator is to

prepare his students to lead well-balanced lives as faithful Jews and productive, self reliant citizens," he works tirelessly to equip his students with the education necessary to thrive.  (Ex. C, Yossi Fried Letter at 1; *accord* (Ex. C, Isaac Muller Letter at 1 ("As a person who truly cares for his students, Mr. Melber involved himself with his great knowledge to create a great curriculum for the school as well, both the religious and general studies are designed in mind to shape and grow the child to be a productive member of society.").)

To that end, Aron ensures that Imrei Shufer teaches "subjects that are not taught in the other Hasidic schools, for example teaching the constitution and [relevant] supreme court decisions about them, teaching of social issues like reparations for slavery, women's rights, gun control," among others. (Ex. C, Isaac Muller Letter at 1.)  Indeed, unlike virtually all other Hasidic schools, Aron's school also utilizes the internet as a teaching tool.  As one set of Imrei Shufer parents report: "Rabbi Aron t[a]ught [his students] internet safety to allow the children to use the internet as an important educational tool, while other schools in the community hate to touch the subject."  (Ex. D, Abraham and Bina Mendlowitz Letter.)

In the world of Hasidic education, Aron's philosophy is nothing short of revolutionary. (*See* Ex. B, Yeedle Melber Letter at 3 ("In school, he made it his mission to revolutionize the Hasidic education system.").)  Aron is truly "a trail blazer, always pushing the envelope and opening new doors . . . . He advanced and modernized his school on many levels."  Ex. B, Yeedle Melber Letter at 3 ("As far as I know he is the only Hasidic school with its own official YouTube channel, Facebook page (Cheder lmrei Shufer), and Instagram account (imreishufermonsey).").) Imrei Shufer is simply "exceptional" in the Hasidic community; it is "the product of Aron's vision for what a Hasidic school should be."  (Ex. C, Shimon Rolnitzky Letter.)  Aron's visionary

leadership is critical to "guaranteeing [his students] the best Hasidic education possible."  (Ex. B, Yeedle Melber Letter at 4.)

### D.    Aron's Pathbreaking Leadership Comes at a Steep Price in the Hasidic Community

Aron's accepting philosophy and commitment to well-rounded education are a godsend for many Hasidic families.  But "[r]unning such an excellent school is a very costly endeavor and the school came dangerously close to shutting its doors."  (Ex. C, Shimon Rolnitzky Letter.)

Although Imrei Shufer is a private, tuition-funded school, Aron remains committed to accepting children whose parents are unable to afford to pay tuition: many of Aron's students "are either orphaned or from divorced homes, with no tuition dollars being paid to keep the establishment alive, yet Aron wouldn't deny them a chance to be the best they can be."  (Ex. C, Yoel Sterngold Letter at 1-2.)  For example, Yehuda Sicherman, who works as an NYPD officer recounts how, recognizing his financial constraints as a civil servant, Aron "graciously worked with [him] and lowered [his] tuition from $2,400 per month to $600 per month."  (Ex. D, Yehuda Sicherman Letter.)  Yehuda is deeply grateful for Aron's commitment to "tak[ing] personal responsibility for helping parents ensure that their kids [receive] a great education."  (Ex. D, Yehuda Sicherman Letter; *accord* Ex. C, Yossi Fried Letter at 1 (Aron frequently accepts children who "have no financial support to pay tuition. But Aron is committed to giving them the chance at an education that he believes they deserve - just like any other child.").)

Aron's commitment to *all* of his students, particularly those requiring extra help and support, also "strain[s]" Imrei Shufer's "finances and those of his school, as they require more help from the school than Aron's average students."  (Ex. C, Yossi Fried Letter at 1.)  These financial shortfalls "put a bigger burden of the shoulder of Rabbi Melber to work overtime to raise the funds to run the school."  (Ex. C, Chaim Hersh Lebowitz, Principal of Imrei Shufer school Letter at 1.)

Compounding the financial difficulties facing Imrei Shufer, Aron's "vision" that "each child and family that wants to join the Imrei Shufer family, is welcome, no matter of their past, disadvantages and struggles," came at a "heavy price" for the school as "many well-to-do parents felt it below their 'dignity' to be part of a school with such diversity of struggling parents and students." (Ex. C, Chaim Hersh Lebowitz, Principal of Imrei Shufer school Letter at 1.) Because of the opposition to Aron's pedagogical vision in the Hasidic community, which is a very "tight knit, [and] traditional community," Aron has "had a very hard time and had to overcome a lot of challenges to make his vision a reality." (Ex. C, Yossi Fried Letter at 1.) To complicate matters further, "because the community's leaders did not support Aron's initiatives, he did not have access to the community's established philanthropists. He had to fundraise himself for Imrei Shufer through small donations from people who understood and respected Aron's goals." (Ex. C, Yossi Fried Letter at 1.)

