Exhibit E

B"H



THE ALEPH INSTITUTE

NATIONAL HEADQUARTERS
9540 Collins Avenue, Surfside, FL 33154
Phone: (305) 864-5553

WEST COAST BRANCH
4221 Wilshire Blvd, #170-6
Los Angeles, CA 90010
Phone: (424) 210-3685
www.aleph-institute.org

**Rabbi Yossi Bryski**
ybryski@aleph-institute.org

**Chairman / Founder**

Rabbi Sholom D. Lipskar

**President**

Lloyd S. Rubin

**Board of Directors**

Robert Danial

Boruch Duchman

Joy Fishman

Stephen Fiske

Russel Galbut

Reuven Herssein

Daniel M. Holtz

Alberto Kamhazi

Sonny Kahn

Rabbi Aaron Lipskar

Rabbi Sholom D. Lipskar

Morris Mendal

Lloyd S. Rubin

David Schottenstein

Ryan Shapiro

Eric Stein

Sylvia Urlich

**Executive Director**

Rabbi Aaron Lipskar

**Director of Operations**

Moshe N. Barouk

**Director of Outreach Programs**

Rabbi Menachem M. Katz

**Director of Military Programs**

Rabbi Sanford L. Dresin

**Director of Advocacy**

Rabbi Zvi Boyarsky

**Director of Outreach Programs**

Rabbi Shua Brook

**Chief Financial Officer**

Yosie Lipskar

🖐  🖐  🖐  🖐

**Programs Coordinator**

Moshe Blizinsky

**Prisoner Services Coordinators**

The Honorable Kenneth M. Karas
United States District Judge
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

October 22, 2020

Re:     *United States v. Aron Melber*
        *Case No. 18-CR-614*

Dear Judge Karas:

With great respect and deference to the Honorable Court, I write on behalf of the Aleph Institute ("Aleph"), regarding the sentencing of Mr. Aron Melber. Aleph submits this letter and proposal to Your Honor, as a friend of the Court, seeking to humbly share Aleph's knowledge and experience with criminal sentencing as it relates to this particular case. We will never take such an opportunity for granted, and we hope that our communication with the Court will demonstrate the humility, deference and utmost faith we have in the Court to achieve the monumental task of choosing an appropriate sentence considering all the factors involved.

Rather than attempt to address any legal aspects of Aron's case, we strive to propose a sentence that effectively addresses the nature of his actions. We respectfully suggest that the sentence we propose in this submission will foster deterrence and will ensure that Aron pays his debt to society, while also providing meaningful rehabilitation. We further believe this proposal will promote respect for the law without unnecessarily burdening society.



### I.      **About Aleph.**

Aleph is a nonprofit organization, founded in 1981, that has provided support to thousands of individuals and their families who are enmeshed in the criminal justice and penal systems.  Aleph works closely with courts nationwide, as well as federal and state lawmakers and prison officials, to assist in the rehabilitation process of incarcerated individuals.  We are recognized by and work closely with the Federal Bureau of Prisons.  Aleph has created and implemented a host of programs over the past four decades that have achieved remarkable success in rehabilitating people and preventing recidivism.[1]  Aleph was a key proponent of the 2018 First Step Act, aiding in its passage.

Aleph has received incredible support and recognition from current and former members of the Federal judiciary, for which we are extraordinarily grateful.[2]  Aleph's mandate is perhaps best described by The Honorable Jack Weinstein (former Chief Judge for the Eastern District of New York):

> "Rabbi Sholom Lipskar, the guiding force of the Aleph Institute, and his associates understand . . . that each person deserves to be treated with respect as an individual personality and not as…as faceless number.  The Aleph Institute is doing extraordinary fine work.  Aleph helps in three ways. First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible.  Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire.  Third, it assists those on the outside, particularly the children of prisoners, to retain their ties with prisoners. As a result of its good work, Aleph is widely known and respected by penal and judicial authorities."

Our nearly four decades of experience assisting the courts have taught us that, in certain cases, many of the goals of the criminal justice system can be accomplished by alternative means and at little or no cost to the government, especially when Aleph is involved.[3]  Every submission that Aleph enters in federal cases carefully considers the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with . . . correctional treatment in the

---

[1] For more about Aleph, its philosophy and methods, see the attached Appendix 1 ("About Aleph").

[2] For several examples of such citations, see the attached Appendix 2 ("Comments on Aleph and Alternative Sentencing").

[3] See Appendix 3 ("Incarceration vs. Alternative Sentencing").

B"H



THE ALEPH INSTITUTE

most effective manner."[4]   Aleph has been closely involved with crafting and submitting numerous alternative sentencing proposals to federal and state judges and prosecutors around the country.[5]

Just last year, Aleph co-hosted (with Columbia Law School) the Rewriting the Sentence Summit on Alternatives to Incarceration in New York City to examine the tremendous changes taking place in the alternatives to incarceration arena.   This summit was attended by approximately 400 jurists, including 25 Federal judges.[6]  The two-day event featured some 80 speakers,[7] and included panel discussions on innovative sentencing practices nationwide, restorative justice, the role of mercy in our system, the merits of risk assessment tools, pretrial justice, and other current topics in criminal justice reform.

In the words of summit Chair, The Honorable Bernice D. Donald (U.S Circuit Judge for the Sixth Circuit Court of Appeals): "This is an opportunity to gather different constituencies in the criminal justice system to try to really put the humanity back into sentencing and to make sentencing more proportionate to mitigate the harm . . . Sometimes, we are, through the sentencing process . . . disregarding the humanity of the person and the potential productivity of that person."[8]  We were also very fortunate to host The Honorable Virginia Phillips (U.S. District Court Judge for the Central District of California), who spoke about the societal benefits of alternatives to incarceration.   At the summit, Judge Phillips described her participation in the

---

[4] 18 U.S.C. § 3553(a)(2)(A), (D).

[5] For examples of some of Aleph's successful alternative sentencing proposals, see <u>Appendix 4</u>: "Selected Successful Aleph Alternative Sentencing Cases."

[6] Participants included judges, prosecutors, defense counsel, probation and pretrial officers, individuals directly affected by incarceration, advocacy groups, and other key stakeholders in the criminal justice system.

[7] Speakers included Hon. New York State Attorney General Letitia James; Congressmen Hakeem Jeffries of New York and Doug Collins of D.C.; Hon. State's Attorney Marilyn Mosby of Baltimore, MD; Hon. Virginia Phillips, Former Chief U.S. District Judge for the Central District of California; Hon. Rodney Ellis, Commissioner of Harris County, TX; Hon. Esther Salas, U.S. District Judge for the District of New Jersey; Hon. Leo Sorokin, District Judge for the District of Massachusetts; Vincent Schiraldi, Co-Director of the Columbia Justice Lab; Hon. Larry Krasner, District Attorney of Philadelphia; Hon. Nancy Gertner, Professor of Law at Harvard Law School and former District Judge for the District of Massachusetts; Matthew Charles, a fellow at FAMM and the first beneficiary of the First Step Act; and Representative Roger Goodman, Chair of the House Public Safety Committee of the Washington State Legislature.

[8] www.chabad.org.