Aron persevered in the face of the financial challenges to his school—even at the expense of his personal financial security. (Ex. C, Yossi Fried Letter at 1 ("His work to provide a warm environment for all of lmrei Shufer's students came at a great cost to Aron personally, including financial hardship for him and [his] family.").) Aron's daughter Goldy recounts how her father "worked tirelessly day and night. He set up appointments with people of means, explaining his vision for the school and the dire situation. He requested donations and procured loans. He was rebuffed many times, but kept going, never giving up." (Ex. B, Goldy Melber Letter at 3.) Eventually, "with tremendous efforts and many sleepless nights, the school pulled through. It is due to [Aron's] sweat and toil that the approximately one hundred fifty students have a warm, home-like school where they are accepted as they are, encouraged and given the tools to reach their potential." (Ex. B, Goldy Melber Letter at 3.)

Even when Aron succeeded in achieving a modicum of financial security for Imrei Shufer, he could not simultaneously do the same for his family.  Aron's daughter Basya was aware that "[t]here were times that . . . [her] family was struggling financially. We couldn't buy everything and moved to a house with cheaper rent. My parents let us know that we could pray to have enough money, but Totty made sure not to burden us." (Ex. B, Basya Melber Letter at 3.)

### E. Imrei Shufer Would Struggle to Survive Without Aron's Dedicated Leadership

Aron's work in the Hasidic community maintaining the school's welcoming ethos is virtually irreplaceable.  Aron "is the heart of lmrei Shufer."  (Ex. C, Shimon Rolnitzky Letter.) And his students would suffer greatly in his absence.

Chaim Hersh Lebowitz, the principal of Imrei Shufer, describes the students' dependence on Aron's unparalleled dedication:

> Your honour, Imrei Shufer school, which is made up of over 150 students, mostly from disadvantaged, broken, unfortunate families, will not survive one week without Rabbi Aron Melber at the helm. Only this selfless, devoted, passionate person, who did not take 1 day [of] vacation for the last Seven years, only this person who does not greed for fame or money, could shoulder the burden of running Imrei Shufer school.

(Ex. C, Chaim Hersh Lebowitz at 2-3.)  Aron plays a personal role in ensuring the success of each of Imrei Shufer's 150 students.  "He has worked with every individual student and guided this special school through thick and thin. His efforts simply cannot be replaced. As he as tirelessly given of himself to others."  (Ex. C, Rabbi Mayer Schiller Letter.)  Yoel Lichtman, a parent of an Imrei Shufer student with special needs details that his young son "need[s] Rabbi Melber in school on a daily basis" to be "his advocate," and "[t]o impart his vision and beliefs of every child to the rest of the staff" at Imrei Shufer."  (Ex. D, Yoel Lichtman Letter.)  Yoel credits Aron's compassion and commitment to "accepting [his] son" with "helping him grow into a healthy citizen."  (Ex. D, Yoel Lichtman Letter.)

16

The letter from Rabbi Wels perhaps sums it up best: "You can copy [a] curriculum, but you can't copy Rabbi Melber's caring touch." (Ex. C, Rabbi and Mrs. B. Welz Letter.)   The contrast between Imrei Shufer, which accepts every student—giving particular attention to children with disabilities and who have experienced childhood trauma—and other Hasidic schools that do not, highlights Aron's irreplaceable leadership.   Aron's special care for his students continues to make a tremendous impact in their lives.   They would suffer tremendously in his absence.   (*See* Ex. C, Rabbi Chaim Berger Letter ("I beg you please have mercy on Aron, and for the over 150 kids of his school and their families, and for all the other people of our town who benefit from Aron's big heart, as I'm not sure how they will make it without having Aron to guide them.").)

## III.   ARON SUFFERED THROUGH A DIFFICULT CHILDHOOD BUT GREW INTO AN EXCEPTIONALLY DEVOTED FAMILY MAN

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████   Instead of turning inward, Aron has channeled the energy and pain he experienced as a child to ensure that his own children and family never feel the abandonment that he suffered.   Thus, he is a particularly devoted father to his nine children ages 2-24, doting on each child individually. Remarkably, Aron also does not harbor any ill will towards his parents and provides them with constant care in their old age.   Aron's mother contracted COVID-19 in March of this year.   She is still on a ventilator, and needs 24-hour care.   Despite his painful childhood, Aron has taken responsibility for overseeing her care, and lifting her spirits with daily visits throughout her lengthy illness.   Aron's large family relies on his giving nature.   Because they would suffer terribly in his absence, the Court should impose a non-custodial sentence on Aron.   *See, e.g., United States v.*

*Sloane,* 308 F.R.D. 85, 88 (E.D.N.Y. 2015) (varying below the Guidelines at least in part based on the court's recognition that "any imposed incarceration will cause distress and difficulties to [defendant's] two sisters"); *United States v. Salvador*, No. 98-CR-484 (LMM), 2006 WL 2034637, at *5 n.7 (S.D.N.Y. July 19, 2006) ("family ties and responsibilities" are relevant "as determining the "'history and characteristics of the defendant' as required by 18 U.S.C. § 3553(a)(1).") (quotation marks and citations omitted).

A.







Still, Aron has directed his energies outward, caring for his children and aging parents, rather than nursing his own wounds.  Aron and his siblings recognize "that the damage done to the [c]hild['] s psychological well-being, has a lifelong negative affect." (Ex. B, Yeedle Melber Letter at 2.)  So he and his siblings "made a promise to make sure that our children and other families will never go through our turbulent childhood experience."  (Ex. B, Yeedle Melber Letter at 2.) Throughout his adulthood, Aron has lived up to that promise, prioritizing his parents and children, as well as his young students.