Conviction and Sentence Alternatives Program (CASA)[9] as "the most rewarding thing I have ever done.  I have been a judge since 1991, but the ability to sit down face to face, without our robes, and listen to the stories of the defendants, their day to day struggles . . . has been a very sobering but enriching experience."

Aleph's programs also include assigning Rabbis to counsel and assist individuals and their families to reduce or ameliorate necessary periods of incarceration and provide moral and ethical education.

## II.      Aron is A Strong Candidate For Alternative Sentencing.

### A.      A Man of Good Deeds.

On occasion, Aleph will be asked to provide a letter of support on behalf of a defendant in a criminal case where that defendant's positive acts, or contributions to their community, may be less than obvious.  Perhaps due to an unfortunate upbringing, unforeseen circumstances, or simply for inexplicable reasons, a life may take a wrong turn, leading to pain and suffering, remorse and regret, and unfulfilled promises and potential.  In such circumstances, we must seek out those "pearls" of inspired actions that support our firmly held belief that there exists a divine "life spark" within each of us, just waiting to be ignited.  Indeed, such individuals are no less worthy (and sometimes, in fact, may be more deserving) of our compassion and sensitivity.

We highlight this inescapable reality for an important purpose – in this case, for the purposes of contrast.  In Aron's case, we need not look very far to find good deeds. The abundance of caring, joy, warmth, compassion, sacrifice, devotion, and love is so evident in Aron's life, and in his actions, so as to be all-encompassing, bathing and enveloping the beholder in a warm glow of tenderness and commonality.  Aron's life is characterized by purposeful actions that provide his life, and the lives of those who surround him, with profound meaning.  For the purposes of this letter, we do not intend to repeat all of Aron's actions that have deeply and positively impacted so many others, but rather we hope to highlight some themes that seem particularly relevant.

#### 1.      Family.

The central theme in Aron's life is family.  Raised in a family of eight children, Aron was brought up having a strong relationship with his parents and with his siblings.

---

[9] The Conviction and Sentence Alternatives ("CASA") program is a post-guilty plea diversion program that offers a creative blend of treatment, sanction alternatives, and incentives to effectively address offender behavior, rehabilitation, and the safety of the community. www.cacd.uscourts.gov.



██████████    Aron explains how "all I wanted after living through those hard times was to help other children have smoother happier childhoods than I did."[10]  At the age of 19, Aron married Rivka, and together they were blessed with nine wonderful children, now aged between 2 and 24: Slava, Golda, Basya, Malky, ███████████ ███████████.  As Aron's daughter Basya explains, "as our family grew, so did my father's heart."[11]  Letters written by Aron's children abound with stories of joyous singing, dancing, and playing games in their home, and family outings to the zoo or to the park.  Aron's daughter Malky provides a deeply moving description of the Melber home:

> "We are nine siblings, the youngest is two and the oldest is twenty-four. We all need different types of support from our family, starting from youngest up: First, there is ██████. The sweetest two-year-old girl around who constantly acts in ways that lights up our home. Then, is ██████. He is six, the youngest boy in our family, and as such takes up a very special place. Next, is ██████, who is a lively, nine-year-old bringing excitement and energy into every corner. One before ██████ is ██████ who just turned fourteen. ██████ is a smart and humorous boy in the process of becoming a young adult. ██████ is one before him, and at almost seventeen years, is just a few years younger than me. As the oldest boy in our family, he is almost a grown man himself as he grows taller physically, spiritually, and mentally daily. Then, you've got the four girls: Me, Malky, I'm twenty years. Atop of me are my two sisters, Basya and Goldy who are twenty-two and twenty-three respectively. Being so close in age, they constantly keep each other busy, helping out around the house, and late night schmoozes. The fourth and oldest is my sister Slavy who at twenty-four years is already married yet pops over often, helps out, and comes up with fun and interesting activities and discussions."[12]

The Melber home is one of warmth and love, and as Malky explains, Aron and Rivka "make my home the rosy place it is."

Into each life some rain must fall, and the Melbers were not exempt. ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[10] See Letter from Aron Melber, attached as Exhibit A to Aron's Sentencing Memorandum.

[11] See Letter from Basya Melber, attached as Exhibit B to Aron's Sentencing Memorandum.

[12] See Letter from Malky Melber, attached as Exhibit B to Aron's Sentencing Memorandum.



███████████████████████ █ ███████████████████ Aron and Rivka enrolled their son in a different school where their son could thrive in a more accepting environment. From these beginnings grew Aron's devotion to the Imrei Shufer school.

2.   *Imrei Shufer*.

The Imrei Shufer school became another central theme in Aron's life. Borne from Aron's and Rivka's need to ensure that their son was safe and in a welcoming environment, Imrei Shufer became Aron's labor of love. In the sometimes judgmental and unforgiving Hasidic Jewish Community, a child's education plays a central role. In this insular community, each student's family background – wealth, social status, reputation – is widely known. Tuition can be prohibitively expensive. For an orphaned, special needs, or even a child of divorced parents, gaining "acceptance" can be a challenge in itself. Imrei Shufer provided a welcoming environment, and Aron was always there, doing his best to make sure that the school could survive. Imrei Shufer's more than 150 students became Aron's "extended family," and the examples of Aron's toil, compassion, and sacrifice in support of the school are numerous and need not be repeated here. These are more examples of Aron's good deeds.

**B.   Shame, Remorse and Regret.**

Aron has expressed to his friends, family and community members "how terrible he feels for the misdeeds and for not being the role model he should be" for his children and students who he holds so dear. Aron's actions were undertaken in order to support Imrei Shufer – a school that, for deeply personal reasons, had become a labor of love. Nevertheless, Aron recognizes how wrong his actions were, and he knows that his mistakes have jeopardized the well-being of his family, his children, and his students: "he cannot bear to think about the consequences that his students may suffer for" his actions. [14] Aron's friend of ten years, Yoel Sterngold, explains:

> "I know that Aron is plagued with guilt and remorse. When I recently spoke to Aron, he expressed his guilt in a profound way 'I admit I was short sighted, thinking only of the now and how. All I could think of was 'another year to fund the schooling for those that need me most.' I know I didn't do the right thing. I would never do it again.'"[15]

---

[13] See Letter from Rivka Melber, attached as Exhibit B to Aron's Sentencing Memorandum.

[14] See Letter from Shimon Rolzinitzky, attached as Exhibit C to Aron's Sentencing Memorandum.

[15] See Letter from Yoel Sterngold, attached as Exhibit C to Aron's Sentencing Memorandum.



THE ALEPH INSTITUTE

Aron has used his position as an educator to educate his students, family and community – anyone who will listen – that his grievous mistakes should serve as a cautionary tale.  As Aron's close friend, Yehuda Weissmandl explains:

> "Aron has accepted responsibility for his actions. He pled guilty to the court and he also pled guilty to his family his friends and his community. He has taken the time over the last few months to explain to all of us – his friends, neighbors, and the community more broadly – that he messed up and now he has to pay the price. His mistake pains him.  I've heard him explain to my children and our friends the importance of following the laws of this country and the obligation he has to society to pay for what he did."[16]

Chaim Hersh Lebowitz, the principal of Imrei Shufer, explains that Aron "is full of regret," and that "he teaches the students to learn from his mistakes to be honest all the time."[17]  Aron wishes only to make up for his wrongs by serving his community, improving his spiritual life, and continuing to be present for his family and for his students.