**B.    Although Aron had a Painful Childhood he Cares Tirelessly for his Parents and In-Laws**

Although Aron endured a turbulent childhood, as an adult, he has cared for his parents with utmost dedication and affection.  In March of this year, during the start of the COVID-19 pandemic, Aron's mother contracted the virus.  She has been gravely ill since.  Because "she is a kidney patient [Aron's] fright was intensified," when his mother became sick.  (Ex. B, Rivka Melber Letter at 4.)  "After a few weeks," of her illness, "one morning at 5:00am there was no choice . . . but to rush her to the hospital. Her devoted son Aron, did not hesitate[.]  He was at her

side in the ambulance and remained there to see her being cared for by the hospital nurses. It's already been [many] months-and she's still on a ventilator." (Ex. B, Rivka Melber Letter at 4.)

As Goldy Melber, Aron's daughter, has witnessed, Aron's care for his mother has been steadfast throughout:

> My dear grandmother, mother of my father, is still in the hospital, hooked onto a respirator, having been infected with COVID19 over four months ago. At the beginning of her illness, when she was in grave danger, my father put all other concerns on hold as he fought heroically for her life. When she was rushed to the hospital, he didn't leave until he saw she was being tended to. Day after day, from early morning until late in the night, my father was on the phone with doctors and nurses, agencies and hospital liaisons. My grandmother was very sick and the doctors didn't give her much hope. My father did everything in his power to save her, leaving no stone unturned. He got in touch with top specialists around the world and anyone who could possibly be of help. He traveled to the hospital even though he couldn't go in to see her so that he could speak to the doctors in person and make sure she was getting the best care possible. He made sure to stay on top of the situation and spoke to hospital personnel a few times a day. Even during this terribly difficult time, my father thought of the overworked healthcare staff and brought them platters of delicious food to reenergize. By the grace of G-d my grandmother survived and it seems the worst has passed. My father very likely saved her life. Though still sick and frail, she is awake, aware and very grateful, while slowly recovering.
>
> When it was impossible for visitors to enter the hospital due to strict regulations, my father would visit virtually, via Zoom, singing to my grandmother and updating her on recent happenings. Now that it is possible to visit, my father makes sure to go every week."

(Ex. B, Goldy Melber Letter at 5; *accord* Ex. B, Rivka Melber Letter at 4 ("Luckily the doctors noted that this frail patient needs someone in her room 24 hours, thus enabling her children to tend to her during this very trying time. Until permission was granted, my husband would be constantly on the phone, involved in finding better care, newer options etc.").)

Aron's reliable presence by his mother's side is important to her still tenuous recovery. For example, "the process of weaning her from the respirator," requires Aron's mother to relax. Her doctors "keep saying that anxiety is hindering her progress. But," according to Aron's daughter Goldy, with Aron "at her side, she looked calm . . . feeling safe and comforted in [Aron's]

presence. She looked happier and so much more peaceful."  Recently, when Goldy went to visit her grandmother with Aron, "[b]efore he left, [Aron] warmly held [his mother's] hand, sharing words of encouragement and love. She relaxed and smiled in appreciation."  (Ex. B, Goldy Melber Letter at 6; *accord* Ex. C, Yehuda Weissmandl Letter at 1 (Aron "is also an exceptional son, caring tirelessly for his ailing mother and his suffering father. In the difficult and scary month of the Corona epidemic, Aron's mother unfortunately became serious ill with the Virus. Aron has relentlessly worried about her care, interacting with doctors and care givers and tending to her every need. Mrs. Melber is not out of the woods yet but the progress made is a direct impact of the tireless devotion that Aron contributed to her care.").)

Aron has attended to his father with equal devotion, particularly during the scary outset of the COVID-19 pandemic. As Aron's wife Rivka recalls:

> During these past months . . . Aron's father, also fought for his life. He was sick with Covid 19, fighting for every breath. Knowing how poor the hospital care was in those chaotic weeks, my husband, who was himself sick with the virus, was on call 24/7 to do everything possible so that his father could avoid going to the hospital. We had no rest. Those weeks were extremely stressful. We had no rest. At some point my husband heard about a special tea, cooked with various natural ingredients, which would minimize Covid symptoms. He would cook it fresh daily and deliver to his father. At long last the severe panic passed and my father in law was out of the woods. He was getting better.

(Ex. B, Rivka Melber Letter at 3-4.)

Aron does not reserve his care and concern for his own parents.  He "is a similarly devoted son in law, tending to the needs of an elderly mother-in-law."  Aron's mother in law, "Mrs. Green . . . raised a wonderful family of 17 children."  (Ex. C, Yehuda Weissmandl Letter at 1.)  Although she has 17 sets of children and children-in-law, "when she was unfortunately diagnosed with cancer and needed full time care," "[i]t was no surprise" that "Aron and his wife Rivky were the ones that stepped up and moved in next door to care for her. When her husband passed during the

peak of the pandemic in late March, it was Aron and Rivky that have been by her side caring for her every need."  (Ex. C, Yehuda Weissmandl Letter at 1.)