Aron is deeply remorseful for his actions.  He has taken every aspect of these charges and the judicial process to heart.  He has demonstrably internalized all the lessons that a traditional sentence of incarceration would be intended to teach him.  He has fully accepted and understood his responsibility for his failures and the harm they caused, and he has engaged in sincere and deep soul-searching to understand his actions and their causes.  As Aron explains, "I understand how deeply wrong my actions were . . . My only wish is that I have an opportunity to truly make amends for my mistakes, which have hurt so many."

Aron has also suffered significant and very public shame stemming from his participation in this crime, which began from the moment of his arrest the morning of his daughter, Malky's, wedding.  That long-awaited day that was intended to be so joyful was instead punctuated by Aron's arrest.  In the insular and conservative community in which the Melber's lived, the shame and embarrassment felt by Aron was tremendous.  Speaking with Aron, his friends and his family members, it becomes

---

[16] Letter from Yehuda Weissmandl, attached as Exhibit C to Aron's Sentencing Memorandum.

[17] Letter from Chaim Hersh Lebowitz, attached as Exhibit C to Aron's Sentencing Memorandum.



clear that regret and remorse creeps into his every waking moment.  Aron is a man who understands remorse, and remorse has a tremendous ability to rehabilitate.[18]

## III.  <u>Proposed Sentence.</u>

Imposing a sentence in any criminal case is a monumental task, and we defer to Your Honor's learned judgment in the consideration and application of all of the relevant factors.  As Judge Denny Chin of the Second Circuit has observed, "in deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."[19]

Under 18 U.S.C. § 3553(a), the sentencing court may consider the traditional sentencing factors of retribution, deterrence, incapacitation, and rehabilitation, as well as the "nature of the offense," and the "characteristics of the defendant" in crafting an appropriate sentence.[20]  Aron's personal history and the nature of the conduct for which he was convicted suggest that alternative sentencing is appropriate in his case. Without question, Aron's actions were wrong and require an appropriate response. However, alternative sentences can be, in many ways, as demanding or more demanding than traditional sentences, and as such they can achieve the same punitive goals.

The following is a summary of the alternative sentence that we ask the Court to consider for Aron:

---

[18] Aleph is not alone in its view that feelings of guilt, remorse and regret have significant rehabilitative potential - the psychological science supports this view as well.  Research has shown that "when people feel guilt about a specific behavior, they experience tension, remorse and regret . . . this sense of tension and regret typically motivates reparative action - confessing, apologizing, or somehow repairing the damage done."  As these experts confirm, "*proneness to guilt predicts less recidivism - a lower likelihood of re-offense*" (emphasis added).  In other words, the more inclined an inmate is to feel guilt, the less likely he or she is to re-offend. *After Committing a Crime, Guilt and Shame Predict Re-Offense*, Association for Psychological Science, February 11, 2014, citing *Shame, Guilt and Remorse: Implications for Offender Populations*, June Price Tangney, Jeff Stuewig and Logaina Hafez, J Forens Psychiatry Psychol, September 1, 2011, 706-723.

[19] *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

[20] *United States v. Rivera*, 281 F. Supp. 3d 269, 271 (E.D.N.Y. 2017).



### A.    <u>Home Confinement</u>.

*Proposed Sentence Component:  Six months' home confinement.*

Many Americans fail to fully consider the impact of skyrocketing incarceration levels in the United States.  We respectfully submit that the public might be less inclined to support incarceration as the default punishment if more were known about the collateral and unanticipated costs of imprisonment, especially for the children of incarcerated parents.[21]  In choosing an appropriate sentence for Aron, this Court can avoid these significant collateral consequences through the careful and appropriate use of alternative sentencing.

Our ethical considerations and experience lead us to believe that the best way to address law-breakers who do not pose an active threat to society is to keep them in their community, with a mandate to directly address both the root causes and the consequences of their offense.  There is little research to suggest that lengthy prison sentences further any legitimate penological goal other than mere punishment.  The National Institute of Justice, which is tasked by the U.S. Department of Justice with research, development and evaluation of criminal justice practices, has concluded that "long prison sentences do little to deter people from committing future crimes."[22]

In contrast, in our experience, lengthy periods of incarceration inhibit defendants from fulfilling their potential, and they devastate the family and community left behind, breeding bitterness, anger, insensitivity, and eventual recidivism. Too many defendants "lose their claim to a future" when "lengthy prison terms" are imposed in place of "reasonable, innovative, and promising alternatives to incarceration."[23]  That is why we advocate, in appropriate cases, for sentences that include an alternative, non-custodial component.  The non-custodial element of the sentence allows offenders to directly address the shortcomings within themselves that led to their offense, while also giving them an opportunity to use their conviction as a conduit to improve the world around them.

---

[21] John Hagan and Ronit Dinovitzer, *Collateral Consequences of Imprisonment for Children, Communities, and Prisoners*, 26 CRIME & JUST. 121, 152 (2013).

[22] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Five Things About Deterrence, Last Modified June 6, 2016, <https://nij.gov/five-things/pages/deterrence.aspx>.  *NB,* the NIJ does not set or represent the official position or policies of the U.S. Department of Justice.

[23] *United States v. Dossie*, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) (internal quotation marks omitted).



THE ALEPH INSTITUTE

In addition to these individual and community considerations, "the consequences of incarceration on family members are numerous and they place already fragile families at increased risk."[24]  Indeed, "children of incarcerated parents are among the most at-risk, yet least visible, populations of children. Parental incarceration serves as a significant risk factor for a host of negative consequences, particularly with respect to emotional and behavioral factors, physical care and custody, and context with the parents."[25]

Aron is a father to nine children – including five children between the ages of 2 and 15.  A lengthy period of incarceration will cause deep and lasting harm to them.  The single most devastating (and often overlooked) collateral damage stemming from incarceration is inflicted upon the children of those incarcerated.  The damage to these children is vast, deep and pervasive because it comes at an age when the child is in his or her formative stage – the most critical time in a child's life.  These effects manifest in poor self-esteem, under-performance in school, and drug use.  Aleph's family services department has personally witnessed the painful reality of the children of inmates who have attempted suicide or turned to drugs.  Tragically, in the case of one family with whom Aleph was involved, one of the daughters whose father recently received a lengthy sentence for a financial crime committed suicide.  It is not a stretch to say that a judge sentencing an individual also sentences his family.

Urgent pleas from Aron's children demonstrate poignantly just how desperately they need their father to be in their lives.  As Basya states, "please understand the depth of the plea of a daughter, who wants her father home."[26] Goldy explains:

> "my parents raised us well, providing us with a solid education and everything we need to develop into independent, contributing adults.  Even so, inside, I'm a little girl who needs her father's reassurance.  I need him to hold my hand and lead the way.  I count on his guidance and trust his advice, knowing that he loves me and has my best interests in mind."[27]

Malky describes how "I wonder if words can ever portray even one raindrop of the ocean of what my beloved father is to me, for words can never describe the feelings and emotions that flow in my heart with gratitude to my father."  There is no substitute for a father's presence in a child's life, and unfortunately, Aron had to experience this

---

[24] Kolina J. Delgado, The Impact of Incarceration on Families: A Summary of the Literature, WRIGHT STATE UNIVERSITY CORE SCHOLAR: PSYCHOLOGY at 14 (2011) < http://corescholar.libraries.wright.edu/psych_student/5>.