Aron also spent several years caring for his father-in-law, who suffered a stroke 20 years ago, and who tragically and suddenly succumbed to COVID-19 early on in the pandemic.  (Ex. B, Rivka Melber Letter at 2 ("The tragic sudden death of my beloved father is still fresh. He was so unexpectedly taken from us during the beginning of the covid 19 pandemic, leaving us with haunting nightmares of his final days alone in Mt. Sinai hospital. As a stroke patient, we have been at his side the past 20 years, yet unfortunately he was left to die alone. The pain is indescribable."); *accord* Ex. B, Izzy Green Letter ("On a personal note, one other thing that struck a chord for me was watching Aron care for our late grandfather the past few years. Our late grandfather was a community Rabbi for many years, he suffered from many health conditions, including 2 strokes. Aron cared for him with such love and devotion the past years.").)

Aron himself contracted COVID-19 in the spring, and continues to experience the virus' lasting effects.  *See, e.g.,* Michael Marshall, "The lasting misery of coronavirus long-haulers," *Nature* (Sept. 14, 2020).[1]  Even his own ailments in recent months have not impacted his continued dedication to ensuring the well-being of his parents and mother in law. Aron's ailing parents and other in-laws rely on his care and presence as they struggle to battle their severe illnesses.

### C. Aron is an Exceptionally Involved Father: His Animating Principle is Ensuring that His Children Never Suffer the Neglect he Did

Aron is also the father of nine children, ranging in age from 2 to 24 years old, each of whom depend on him.  (Ex. B, Basya Melber Letter at 3.)  "Aron takes his responsibilities as a father very seriously. He is never too tired or too busy, and his wife and children always come first." (Ex. C, Yehuda Weissmandl Letter at 1.)  Aron's care as a father is all the more exceptional

---

[1] Available at: https://www.nature.com/articles/d41586-020-02598-6.

because he suffered such a difficult childhood.  (Ex. B, Rivka Melber Letter at 1 (Rivka, Aron's

wife, "give[s] Aron credit, for being who he is, even though he himself had a very hard

childhood").)

And, although his family knows that he is devoted to his school and his students, Aron still

makes sure his children "know that 'family comes first' [i]s his way of life." (Ex. B, Malky Melber

Letter at 3; *accord* Ex. B, Goldy Melber Letter at 3 ("My father is very involved in community

activism. He is always helping people, giving hours of his time freely. Even so, he is never too

busy for family. We are his top priority.").)  "Aron is the most tuned in father a child could wish

for. Although he is so busy helping others, he is totally involved in each child's life." (Ex. B,

Rivka Melber Letter at 1.)  He "has a special knack to listen and listen all the way, with all his

heart, and what a big heart he has.  A heart so soft and so kind, so generous, so loving. A heart that

will never ever hurt or slight another being," he is "a role model to [his] children." (Ex. B, Rivka

Melber Letter at 1.)

> Aron gives his children individual attention, tending to each child's needs:
>
> Even if it's after a long, hard day for my father, you can't tell. He plays with the
> baby and listens with patience as my siblings and I tell him about our day. My little
> brother is a very picky eater. Some days he won't eat dinner unless my father spoon-
> feeds him. My father does it gladly, making supper a fun experience for him. He
> plays games with the kids and tells us interesting stories.

(Ex. B, Goldy Melber Letter at 4.)  Aron's wife Rivka counts on the active role that Aron plays in

raising their children with his happy and calm demeanor: "I don't perform so well when my eyes

are begg[ing] for just a little more rest, as a mother of a lively brood," but that is "no problem" for

Aron.  Rivka explains: "he is here for the precious bunch who are ready to start the new day, and

the morning routine is as smooth as can be." (Ex. B, Rivka Melber Letter at 2.)

> He gently dresses our preschooler each morning and hums a song while he feeds
> breakfast to our picky morning eaters. He believes kids need proper nutrition to

24

> focus and do well, and he gives his precious morning time to make sure breakfast
> gets eaten in a beautiful happy environment. He wishes them well as they skip out
> to the bus.

(Ex. B, Rivka Melber Letter at 2; *accord* Ex. B, Malky Melber Letter at 2 (Aron's "ever-present

caring help saves the day once again! He bends over to coax my little brother, who as all little kids

doesn't like healthy food, to put some nutrition into his mouth. He gladly circles the block with

my two-year-old sister since she wanted a ride in the car. And his patience and affection for all

ages seeps through!").)

Aron is also an extraordinarily animated and enthusiastic father to his nine children.  His

daughter Goldy recounts:

> After dinner Friday night my father holds the hands of the younger children and
> they sing together, sometimes marching around the room, giggling as they sing. My
> father makes home a joyous place. I also remember how, as a little child, we would
> sometimes run in circles with Totty, to the backdrop of lively music, faster and
> faster, until we dropped to the floor in heaps of laughter.