[25] Id., at 9.

[26] See supra, note 11.

[27] See Letter from Goldy Melber, attached as Exhibit B to Aron's Sentencing Memorandum.



reality in a most traumatic way.  His children need their father for his support, guidance, and protection.

For the foregoing reasons, we humbly submit that six months' home confinement meets the requirements of 18 U.S.C. § 3553(a).

### B.    Community Service.

*Proposed Sentence Component:  300 hours' community service to include mentoring youth in his community, preparing and implementing a school curriculum focusing on the importance of inclusivity, and assisting in the delivery of computers to children in need.*

#### 1.    Mentoring Youth.

Aron is currently mentoring three teenage boys in his community.  They are teenagers who already lacked the presence of an adult role model in their lives, and the isolation resulting from Covid-19 only worsened their conditions.  Aron takes them out 2-3 times a week, for 2 hours at a time.  He helps them manage their anxieties, fears and intense loneliness.

#### 2.    Inclusivity Education.

Aron's passion was directed towards his school, Imrei Shufer.  As eloquently described by so many people who have taken their time to write on his behalf, Aron has dedicated his life to helping and accepting into his school Jewish children who would otherwise have nowhere to go.  Many of his students come from broken or atypical families, and sadly, they are shunned by most of the other Jewish schools.  Aron strongly believes in inclusivity: that every Jewish child should have a chance at a Jewish education, and should not be rejected on account of not conforming to the standard of perfection arbitrarily set by many private Jewish schools.

Aron proposes to create a detailed curriculum focusing on the importance of inclusivity, and then to implement this curriculum in schools in his community, as well as in the public school system.  It would be a 4 week curriculum, directed at children between the ages of 5 and 9, and focusing on the importance of accepting others, regardless of their race, religion, disability or special needs.

#### 3.    Computers for Children in Need.

Aron misused funds that were intended to provide students more access to technology. Covid-19 has heightened the need for access to technology and computers, particularly for low income families. To demonstrate his remorse, Aron will partner with Aleph



and Family Services in Rockland County to facilitate the delivery of computers and related equipment to children in need.

## IV.   Application of Section 3553(a) Sentencing Factors.

### A.   Retribution

Aron will serve a period of home confinement, which would significantly punish him by limiting his movement and forcing him to comply with the terms of his supervision. Moreover, under our proposal, Aron will continue to have requirements placed on him in the form of community service obligations.  While he will no doubt gain valuable experience from the community service that we outline, it will also impose a substantial burden.

While not a formal element of our proposal, as previously discussed, it cannot be denied that Aron has already experienced tremendous shame and humiliation as a result of his arrest and conviction.  The shame Aron has undergone is magnified because of the impeccable reputation that he held prior to his arrest. The Bible, Maimonides, and Jewish Law all emphasize the power that shame has to transform a person's actions, and as such we believe that shame suffered by an individual should not be undervalued or unappreciated.

### B.   Deterrence

The term of confinement that is part of our proposal will additionally serve to deter Aron from engaging in any future misconduct, and, along with his community service obligations, will deter others as well.

Whereas a lengthy prison sentence often fails to provide adequate deterrence, shame succeeds. Shame is a powerful reason that non-custodial sentences can be effective in deterring criminal conduct and, for the reasons discussed above, Aron's shame is acute.

Further, both due to Aron's age and the nature of his crimes, Aron is a low risk for recidivism. It is well established that recidivism is considerably lower for older defendants.[28] Moreover, non-custodial sentences for financial crimes can be as

---

[28] See, e.g., *United States v. Hodges*, No. 07 Cr. 706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-Booker, courts have observed that recidivism is markedly lower for older defendants") and *United States v. Sanchez*, No. 99 Cr. 338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy guidelines



effective in deterring future crimes as prison sentences. Under earlier iterations of the Sentencing Guidelines, white-collar criminals were less likely to be incarcerated because they "suffer greater stigma from conviction." Empirical studies of this prior approach to sentencing – which utilized primarily non-custodial sentences for white-collar offenses – suggest that these sentences were as efficient as the more punitive sentences that are currently reflected in the Sentencing Guidelines.[29]

### C.   Incapacitation

Aron has never been in trouble with the law before, and the behavior that gave rise to his conviction was completely out of character for him. He understands the damage he caused by his mistakes. Therefore, it is highly unlikely that Aron will reoffend.

### D.   Rehabilitation

Our proposal is specifically tailored to address the rehabilitative goal of sentencing. As many scholars, the Supreme Court, and the Rabbis at Aleph have all observed, prison is often not conducive to "promoting correction and rehabilitation."[30] This is because rehabilitation is a "forward-looking" concept, promoting resocialization by emphasizing "personal reform over punishment" and "illuminat[ing] the criminal's inner struggle,"[31] and as such only works when combined with an intense personal commitment to change. Perhaps understandably, though imprisonment may satisfy a thirst for retribution, the prison environment rarely inspires this commitment in the incarcerated individual. As Judge Richard Lowell Nygard once observed, "people – offenders included – change because they see something in themselves they do not like, and they reach down inside themselves and change it. Most criminal offenders who change for the better do so in spite of prison not because of it."[32]

Whereas prison may not promote rehabilitation, community-based programs like Aleph's proposal are often effective at restoring an individual's commitment to ethical behavior. The same characteristics that have made Aron such a source of strength for

---

sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'" (citing U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, 12 (2004)).

[29] *Id.*

[30] *Tapia v. United States*, 131 S. Ct. 2382, 2387 (2011)*; see also* Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 460 (2016).

[31] Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 458-60 (2016).

[32] Richard Lowell Nygaard, *Crime, Pain, and Punishment: A Skeptic's View*, 102 Dick. L. Rev. 355, 362-63 (1998).



his own family and community, including his strong history of selfless giving and mentorship, will ensure that his efforts have a strong positive impact for those with whom he interacts under the terms of this proposal. We hope that he will be able to reach his own full potential as he rehabilitates himself through hard work in the community and that, in the process, he will push others to reach their full potential.

## V.      Conclusion.

Your Honor, we believe that Aron presents a compelling case for alternative sentencing. We are aware that this Court has wide-ranging discretion to consider any or all of Aron's unique circumstances as a basis for sentencing, and we have complete faith that Your Honor will impose a fair and just sentence upon consideration of all of the relevant sentencing factors. Aron's significant contributions to his community, his role as a loving and caring father, and the profound remorse that he feels and expresses, we believe cry out for alternative sentencing in this case.

We respectfully submit that our recommendation will adequately protect society while addressing the specific needs of Aron's rehabilitation. It would also effectuate the purposes of, and be consistent with, the sentencing goals enumerated in 18 U.S.C. § 3553(a), and would offer all the benefits underlying a sound corrections policy, while avoiding additional and unnecessary negative or harmful consequences.