(Ex. B, Goldy Melber Letter at 4.)  "Some of [Goldy's] happiest childhood memories involve a

sunny afternoon spent with family in the park," she remembers frequently,

> laughing hysterically as we ran from my father in a game of tag. My father would
> often take us on fun outings, whether to the playground, zoo, a local park or farm.
> It was not the particular destination -- but going there with Totty -- that made these
> trips memorable . . . . I grew up feeling so lucky to have the best father ever and
> proud to be his daughter. I felt safe and protected in his presence; confident in his
> love. Now, years later, my feelings haven't changed.

(Ex. B, Goldy Melber Letter at 1; *accord* Ex. B, Basya Melber Letter at 1 ("I enjoy thinking about

the many summer outings which we did as a family. The fun began as we got into the car and went

uphill from there. We spent real quality family time as we picked fruits and vegetables in a farm

or while watching the animals in the zoo. My favorite were the parks where my father would race

us and played tag with us. We squealed in delight as we ran; playing with Totty was fun. With

Totty, even something as mundane as getting ready for bed was fun. Totty tickled us as he helped us unbutton our shirts. Anything we did with Totty was fun.").)

Aron's children have always relied on him for help when they have faced challenges. When his daughter Basya struggled to learn to read, Aron helped her with infinite patience.  (*See* Ex. B, Basya Melber Letter at 2 ("Totty chose the school he felt would be best for his girls, yet for some reason I struggled. Totty sat with me and practiced reading which eventually paid off.").) His daughter Basya reports, "Totty was always interested in what we were learning and wanted us to do well." (Ex. B, Basya Melber Letter at 2.)

Aron has always given his children's needs his undivided attention.  "Even though Totty is so busy, when I need advice or help or even just a listening ear, it's as if nothing else exists for him."  (Ex. B, Basya Melber Letter at 3.)  Aron's commitment to imparting patience and understanding on his children has made a real impact on their development as they have grown into adults. Aron' daughter Malky, who is 20, credits her father with guiding her journey into adulthood: "He listens as I explain how I see a concept and teaches me how to view life properly. And his constant listening ear communicates to me how to listen and behave as a grownup." (Ex. B, Malky Melber Letter at 2.)  His daughter Basya similarly recalls: "As an eighth grader I got into a fight with one of my classmates; my father helped me get the right perspective and showed me how to move on in life. Totty taught me to forgive and forget, to care and so much patience." (Ex. B, Basya Melber Letter at 3.)

Aron has also taken primary responsibility for navigating his children's health challenges: "A year ago [Aron's daughter Basya] went through a medical procedure."  She explains that: "Totty took me to the pre-op appointments including some last minute ones as complications arose.

When they wheeled me in, I felt calm knowing I'm not alone." (Ex. B, Basya Melber Letter at 4.)

Even when she encountered less serious health issues, Basya has always looked to Aron:

> Life has its hurdles; when they came I knew Totty would be there to help me. Totty took me to many doctor appointments. . . Totty was very on top of us taking our medicine anytime we were sick; he wanted us healthy as soon as possible. I remember Totty taking me to many different doctors because I had constant headaches. Not only did Totty carve out time in his busy day to take me, Totty did it with heart even buying treats and prizes on the way.

(Ex. B, Basya Melber Letter at 2.)

Similarly, when Aron's nine-year-old son required mental health counseling, Aron took charge of ensuring that he received the best possible care. Aron's wife Rivka recalls that Aron "did lots of research and set up one of our boys with an excellent therapist to help him with anxiety issues. Aron drives him to his appointment every week and lovingly waits to bring him home." (Ex. B, Rivka Melber Letter at 2.) Shia Beck, a staff therapist at Achieve Behavioral Health, who treats Aron's son for "Social Anxiety Disorder," describes that during meetings to "plan, discuss, and follow up on [Aron's son's] therapy goals, progress, and course of treatment," Aron "has consistently presented as a very dedicated, devoted, consistent and loving parent. He . . . consistently sought out new and better ways to help [his son] and his other children." (Ex. C, Shia Beck, MHC Letter.) Mr. Beck also reports that Aron takes a particularly proactive role in his son's treatment: "Mr. Melber frequently contacted me to check in on [his son]'s progress and collaborated with me and with [the] school to further [his son]'s academic, social and emotional success. In addition, Mr. Melber was always open to learning new parenting skills and to find new ways to enhance family relationships." (Ex. C, Shia Beck, MHC Letter.) Mr. Beck has concluded, based on his treatment experience that Aron's son:

> very much needs his father in his daily life. [He] feels safe, loved and accepted by his father and would be significantly negatively impacted by his father's absence. [Aron's son] is a child with specific challenges. His father's attunement, sensitivity

27

and availability make a significant, positive impact on [his] functioning and help improve his quality of life.

(Ex. C, Shia Beck, MHC Letter.)

Because Aron has taken such an active role in his children's lives, his grown children continue to depend on his love and support—particularly in the difficult time of the COVID-19 pandemic, that has killed one of his children's grandparents, and seriously sickened two more.  As Aron's daughter Goldy puts it:

> My parents raised us well, providing us with a solid education and everything we needed to develop into independent, contributing adults. Even so, inside, I'm still a little girl who needs her father's reassurance. I need him to hold my hand and lead the way. I count on his guidance and trust his advice, knowing that he loves me and has my best interests in mind. Like the rest of the world, my family experienced a major shake-up in the recent months. Throughout the long weeks of quarantine, the fear and uncertainty and the terrible pain of losing loved ones, my father remained a pillar of stability for our family, keeping us together with hope and faith and even positivity.