Aleph stands ready to remain involved, as the Court sees fit, and has the experience and infrastructure to support Aron as needed. Aleph would be pleased to facilitate and supervise Aron's community service program, and would provide regular and detailed progress reports to the Court and to the Probation Office should the Court so instruct.

With the utmost respect and admiration for Your Honor's wise and compassionate decisions, I hope and pray that this submission will receive the consideration that will produce good results for society, and for Aron and for his family.

Respectfully submitted,

/s/ Yossi Bryski

Rabbi Yossi Bryski



# APPENDIX 1

# ABOUT ALEPH

*No One Alone. No One Forgotten.*

## INTRODUCTION

Aleph was founded in 1981 in the chambers of the Hon. Jack Weinstein, then-Senior District Judge of the United States District Court for the Eastern District of New York, at the behest of the Lubavitcher Rebbe. Aleph provides direct supportive services for criminal defendants, incarcerated persons, and their families, in order to provide a light during some of the most trying times in their lives. Aleph also advocates on behalf of individual criminal defendants in limited circumstances, and regularly commissions amicus briefs promoting favorable policy changes. In the nearly 40 years since its inception, Aleph has gained substantial experience and insight in the area of alternative sentencing.

Sentencing proposals prepared by Aleph are designed to mete out appropriate, substantive punishment with the greatest benefit and lowest cost to society, while redirecting and enhancing an individual's value structure through social, therapeutic, and moral counseling and education. Every proposal Aleph submits to the federal courts carefully considers the factors outlined in 18 U.S.C. §3553(a) including, but not limited to, "the history and characteristics of the defendant," id. §3553(a)(1), and the legislative directive to provide, "correctional treatment in the most effective manner." *Id.* at §3553(a)(1)(D). Moreover, we have, in hundreds of varied cases and situations, worked to assist courts in fashioning a particularized sentence, "sufficient, but not greater than necessary," to comply with the purposes set forth in the relevant sentencing statute. 18 U.S.C. §3553(a).

Aleph maintains certain parameters that must be satisfied before it will advocate for a defendant with regard to sentencing: the offense of conviction must not involve actual use of predatory violence; the defendant must accept responsibility for his or her conduct and express genuine remorse; and we must be confident that the defendant does not pose a future threat to society.

Judge Weinstein described Aleph as follows:

> [T]he Aleph Institute…understands and forces us to face the fact that each person deserves to be treated with respect as an individual personality and not as…a faceless number…The Aleph Institute is doing extraordinary fine work. Its assistance to defendants and their families provide standards of compassion and aid worthy of emulation…

> Aleph helps in three ways: First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those outside, particularly the children of prisoners, to retain their ties with prisoners. As

a result of its good work, Aleph is widely known and respected by penal and judicial authorities.[1]

The Honorable Joy Flowers Conti, Chief District Judge of the United States District Court for the Western District of Pennsylvania, has noted, "You at Aleph are doing extraordinary things on behalf of the judges in my court. We appreciate the work that you do." (Address to the Pittsburgh Chaplains Conference, November 19, 2014.)

Our many years of experience have taught us that, in certain cases, the goals of the criminal justice system can be accomplished by alternative means. Motivated by that belief, we have endeavored to become a resource to those seeking reform of the criminal justice system, and in particular, alternative sentencing.

## PHILOSOPHY

Since inception, Aleph has developed institutional expertise with various sentencing modalities. In analyzing the nature and form of sentencing, Aleph has developed the view that custodial sentences should be reserved for predatory individuals as well as individuals that pose a significant or ongoing danger to society. We agree with William Fitzpatrick, the former President of the National District Attorneys' Association, who suggests that society "use prison for those we are afraid of, not those whom we are mad at based upon their behavior."[2]

Aleph's perspective on sentencing is based on these convictions and supported by a consensus of social scholars and legal academics that study penal policy. For more on the relative merits of alternatives to incarceration, please see Appendix C.

## ROLE

Our extensive experience has taught us that many of the goals of the criminal justice system can often be accomplished through alternative means. Motivated by that belief, Aleph endeavors to become a resource to those seeking reform of the criminal justice system, and in particular, alternative sentencing. We often advocate for sentences that include an alternative, non-custodial component. The non-custodial nature of the sentence allows individuals to directly address the shortcomings within themselves that led to their offense and give them an opportunity to use their conviction as a conduit to improve the world around them.

In our role as advocating for a better approach to sentencing, we believe it is imperative to regularly bring thought leaders together with judges and prosecutors to discuss the sentencing framework. Over the past few years, we have held two conferences that focused on alternatives to incarceration.

---

[1] Jack B. Weinstein, *Prison Need Not Be Mandatory: There Are Options Under the New U.S. Sentencing Guidelines*, 1 Judge J. 16, 28 (1989).
[2] April 26, 2016 letter to Senators Mitch McConnell, Senate Majority Leader, and Harry Reid, Senate Minority Leader.

In March 2016, we organized and hosted a symposium at Georgetown Law School, the Alternative Sentencing Key Stakeholders Summit ("ASKS Summit"). Building on the success of the ASKS summit, we hosted another summit, Rewriting the Sentence, in June 2019 at Columbia Law School. The Rewriting the Sentence summit convened more than 400 judges, prosecutors, defense counsel, probation and pretrial officers, individuals directly affected by incarceration, advocacy groups, and other key stakeholders in the criminal justice system to examine the tremendous culture change taking place in the alternatives to incarceration arena. The summit highlighted an array of alternative approaches to criminal justice currently isolated in pockets throughout the country and brought together leaders of innovation in the field to broadcast best practices and ideas for further implementation of alternatives. The Federal Judicial Center sponsored a cohort of federal judges from all over the country to attend the summit.

Some 80 speakers were featured over the two-day convening, including: a panel of reform-minded newly elected DAs, highlights of innovative practices nationwide, and panels on restorative justice, the role of mercy in our system, the merits of risk assessment tools, pretrial justice, and other hot topics in justice reform. Speakers who imparted their views on criminal justice policy relating to incarceration included Hon. New York State Attorney General Letitia James; Congressmen Hakeem Jeffries of New York and Doug Collins of D.C., who championed the recently passed First Step Act; Hon. State's Attorney Marilyn Mosby of Baltimore, MD; Hon. Virginia Phillips, Chief U.S. District Judge for the Central District of California; Hon. Rodney Ellis, Commissioner of Harris County, TX; Hon. Esther Salas, U.S. District Judge for the District of New Jersey; Hon. Leo Sorokin, District Judge for the District of Massachusetts; Vincent Schiraldi, Co-Director of the Columbia Justice Lab; Hon. Larry Krasner, District Attorney of Philadelphia; Hon. Nancy Gertner, Professor of Law at Harvard Law School and former District Judge for the District of Massachusetts; Matthew Charles, a fellow at FAMM and the first beneficiary of the First Step Act; and Representative Roger Goodman, Chair of the House Public Safety Committee of the Washington State Legislature. A complete list of speakers is available at www.rewritingthesentence.org/agenda.