(Ex. B, Goldy Melber Letter at 6.)

Aron's family has already suffered so much loss during the pandemic—one grandfather succumbed to the illness, and a grandmother still on a ventilator, and several others hospitalized and on a slow path to recovery.  Aron's family needs him more than ever during these dark times. "[S]ometimes" Aron's younger children still "wake up at night with nightmares, needing to be calmed. Especially in these turbulent times, they badly need their father close so they can feel secure."  (Ex. B, Goldy Melber Letter at 6-7.)  Aron's wife Rivka puts it most starkly:

> At this very vulnerable time, when our children have lost so many special loved ones, when our children are helping out and watching both grandmothers struggling for their lives, each one fighting her own illness, I hope and beg not to shake up their world even more. We need stability, we need security. We need a father at home. We need Aron home. I plead to you, Dear Judge, please be compassionate, and please see Aron for who he really is.

(Ex. B, Rivka Melber Letter at 6.)

## IV.     A CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE DETERRENCE

Incarceration is similarly unnecessary to deter Aron, or others from committing similar crimes.  Aron is painfully sorry for his criminal conduct, and he recognizes the harm that his crimes caused underprivileged children who attend schools that depend on e-Rrate funding.  (Ex. A, Aron Melber Letter at 1 ("I am deeply and humbly sorry for the crime I committed . . . . My crime has harmed innocent students and risked the futures of many more.").)  Aron knows he "will carry the shame of [his] criminal conduct for the rest of [his] days," and recognizes that his "reckless decisions risked everything [he]care[s] about: [his] family, [his] students, [his] reputation as an educator in the Hasidic community."   (Ex. A, Aron Melber Letter at 1.)  He is committed to "work[ing] tirelessly to try and make amends."  (Ex. A, Aron Melber Letter at 1.)

Indeed, in addition to his $127,654.55 restitution and forfeiture payment, and indelible criminal conviction, Aron has taken concrete steps to make amends for his criminal acts.  He has "already stepped down from the school's financial administration and agree[s] not to have any input on the operations."  (Ex. A, Aron Melber Letter at 2.)  He has also devoted countless hours since the start of the COVID-19 lockdown this spring, mentoring teenage boys suffering from depression anxiety.  Aron views this work as but a first step towards making amends.  (Ex. A, Aron Melber Letter at 2 ("My only wish is that I have an opportunity to truly make amends for my mistakes, which have hurt so many.  As a start, for the last several months since the lockdowns in the spring, I have been tutoring Hasidic children suffering from isolation and depression.  I know this is only a small step.").)  With the opportunity, he plans to invest his time and energy to repay his debt to society and improve his community, after the harm that his crime wrought by diverting funds from schools serving underprivileged children. (Ex. A, Aron Melber Letter at 2 ("I agreed to receive Erate money for my school that should have gone to help other students . . . . I understand how deeply wrong my actions were.  I deserve whatever punishment the Court imposes.  My only

29

wish is that I have an opportunity to truly make amends for my mistakes, which have hurt so many . . . . I hope Your Honor will see fit to . . . give me the chance to continue working at Imrei Shufer and helping the many struggling students who need a caring mentor.").)

Aron has also expressed to countless friends, family and community members "how terrible he feels for the misdeeds and for not being the role model he should be" for his children and students who he holds dear.  (Ex. C, Shimon Rolnitzky Letter.)  Aron "recognizes how wrong his actions were," and knows that his mistakes have jeopardized the well-being of his family, his children, and his students: "he cannot bear to think about the consequences that his students may suffer for" his actions.  (Ex. C, Shimon Rolnitzky Letter; *accord* Ex. D, Elky Fekete Letter ("Rabbi Melber did something very wrong, and that he wasn't honest with a government application and program. But I can guarantee your honor that he learned his lesson, he feels terrible about his actions, and he feels even worse that his students could suffer because of what he has done . . . . I'm sure that Rabbi Melber will actually use his mistakes as a chance to teach his students respect for the law, so they can learn from his mistakes what not to do.").)

He also does not shy away from the very public shame he has endured because of his participation in this crime, which began from the moment of his arrest on the morning of his daughter's wedding.  Shmuel and Malky Green describe the scene:

> Aron's case went worldwide! THE BRIDE'S FATHER ARRESTED THE MORNING OF THE WEDDING DAY. Yes, this was true and took place at the Melbers. The cries of the youngsters, the bitter tears of the bride's mother and the bride herself! The long awaited day that was going to be so joyful became marred and fogged with the arrest of her dear father.  In this case the outrageous amount of shame and embarrassment was by all means the biggest form of punishment one can imagine!

(Ex. B, Shmuel and Malky Green Letter.)