Also at the conference, Aleph formally announced the formation of the Center for Fair Sentencing, a clearinghouse that hosts a digital portal on alternatives to incarceration. The Center will bind together the community of stakeholders exploring or exemplifying the best practices in alternative programs; provide data and analysis; lift up examples of programs using data-informed approaches and best practices; publish turnkey guides, such as one for establishing alternative programs; proffer policy white papers and reports; and advocate for expansion of the use of non-custodial approaches throughout all stages of the criminal legal system. As a result of the 2016 and 2019 conferences, we have been able to collect critical data in helping us prepare the recommendation that we are providing in this situation.

In addition, Aleph regularly pursues executive clemency for individuals. Most recently, Aleph successfully lobbied the Trump administration to commute the sentences of two individuals.  The first, Rabbi Sholom Rubashkin, was serving a 27-year sentence imposed as a result of a raid on his kosher meatpacking plant that uncovered irregularities. The second is Ronen Nahmani, who was serving a 20-year sentence for selling a synthetic marijuana analogue product at a time when the status of the substance was legally fluid. While Ronen was languishing in prison for what was

essentially a regulatory offense, his five young children were on the verge of becoming orphans as his wife was suffering from an aggressive form of breast cancer with a poor prognosis.

Aleph was also one of several organizations who participated in the drafting of The First Step Act, Pub. L. No. 115-391 (2019).  Aleph's input was instrumental in adding non-violent financial offenders to the category of persons eligible for relief under the statute.


## BASIS OF PHILOSOPHY

At a fundamental level, we center our work on the belief that, as Rabbi Schneerson, *of blessed memory*, said: "Our souls cannot be broken that they should need repair, nor deficient that they should need anything added. Our souls need only to be uncovered and allowed to shine." We start from the premise that the individuals in the criminal justice system are, first and foremost, human beings in need of rehabilitation and reform. We inevitably arrive at the conclusion that the system needs to fundamentally change and more compassion should be shown. The current mindset that incarceration is the default for malfeasance is failing society and the individual; the objective should be restorative justice. The Bible's code of civil law mandates the establishment of courts of justice to judge and sentence lawbreakers. However, prison is conspicuously absent as a form of punishment. This is based on the Torah principle that everything in the world was created by G-d for a positive purpose and that every individual, no matter their shortcomings, has a mission to fulfill.[3]

## SELECTING CLIENTS

We infuse this philosophy through every case that we accept. Our advocacy is deeply rooted in our conviction that incarceration should not be used as a default punishment absent a compelling need. We are selective in the cases that we take on. Our criteria include the following:

- · The potential client is not charged with an offense of a predatory nature, a sex offense, or arson.

- · The potential client expresses clear and genuine remorse.

We are extremely careful in identifying cases that are especially amenable to alternative approaches, and we strive to ensure that our submissions carefully consider the factors outlined in 18 U.S.C. §3553(a), with a particular focus on the legislative directive to "provide the defendant with...correctional treatment in the most effective manner."[4] Aleph provides all services *pro bono* and we do not accept any payment or remuneration. Rather, Aleph tries to assist courts in fashioning particularized sentences that are "sufficient, but not greater than necessary" to comply with the purposes set forth in the relevant statute.[5]

---

[3] Talmud Shabbos 77b; Bereishis Rabba 44:1, 10:7.

[4] 18 U.S.C. §3553(a)(2)(A), (D).

[5] *Id*.



# Appendix 2

# Comments on Aleph and Alternative Sentencing



Over the past decades, Aleph has received incredible support and commendation from current and former members of the federal judiciary, for which we are extraordinarily grateful. Below are several comments from the judiciary about Aleph and alternative sentencing:



"Rabbi Sholom Lipskar, the guiding force of the Aleph Institute, and his associates understand… that each person deserves to be treated with respect as an individual personality and not as…as faceless number. The Aleph Institute is doing extraordinary fine work. Aleph helps in three ways. First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those on the outside, particularly the children of prisoners, to retain their ties with prisoners. As a result of its good work, Aleph is widely known and respected by penal and judicial authorities"**—Hon. Jack B. Weinstein of the U.S. District Court Judge for the Eastern District of New York, Eastern District of New York**



"Aleph historically has upheld the goals of sentencing by urging prudence to protect society, and humanity to recognize that it is people we are sentencing." **—Former Attorney General and Chief Judge of the United States District Court for the Southern District of New York, Michael B. Mukasey**



"For over 35 years Aleph has been championing and delivering justice to people who have been overlooked or forgotten by the rule of law, giving them hope, relief from suffering and the chance to improve their lives and fortunes. Both these individuals and the Nation are the beneficiaries of Aleph's goodness and mission."**—Former Director of the FBI, Louis Freeh**



"We need to prove going forward what I know in my bones is the truth, which is, these [alternative sentences] work, just as they worked in the states. And they put a human face on a criminal justice system that, for the last 25-30 years, is so desperately in need of a little humanity. This is the right thing to do."— **Hon. John Gleeson, former District Judge of the United States District Court for the Eastern District of New York (ret.), speaking at an alternative sentencing summit that Aleph hosted.**





"The opportunity to work as a conviction and sentence alternative (CASA) judge is the most rewarding thing I have ever done. I have been a judge since 1991, but the ability to sit down face to face, without our robes, and listen to the stories of the defendants, their day to day struggles… has been a very sobering but enriching experience. Their car breaks down, they can't get to work, then they are evicted, then their kids are taken—something as simple as a car breakdown can start this chain of events. People who are living so close to the edge, even when they are trying very, very hard, it doesn't take much to send their lives into a downward spiral."**—Hon. Virginia Phillips, Chief U.S. District Judge, California, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"While judging, in general, requires the application of law to the facts, sentencing requires more. It necessarily involves empathy and compassion, which Aleph surely brings to the table. **At a time when sentencing principles are changing, Aleph's input is invaluable.** It provides careful analysis of alternatives to incarceration entirely consistent with – and some may say better suited to – public safety. It provides a critical link between prisoners and their families and friends, making certain that prisoners – human beings – do not disappear behind the walls. Put simply, Aleph brings to bear its reservoirs of compassion and empathy, both before during and after punishment has been imposed, and has been doing so for 35 years; The men who [I sentenced years ago and] I am following now, their stories are simply extraordinary. The time lost in their lives, the families that have disintegrated because they were put in a prison in the middle of the country, the relationships that they may have had, that were not fabulous to begin with, but at least were something. We have to talk about what do we do to repair these communities."**—Hon. Nancy Gertner, Judge, United States District Court of Massachusetts, Ret., and Professor at Harvard Law School**



"I think we are all in agreement this has been an extraordinary summit….35 years ago, a young Rabbi started some educational institutions, believing… that education was a fundamental right and goal of all people. He also had an interest—because of faith, belief and experience—that reforms could be made in the criminal justice system; to deal with defendants more humanely, to be aware of the impact on families, [and] the problem of reentry, and he started an institution to deal with these problems. Today we are the beneficiaries of that vision and that work."**—Judge Charles B. Renfrew, United States Deputy Attorney General and Judge, United States District Court, Northern District of California**





"The Aleph Institute must be commended for its vision in bringing together at the ASKS Summit such diverse and interesting people and perspectives on the questions of criminal justice reform and sentencing alternatives in this era of mass incarceration."**—Chief Magistrate Judge Brooke Wells, United States District Court, District of Utah**