30

Instead, Aron has used his position as an educator to educate his students, family and community—anyone who will listen—that his grievous mistakes should serve as a cautionary tale. As Aron's close friend, Yehuda Weissmandl explains:

> Aron has accepted responsibility for his actions. He pled guilty to the court and he also pled guilty to his family[,] his friends and his community. He has taken the time over the last few months to explain to all of us - his friends, neighbors, and the community more broadly - that he messed up and now he has to pay the price. His mistake pains him.  I've heard him explain to my children and our friends the importance of following the laws of this country and the obligation he has to society to pay for what he did.

(Ex. C, Yehuda Weissmandl Letter at 2; *accord* Ex. C, Aron Weider Letter ("I spoke to Aron recently, and what struck me the most was how openly remorseful he was for his actions."); Ex. C, Hersh Horowitz Letter ("I understand that he has been found guilty of fraudulent practices for which he has expressed his sincerest regret").)  Chaim Hersh Lebowitz, the principal of Imrei Shufer describes that Aron "is full of regret," and that "he teaches the students to learn from his mistakes to be honest all the time."  (Ex. C, Chaim Hersh Lebowitz Letter at 3; *accord* Ex. C, Rabbi and Mrs. B. Welz Letter ("Yes, he has sinned against the law. He is paying for it every day with the shame that he carries in the street."); Ex. C, Yoel Sterngold Letter at 1 ("Now, as he pleads guilty, I know that Aron is plagued with guilt and remorse. When I recently spoke to Aron, he expressed his regret in a profound way 'I admit that I was short sighted, thinking only of the now and how . . . . I know I didn't do the right thing. I would never do it again.'"); Ex. B, Goldy Melber Letter at 7 ("He is sincerely remorseful and teaches his children and students to be honest.").)

Aron is also unlikely to recidivate.  He is well beyond the age of offenders where recidivism is most prevalent.  *See United States v. Hodges*, No. 07-CR-706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-Booker, courts have observed that recidivism is markedly lower for older defendants"); *United States v. Sanchez*, No. 99-CR-338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant,

this Court and others have previously declined to impose lengthy guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'" (citing U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12 (2004) and collecting cases)); *see also United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) (reversing and remanding for resentencing because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"). Offenders like Aron who have a criminal history category of I and are between 41 and 50 years old recidivate a mere 6.9% of the time. *See Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines Release One,* Exhibit 9 (May 2004), http:/www.ussc.gov. The subset of true "first offenders," those who have zero Criminal History points, are even less likely to re-offend. *See* Ex. Six to *Recidivism and the "First Offender"*, *Release Two* (May 2004), http:/www.ussc.gov. Only 3.6% of defendants in this category re-offend in the 24 months following initiation of probation or release from confinement.

According to the Sentencing Commission's statistics, defendants sentenced for fraud crimes with a criminal history category of I are the *least likely to re-offend*. *See* Ex. 11 to *Measuring Recidivism.* The Sentencing Commission has also clarified that "[t]here is no apparent relationship between the sentencing guideline final offense level and recidivism risk . . . . the guideline offense level is not designed to predict recidivism, while the criminal history computation is designed to predict [it]." *Measuring Recidivism* at 13. A non-custodial sentence would achieve the deterrence envisioned by § 3553(a)(1)(C). Particularly given Aron's remorse, and the meaningful steps he has taken towards his rehabilitation, the goals of specific deterrence have already been met. *See, e.g., United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009)

(vacating sentence because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines.").

Finally, given the circumstances of Aron's case, incarceration is also unnecessary to achieve general deterrence. Although Aron participated in a scheme defrauding the e-Rate program, there is no evidence that Aron personally received any ill-gotten gains from the conspiracy.[2] Indeed, by all accounts, Aron has always lived a particularly modest material life. (*See* Ex. 3, Basya Melber Letter at 3.) Thus, unlike most white-collar cases, Aron did not reap substantial material profits from to his offense. The absence of pecuniary gain renders a custodial sentence that much less crucial for achieving general deterrence. *See, e.g., United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of . . . deterrence argue for punishing more heavily those offenses that . . . are lucrative"); *United States v. Nehmad*, No. 16-CR-829 (AKH), 2020 WL 4586798, at *2 (S.D.N.Y. Aug. 10, 2020) (general deterrence necessary for "a crime in which a wealthy man succumbed to avarice and greed") (quotation marks and citations omitted); *United States v. Baldassarre*, No. 11-CR-801-02, 2013 WL 3466562, at *3 (E.D.N.Y. Mar. 27, 2013) (general deterrence that is "achieved primarily by the term of incarceration" is important for those who would commit "securities fraud for pecuniary gain"). Whatever misguided reasons propelled Aron to engage in this crime, the consequences of his conviction—an indelible felony record, several years' of supervision severely curtailing his liberty, a $127,654.55 restitution and forfeiture judgment, and the shame of his indictment and arrest over

---

[2] Aron accepts full responsibility for his participation in diverting e-Rate funds intended for underprivileged children's schools, which were instead used to fraudulently obtain materials and services, such as internet connections, and cellphones for teachers at Imrei Shufer. He admits that as the school received equipment and services not authorized by e-Rate, which it would not have received absent the fraud. Aron has agreed to pay $127,654.55 in forfeiture for the fraudulent requests that he made on Imrei Shufer's behalf, which were funded by e-Rate.

two years ago on his daughter's wedding day—are sufficiently severe to achieve general deterrence in this case.