"You at Aleph are doing extraordinary things on behalf of the judges in my court. We appreciate the work that you do."**—Hon. Joy Flowers Conti, Chief District Judge of the United States District Court for the Western District of Pennsylvania**



"Today judges and lawyers, prosecutors and law enforcement communities…are engaged in trying to make certain that our system is fair. It takes a collaborative partnership and that's why I am so glad that all of us are here committed to making certain our justice system is the best that it can be. And I thank [Aleph] for being here. And I thank you for your continued great work."**—Hon. Bernice Donald, United States Circuit Judge for the Sixth Circuit**



"The many problems in our system cannot be addressed by simply building more prison beds. One of the keys of an effective Department of Corrections will be…great emphasis on alternatives to incarceration. Organizations such as the Aleph Institute will be key to any community-based programs." **—Lawton Chiles Former Governor, FL**



"Very impressive. I have reviewed countless alternatives during my years on the bench. This is one that is realistic."**—Hon. Thomas E. Scott, Former United States District Court Judge for the Southern District of Florida, in reference to an Aleph alternative sentencing proposal**





"[Criminal Justice reform] is hard work and even if we do it thoughtfully, and with the openness and humanity it requires, there will inevitably be setbacks and disappointments…But it is work that draws its sustenance from the divine spark in each of us. I commend Aleph for its decades of commitment, and for convening such an impressive group of people and organizations.**"—Hon. Jeremy Fogel, Former Director of the Federal Judicial Center, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"When we approach alternatives to incarceration, we need to think about…the individuals, the population we're dealing with and [to] remember that sometimes just a little compassion, just a little time makes all the difference."**—Hon. Esther Salas, U.S. District Judge, New Jersey, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"When you send a person to prison, you send his or her family to prison with them."**—John Creuzot, District Attorney, Dallas County, Texas, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"Our bench [is] thinking about sentencing in a more meaningful way...we are seeing a positive element as a result of that…We are employing alternatives. We are reducing the amount of people receiving custodial terms, overall lowering the amount of time that we are imposing terms of sentence… lowering terms of supervised release and probation…You can see by our rearrest rates, these numbers have dropped in the past five years. And likewise, when we are talking about post-conviction outcomes and revocation, ours is well below the national average."**—Mark Gjelaj, Deputy Chief U.S. Probation Officer, Eastern District of New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"I think the place where we need to start thinking about a paradigm shift is where the concepts of atonement and forgiveness interact."**—Paul Fishman, Former U.S. Attorney, New Jersey, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**





"For me, success looks like changing the focus of our work as crime fighters, from strictly prosecution and punishment to prevention."**—Cyrus Vance, District Attorney, Manhattan, New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"The justice system, as you know, was meant to correct behavior and to keep our community safe, not simply penalize individuals. But unfortunately, and misguidedly, the evolution of the system made it one that's heavy on punishment, devoid of basic human dignity, light on rehabilitation, hostile to reform, and even lighter on transparency. We have witnessed that system go horribly wrong."**—Hon. Letitia James, Attorney General, New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"We have a duty to be aware. As a prosecutor, we are the ones who decide what sentence recommendations will be made to the court. It is incredibly important to understand and be aware of the reality of the sentences we help impose. We have to remind society of rehabilitative solutions."**—Hon. Marilyn Mosby, State's Attorney, Baltimore, Maryland, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"Rehabilitation and recovery are no longer dirty words."**—Chuck Grassley, Senior U.S. Senator, Iowa, at Aleph's 2016 ASKS Summit, Georgetown University Law Center**



# Appendix 3

# Incarceration
# vs. Alternative Sentencing



# Overview

We recognize the sobering and complex task judges undertake in crafting criminal sentences, well expressed by Judge Denny Chin (writing for the United States Court of Appeals for the Second Circuit): "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal citations and quotation marks omitted).

When sentences are crafted to mete out **appropriate, substantive punishment with the greatest benefit and lowest cost to society**, while redirecting and enhancing an individual's value structure through social, therapeutic, and moral counseling and education, results have shown to be substantial and meaningful, leading to hundreds of successful rehabilitative outcomes.

The United States's prevailing method of sentencing, which uses incarceration as a default, has staggeringly high economic and social costs, **as well as a colossal social cost on the defendant's family**. The total cost of incarceration is approximately $1 trillion annually, which approaches six percent of GDP and is 11 times larger than corrections spending alone. The social cost is more difficult to measure, but the literature describes myriad problems related to incarceration, especially the effect of parental incarceration. Specifically, research shows that children of incarcerated parents demonstrate maladaptive symptoms, including behavioral problems, difficulties at school, depression, and an increased risk of winding up in prison themselves.

Two-thirds of federal judges responded to a survey in 1996 saying there ought to be alternative to incarceration programs. DOJ supports them. FJC supports them. The ABA, Right on Crime, and organization across the political spectrum support them.

Our nearly four decades of experience assisting the courts in this arena have taught us that, in certain cases, many of **the goals of the criminal justice system can be accomplished by alternative means and at little or no cost to the Government, especially when Aleph is involved**. The reason why thoughtfully crafted alternative sentencing plans work is best articulated by the Hon. John Gleeson, former District Judge of the United States District Court for the Eastern District of New York (ret.), speaking at an alternative sentencing summit that Aleph hosted at Georgetown Law School:

> "We need to prove going forward what I know in my bones is the truth, which is, these [alternative sentences] work, just as they worked in the states. And they put a human face on a criminal justice system that, for the last 25-30 years, is so desperately in need of a little humanity. This is the right thing to do."

This perspective on sentencing is supported by a consensus of the social scholars and legal academics that study penal policy. A survey of the literature on the subject reveals that lengthy prison sentences do not further any legitimate penological goals other than mere punishment—and even that is contested. In fact, the National Institute of Justice has concluded that **"long prison sentences do little to deter people from committing future crimes"** (William Fitzpatrick, a



former President of the National District Attorneys' Association, April 26, 2016 letter to Senators Mitch McConnell and Harry Reid). *See also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("There is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs.")

Furthermore, the NIJ explains that:

> …compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects.[1]

There is also a significant financial cost associated with incarceration. The individual is removed from society and not able to earn a living or pay taxes. Society's net loss is compounded because, according to the United States government, the fee to cover the average cost of incarceration for Federal inmates was $34,704.12 ($94.82 per day) in FY 2016 and $36,299.25 ($99.45 per day) in FY 2017.[2] The financial cost of incarceration is another reason that we seek to create alternative sentences that allow defendants to be able to contribute to society instead of being clothed, housed, and fed by the government.

In addition to these individual and community considerations, "the consequences of incarceration on family members are numerous and they place already fragile families at increased risk."[3] "Research suggests that the children of incarcerated parents are among the most at-risk, yet least visible, populations of children. Parental incarceration serves as a significant risk factor for a host of negative consequences, particularly with respect to emotional and behavioral factors, physical care and custody, and contact with the parents."[4] Thus, whenever a court sentences an individual, it is not a stretch to say that it sentences an entire family, and the children of incarcerated individuals will suffer a permanent scar.