## V.  PROBATION RECOMMENDED A SUBSTANTIAL VARIANCE FROM THE ADVISORY GUIDELINES BASED ON ARON'S § 3553(A) FACTORS, BUT FAILED TO ACCOUNT FOR THE MITIGATING CIRCUMSTANCES SURROUNDING ARON'S OFFENSE

Based on Aron's lack of criminal history, his employment history, and his family responsibilities to his nine children and ailing mother, Probation recommended a one-year term of imprisonment below the advisory Guidelines range of 18 - 24 months.  (*See* PSR at 26-27.)  But, while Aron's conduct is admittedly serious and deserving of criminal sanction, respectfully, in concluding that a "custodial sentence would serve to reflect the seriousness of the offense and afford adequate deterrence to criminal conduct," (PSR at 27), Probation failed to account for Aron's relatively minor role in the conspiracy.  Specifically, Probation noted that as a school administrator Aron "signed many of the certifications allowing vendors to receive E-Rate funds for equipment that was never provided."  (PSR at 26.)  Imrei Shufer, Aron's school, was only one of several schools whose administrators similarly requested fraudulent USAC funds, (*see, e.g.*, PSR ¶ 22), but Aron was the only school administrator to receive criminal sanction for his role.[3] Without minimizing the seriousness of Aron's criminal conduct, for which he is deeply remorseful, (*see supra* § IV), because other school administrators were not prosecuted, it is clear that Aron played a relatively minor role in the scheme.  Six months' home confinement and 300 hours of

---

[3] Aron accepts full responsibility for his role in the conspiracy, including signing fraudulent e-Rate requests on behalf of Imrei Shufer, and initially offering to act as a broker for Sholem Steinberg and the e-Rate scheme.  Recognizing his conduct was wrong, Aron withdrew as a broker, however, and never actually caused any other school to place fraudulent e-Rate requests through Steinberg. Indeed, the forfeiture and restitution judgments reflect that improper funding of Imrei Shufer's fraudulent requests represent the only actual losses incurred due to Aron's crime—there is no evidence that other schools in fact made e-Rate funding requests at Aron's behest.

community service, in addition to Aron's felony conviction, and the severe collateral consequences he will suffer are just punishment, appropriately reflecting the seriousness of his offense.

## VI.    ARON'S FORFEITURE JUDGEMENT SHOULD BE JOINT AND SEVERAL WITH HIS CO-DEFENDANT SHOLEM STEINBERG

Aron's $127,654.55 forfeiture judgment should be joint and several with his co-defendant Sholem Steinberg.  Any funding requests that Aron made for Imrei Shufer were placed through Sholem Steinberg, who acted as the school's purported equipment vendor.  *See, e.g.,* PSR ¶¶ 22-23; *see also id.* ¶ 48 ("STEINBERG did land a large contract with one School, Imrei Shufer.").  Thus the $127,654.55 in proceeds that e-Rrate paid for Imrei Shufer's funding requests are encompassed in the $191,423.50 of actual loss attributed to and forfeitable by Steinberg.  *See* PSR ¶ 49.[4]  Indeed, Aron only indirectly received the fraudulent proceeds by benefitting from the school's receipt of equipment not authorized by e-Rate, but never obtained cash funds which e-Rate paid directly to the vendor.  In any event, the proceeds provided to the vendor on behalf of Imrei Shufer represent the universe of fraudulent proceeds.

Both Aron and Steinberg are responsible for the $127,654.55 of funding from e-Rrate represented by Aron's forfeiture plea, thus they "each can still be held liable to forfeit the value of those tainted proceeds."  *United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019) (quoting *Honeycutt v. United States*, 137 S. Ct. 1626, 1635 (2017)).  Still, the government is only entitled to recover the $127,654.55 of fraudulent proceeds once.  *See id.* at 67 (vacating forfeiture judgments against co-defendants where the total fraudulent proceeds were $9,703,995.33, but the codefendants "were ordered to forfeit $9,703,995.33 each rather than jointly and severally, for an approximate total of $19.4 million," finding that it was "error for the District Court to order the

---

[4] At the time of Aron's plea, the government orally expressed that it agreed that Aron's forfeiture judgment would be joint and several with Steinberg.

defendants to forfeit double that amount, and "vacat[ing] and remand[ing] with instructions to amend the judgments so that the defendants together are required to forfeit a total of no more than $9,703,995.33.").  Thus, any forfeiture judgment against Aron should be joint and several as to his co-defendant Sholem Steinberg.

## VII.   CONCLUSION

For the reasons stated above, Defendant Aron Melber respectfully requests that this Court impose a sentence of six months home confinement and 100 hours of community service for each of his three years of supervised release, which would be sufficient but not greater than necessary to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

Dated: October 27, 2020
          New York, New York

Respectfully submitted,

MEISTER SEELIG & FEIN LLP

By:     /S/

Henry E. Mazurek
Ilana Haramati
125 Park Avenue, Suite 700
New York, New York 10017
hem@msf-law.com
ih@msf-law.com

*Attorneys for Defendant Aron Melber*