Aleph's family services department has personally witnessed the painful reality of the children of inmates who have attempted suicide or turned to drugs. Tragically, in the case of one family with whom Aleph was involved, one of the daughters whose father received a lengthy prison sentence for a financial crime committed suicide last year.

---

[1] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence*, last Modified June 6, 2016 &lt;https://nij.ojp.gov/topics/articles/five-things-about-deterrence&gt;.

[2] U.S. Department of Justice, Bureau of Prisons, Annual Determination of Average Cost of Incarceration, THE FEDERAL REGISTER, Vol. 83, No. 83, 18863 (4/30/18).

[3] Kolina J. Delgado, *The Impact of Incarceration on Families: A Summary of the Literature*, WRIGHT STATE UNIVERSITY CORE SCHOLAR: PSYCHOLOGY at 14 (2011) <https://corescholar.libraries.wright.edu/psych_student/5>.

[4] *Id*. at 9 (internal citations omitted).



Obviously, alternative sentences must carefully consider the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with… correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A), (D). Moreover, sentences should be "sufficient, but not greater than necessary" to comply with the purposes set forth in the relevant sentencing statute. *Id.*

# On Crafting an Alternative Sentence

An alternative sentence can be crafted to directly address the crime that brought an individual into the criminal justice system. An individual who, for example, must serve the community that he or she has wronged, or must use his or her strengths to support those who need help, **may have a truly redemptive experience that leads to rehabilitation if given the opportunity**. That is why in appropriate cases, sentences that favor an alternative, non-custodial component that keeps them with their families and in their community, with a mandate to directly address the root causes and inevitable consequences of their offense, allows individuals to consider their personal shortcomings that led to their offense, and **gives them an opportunity to improve themselves and the world around them, while also savings their family's fate**.

Therefore, we strive to construct corrective roadmaps that are designed to (i) confer a benefit on society as a whole, (ii) show the American people the proportional punishment associated with violating American society's standards and (iii) ensure that the individual is held accountable so as to prevent recidivism. We do not want to punish someone so extensively and create undue burdens or hardships on innocent people like young children. In our experience, lengthy periods of incarceration in cases where the individual does not present a danger to society unnecessarily inhibit defendants from fulfilling their potential, and devastate the family and community. The unintended consequences of such devastation breed bitterness, anger, insensitivity, and a greater chance of recidivism and multi-generational dysfunction. Too many defendants "lose their claim to a future" when "lengthy prison terms" are imposed in place of "reasonable, innovative, and promising alternatives to incarceration."[5]  Individuals can only be of full service when they have the freedom to act with their own accord. Prisoners are denied the opportunity to serve in this manner and improve by means of their own free will.

Aleph believes that prison should be used sparingly, primarily when it is necessary to protect the public from violent or predatory individuals. Rather than being strictly punitive, criminal punishments should be designed to confer a benefit on the victims of the offense, society as a whole, and the perpetrator.[6]  As such, our ethical convictions and experience lead us to believe that the best way to address lawbreakers who do not pose an active threat to society is to address both the root causes and the necessary consequences of their offenses. It is vital to keep people with their families in their community and productively contributing to society in order to effectively address their actions while ensuring that others do not needlessly suffer.

---

[5] United States v. Dossie, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) (internal quotation omitted).
[6] Talmud Berachos 606b; Likutei Torah Nasso.



In formulating the Alternative Sentence proposal in this case, Aleph's team of legal specialists have carefully reviewed the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with… correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A), (D).



# Appendix 4

# Selected Successful Aleph Alternative Sentencing Cases



We at Aleph are deeply grateful to have had the honor of submitting numerous alternative sentencing proposals to federal and state judges and prosecutors around the county, helping the judiciary secure hundreds of successful rehabilitative outcomes. Below are a handful of examples:

# 1.

In December 2018, Judge Joseph F. Bianco accepted in part a proposal submitted by Aleph, significantly reducing a defendant's custodial sentence in exchange for time served in a rehabilitation facility to treat a gambling problem. Aleph's mental health and legal experts determined, and the Court agreed, that the defendant's gambling addiction had been a major motivator in his criminal behavior. *See United States v. Barkany*, Case No. 13-CR-362 (E.D.N.Y.). Under the guidelines, the defendant was facing as much as 295-365 months. Aleph worked intensively with the defendant, helping him get the psychological evaluation he needed to enroll in the program and providing critical support to him and his family.

# 2.

In another successful case, a physician was convicted in the Western District of Pennsylvania for offenses related to the improper prescribing and dispensing of controlled substances. His guideline range, as accepted by the court, called for four years of imprisonment. After multiple interactions, Aleph's mental health and legal experts determined that the defendant was truly remorseful and that he had suffered sufficient punishment in the form of the tremendous collateral consequences stemming from his conviction, including personal shame, public humiliation, and the loss of his license to practice medicine. Aleph suggested that an alternative, non-custodial sentence was appropriate. The court accepted Aleph's recommendation and sentenced the defendant to a two-year term of probation, during which he was required to perform hundreds of hours of community service, some of which was facilitated by Aleph. The defendant successfully completed his sentence and has not reoffended or caused any further harm to society. *See United States v. Barnett*, Case No. 2:16-cr-153-JFC (W.D.P.A. 2017).

# 3.

In another recent case, we helped a young man in his early twenties who was facing one to five years in prison for trafficking marijuana. Aleph's mental health and legal experts determined that he was naive and impressionable and didn't fully understand the consequences of his actions. Aleph also learned that he had become more observant in the years leading up to his offense, but that he had turned away from his faith after a year in which he faced a difficult breakup, a serious car accident, and a financial setback. Aleph proposed that he be placed into an unconventional diversion program, in which he would take on extensive religious study, which would be



supervised by Rabbis at Aleph. The judge agreed to this proposal and treated the case like a standard diversion program, imposing neither jail time nor probation. She agreed to personally supervise the young man's progress for three years but planned to rely on Aleph for day-to-day monitoring and quarterly reports, which we continue to provide. *See State v. David Ian Alper*, Case No. CR19-0423 (Second Judicial District, State of Nevada 2019).

# 4.

A teenager who was suffering with severe depression and drug addiction for most of his adult life was facing felony charges following an arrest. Aleph was able to secure for him a place in a pilot diversion program that provided an alternative to incarceration. This program gave him housing and the intensive mental care that he needed to ultimately be a productive member of society. To date his progress reports have been outstanding. The built in support has enabled him to stay clean, to thrive mentally and emotionally, and to exceed the courts expectations for his success. *See People v. Gutnick*, Case No. LAXSA100756-01 (Superior Court of California, County of Los Angeles 2019).

# 5.

A young woman was involved in a company that sold binary options with misleading sales tactics. She was facing several years in prison but had unique health challenges which made the possibility of a lengthy incarceration substantively more onerous. The woman showed extreme remorse for her actions, and had already taken action to make amends by beginning to volunteer in a nursing home for upwards of twenty hours per week. Aleph presented the woman's unique circumstances to the judge and proposed that she pay for her crime with house arrest and continues community service. The judge sentenced her to only four months of incarceration, to be followed by four months of house arrest and the proposed community service. *See United States v. Shira Uzan*, Case No. 8:18-CR-608 (District of Maryland. 2019).