UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

SIMON GOLDBRENER,
      a/k/a "Simon Goldbrenner,"
      a/k/a "Shimon Goldbrenner,"
PERETZ KLEIN,
SUSAN KLEIN,
      a/k/a "Suri Klein,"
BEN KLEIN,
      a/k/a "Benzion Klein,"
      a/k/a "Benzi Klein,"
MOSHE SCHWARTZ,
SHOLEM STEINBERG, and
ARON MELBER,
      a/k/a "Aharon Melber,"

           Defendants
.

18 Cr. 614 (KMK)

---

**GOVERNMENT'S SENTENCING MEMORANDUM**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for the United States of America

Michael D. Maimin
Hagan Scotten
Vladislav Vainberg
Assistant United States Attorneys
 -Of Counsel-

**Table of Contents**

I. Background ........................................................................................... 1

    A.    The E-Rate Program ........................................................... 1

    B.    The Offense Conduct ........................................................... 6

        1.    The Schools ........................................................... 9

            a.    Yeshiva Chofetz Chaim ................................... 10

            b.    Bais Yehuda ................................................. 11

            c.    Shaar Ephraim ............................................. 12

            d.    Ohr Yochanan ............................................. 13

            e.    Cheder Ateres Tzvi ....................................... 13

            f.    Imrei Shufer ................................................. 14

            g.    Community Enrichment Center ...................... 16

        2.    The Vendors ......................................................... 17

            a.    Peretz and Susan Klein's Companies .............. 17

            b.    Sholem Steinberg's Companies ....................... 23

            c.    Ben Klein's Companies ................................... 26

    C.    The Victims ......................................................................... 26

II. The Applicable Guidelines ................................................................ 30

III. The § 3553(a) Factors ....................................................................... 34

    A.    The Defendants' Crimes Require Serious Punishment. ...................... 35

        1.    Peretz Klein ........................................................... 35

        2.    Susan Klein ........................................................... 39

        3.    Simon Goldbrener .................................................. 40

        4.    Moshe Schwartz .................................................... 45

5.      Ben Klein ...................................................................... 52

6.      Sholem Steinberg............................................................ 53

7.      Aron Melber ................................................................... 55

B.      The Defendants' Claims of Mitigation Are Exaggerated. .................... 57

1.      The Defendants' Childhoods Do Not Suggest Lighter
        Sentences. ..................................................................... 57

2.      With the exception of Susan Klein, the Defendants'
        Family Circumstances Do Not Support Lighter Sentences. ....... 58

3.      The Defendants' Status and Charitable Works in Their
        Community Do Not Mitigate Their Crimes............................. 60

4.      The Defendants Pose a Risk of Recidivism. ........................... 66

5.      Prior Sentences in E-Rate Cases Support Substantial
        Sentences Here ............................................................... 68

6.      If Necessary, Reasonable Delays of Incarceration Can
        Mitigate the Risk from COVID-19 ..................................... 72

IV.  Conclusion ....................................................................... 74

The defendants stole from impoverished schoolchildren. In a purely technical sense, they defrauded a Government program called "E-Rate." But what they really did was steal from underprivileged schoolchildren. This is because E-Rate is a program that helps provide telecommunications services and equipment to schools serving needy students, and the program never has sufficient funds to aid every eligible school. The defendants figured out how to game the program, submitting fraudulent invoices in order to get paid for equipment they did not provide, among many other deceptions. They robbed students of technology needed to prepare for a digital world in order to enrich themselves and their families. And, when they lied to steal that money, they broke the law.

The Government respectfully submits this memorandum in connection with the sentencings of all seven defendants, because their criminal behavior and claims of mitigation overlap considerably. The advisory Sentencing Guidelines recommend significant prison terms for each defendant. Each is worthy of serious punishment, not only for what they did, but to deter other potential fraudsters. For the reasons set forth below, this Court should sentence each of the defendants except for Susan Klein to a Guidelines term of imprisonment; in light of her unique circumstances, Susan Klein may merit a downward variance.

## I. Background

### A. The E-Rate Program

In the Telecommunications Act of 1996, Congress determined that "[e]lementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services." Pub. L. 104-104, 110

Stat. 56 (1996), § 254(b)(7). To achieve this goal, the Act created the E-Rate program, under which the FCC would subsidize the purchase of telecommunications services, and the equipment necessary to use those services, by schools and libraries from private vendors. The amount of the subsidy varied from 20% to 90% of the purchase price,[1] depending the financial need of the students served by the school.[2]

The FCC would not, however, provide this subsidy directly. Instead, it would use the "Universal Service Fund."[3] The Universal Service Fund, in turn, was funded by "by contributions from providers of telecommunications based off an assessment on their interstate and international end-user revenues."[4] Or, put more simply, when a person looks at her phone bill and sees a charge for something along the lines of "Federal Universal Service Fee," she is paying into the Universal Service Fund.[5] Everyone with a phone pays into the Universal Service Fund.

---

[1] In the parlance of the E-Rate program, these subsidies are called "discounts." *See* 47 C.F.R. § 54.505. So, for example, if a service to a school is to receive a 90% "discount," the E-Rate program will subsidize 90% of the purchase price of that service.

[2] The program also subsidizes purchases by libraries, and in some circumstances considers geographic in addition to financial need, but neither libraries nor geographic need are relevant in this case.

[3] "Prior to the Telecommunications Act of 1996, the Universal Service Fund (USF) operated as a mechanism by which interstate long distance carriers were assessed to subsidize telephone service to low-income households and high-cost areas." https://www.fcc.gov/general/universal-service-fund.

[4] https://www.fcc.gov/general/universal-service. There were a variety of political and statutory reasons not to fund the Universal Service Fund—or E-Rate—with direct taxation.

[5] *See* https://www.oca.nh.gov/Understanding%20Your%20Telepone%20Bill.htm.

In order to administer E-Rate and other programs, the Telecommunications Act established the Universal Service Administrative Company ("USAC"). USAC administers the E-Rate program in a manner intended to ensure that schools and students—particularly schools and students with limited financial resources—obtain the services and equipment that they need to begin to bridge the digital divide. To do this, USAC sets forth a multistep process:

- First, a school seeking to make E-Rate subsidized purchases must engage in an open and fair competitive bidding process. To do so, the school "certifies an FCC Form 470 (Description of Services Requested and Certification)" in order to receive bids from vendors.[6]

- Second, the school must "evaluate the bids received and choose the bid that is the most cost-effective," meaning that "the price of the eligible products and services must be the primary factor and must be weighted more heavily than any other single factor."[7] In the event that only one vendor bids, the school must still ensure that the bid is cost-effective.[8]

---

[6] https://www.usac.org/e-rate/applicant-process/competitive-bidding/; *see also* 47 C.F.R. §§ 54.503(a) and (b). In order to ensure the integrity of the process, the certifications on the Form 470 must be made under oath. *See* 47 C.F.R. § 54.503(c)(2).

[7] https://www.usac.org/e-rate/applicant-process/selecting-service-providers/; *see also* 47 C.F.R. § 54.511(a) ("In determining which service offering is the most cost-effective, entities may consider relevant factors other than the pre-discount prices submitted by providers, but price should be the primary factor considered.").

[8] https://www.usac.org/e-rate/applicant-process/selecting-service-providers/. The service providers are also required to certify, under oath, that "The prices in any offer that this service provider makes pursuant to the schools and libraries universal service support program have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to those prices, the intention to submit an offer, or the methods or factors used to calculate the prices offered." *See* 47 C.F.R. § 54.504(f)(1).

- Third, the school must apply for a subsidy by "fil[ing] an FCC Form 471 to provide USAC with information about the services or equipment [it is] requesting and the entities that will receive the services or equipment."[9] "Applicants must include information on the recipients of services and service provider(s); provide detailed descriptions of services including costs and dates of service or equipment; and certify compliance with program rules."[10]

- Fourth, USAC reviews the applications, checking for, among other things, eligibility of the entities receiving services, eligibility of the services requested, and the nature of the competitive bidding process.[11] While the reviewers may ask for back-up documentation, they typically rely on the schools and vendors to provide them with the information.

- Fifth, after the contracted services actually start, the school must file an FCC Form 486 confirming that the services have started.[12]

- Sixth, once the school has confirmed that it has received the eligible services, either it or the vendor invoices USAC for the subsidy."[13]

There are also rules and regulations for the vendors.[14] Among other things, vendors "must be compliant with all E-rate Program rules and all applicable state

---

[9] https://www.usac.org/e-rate/applicant-process/applying-for-discounts/. Again, in order to ensure the integrity of the process, the certifications on the Form 471 must be made under oath. *See* 47 C.F.R. § 54.504(a)(1).

[10] https://www.usac.org/e-rate/applicant-process/applying-for-discounts/fcc-form-471-filing/.

[11] https://www.usac.org/e-rate/applicant-process/application-review/.

[12] https://www.usac.org/e-rate/applicant-process/starting-services/. The Form 486 advises declarants that "[p]ersons willfully making false statements on this form can be punished by fine or forfeiture under the Communications Act, 47 U.S.C. Secs. 502, 503(b), or fine or imprisonment under Title 18 of the United States Code, 18 U.S.C. Sec. 1001." https://www.usac.org/wp-content/uploads/e-rate/documents/486.pdf.

[13] https://www.usac.org/e-rate/applicant-process/invoicing/.

[14] https://www.usac.org/e-rate/service-providers/.

and local procurement rules and regulations, including any competitive bidding requirements."[15] Needless to say, vendors must provide the services that were approved to be subsidized.[16] In addition, vendors must certify either that the school has paid the entire cost of the purchase and so USAC should reimburse the school for the subsidized amount, or that the school has paid only the non-subsidized portion of the cost, and so USAC should pay the vendor the subsidy.[17]

Each year, the FCC releases a list of equipment and services eligible for subsidy. Only eligible products or services that will be used for educational purposes can be funded."[18]

Schools or vendors may use consultants—outside experts in the E-Rate program—to help navigate this process. But those consultants may not have a conflict-of-interest; they may work for the schools seeking to make subsidized purchases or the vendors seeking to make subsidized sales, not both:

> In order to be sure that an open and fair competition is achieved, any marketing discussions held with service providers must be neutral, so as not to taint the competitive bidding process. For example, the applicant should not have a relationship with a service provider prior to the competitive bidding process that would unfairly influence the outcome of a competition or would furnish the service

---

[15] https://www.usac.org/e-rate/service-providers/step-2-responding-to-bids/.

[16] https://www.usac.org/e-rate/service-providers/step-4-starting-services/.

[17] https://www.usac.org/e-rate/service-providers/step-5-invoicing/; *see also* 47 C.F.R. § 54.523 ("An eligible school … must pay the non-discount portion of services or products purchased with universal service discounts.").

[18] https://www.usac.org/e-rate/applicant-process/before-you-begin/eligible-services-list/.

provider with "inside" information or allow it to unfairly compete in any way. Similarly, applicants must avoid conflicts of interest in the bidding process.

Similarly, applicants must avoid conflicts of interest in the bidding process. For example, a conflict of interest exists when the applicant's consultant is associated with a service provider that is selected and is involved in determining the services sought by the applicant and the selection of the applicant's service provider(s).[19]

The purpose of all these rules is clear: to ensure that students who need equipment and services have access to the right equipment and services at market price, which allows USAC to maximize the benefit to the largest number of needy children. This is of particular importance because the E-Rate program draws from a statutorily capped pool of funds (which pool can be even smaller, depending on the funds available to the Universal Service Fund).[20] The system, however, relies in large part on self-regulation: schools and vendors are trusted to abide by the rules, prepare accurate paperwork, certify truthfully, and generally be honest in monitoring themselves. The defendants saw that weakness and exploited it.

## B.    The Offense Conduct

Four of the defendants, Peretz Klein, Susan Klein, Ben Klein and Sholem Steinberg, owned or operated E-Rate vendor companies. Two defendants, Simon

---

[19]   https://www.usac.org/e-rate/applicant-process/competitive-bidding/open-fair-process/.

[20]   *See* 47 C.F.R. § 54.507 (setting forth an "aggregate annual cap on federal universal service support for schools and libraries.").

Goldbrener and Moshe Schwartz, were E-Rate consultants paid by the vendor defendants. Aron Melber was a school official who helped Steinberg obtain E-Rate business. The defendants used various means to fraudulently obtain E-Rate money for the vendor defendants, at the expense of the program's legitimate participants:

- The vendors billed USAC for equipment and services that they never provided, simply stealing money;

- The vendors provided far cheaper equipment and services than the equipment and services for which they billed USAC, pocketing the difference;

- The vendors provided equipment and services that had nothing to do with education, such as alarm systems, and then falsely claimed that they had instead supplied eligible equipment and services;

- The schools obtained necessary services at market prices from legitimate companies (such as Verizon), and then the defendant vendors separately billed USAC for redundant services at inflated prices;

- The vendors provided equipment and services that, although authorized for subsidized purchase under the program, were not in fact needed by or used by students; and

- The defendants undermined the competitive bidding process, steering contracts to vendors without exposure to market competition;

To complete and conceal these frauds, the defendants used a number of devices, including:

- The consultants claimed to work for the schools, when they in fact worked for the vendor defendants, steering contracts to the vendor defendants and ensuring that the schools did not reveal the frauds;

- The vendors kicked back a portion of their profits from the fraud to certain school officials, motivating their schools to participate in the fraud even when not receiving anything useful to their students;

- The vendors secretly reimbursed the schools for the non-subsidized portion of their purchases, causing USAC to believe that the schools were paying for part of their purchases as required by the program,

and thereby defeating a mechanism meant to ensure honest bidding; and

- Certain vendor defendants set up a large number of shell companies to create the illusion that there was a thriving competitive market-place—when in fact the same vendor defendant was simply billing USAC under many different names.

In the end, the defendants' schemes were quite lucrative. For example, just five of Peretz and Susan Klein's companies—Hashomer Alarm Systems, Inc., Multimedia Broadcasting Corporation, IP Connect Inc., Crystal Clear Communications Inc., and NY NJ Telco Corp.—sought a total of $28,687,850.62 from the E-Rate program for funding years 2009 through 2015, ultimately receiving $12,164,739.43.[21] Of that, $2,419,375.97 was sought, and $1,349,205.84 was obtained, in connection with six schools—Bais Yehuda, Yeshiva Chofetz Chaim, Shaar Ephraim, Ohr Yochanan, Community Enrichment Center, and Congregation Machzikei Hadas of Belz—that this investigation confirmed did not receive all the invoiced services and equipment.[22] As another example, during the same period, Ben Klein's Trust Corp. sought a total of $1,817,808.50 in E-Rate program funding, ultimately receiving $959,661.54. Of that, $745,714.34 was sought, and $495,562,48 was obtained, in connection with two schools—Cheder Ateres Tzvi and Yeshiva Talpiot—that did not receive all the in-voiced services and equipment. As another example, during the same time period,

---

[21] Because certain applications were rejected, and because the E-Rate program has limited funds, not all funds requested were ultimately disbursed.

[22] Except where expressly stated, the Government does not mean to imply that any specific school or school official was complicit in the fraudulent scheme. Although some were involved, in many cases it appears that school officials were unaware of the fraud being committed in their school's name.

Sholem Steinberg's Simi Securities Inc. and CSI Communications and Security, Inc. sought a total of $1,641,586.13 in E-Rate program funding, ultimately receiving $457,290.58. Of that, $534,284.43 was sought, and $191,847.60 was obtained, in connection with Congregation Bnos Sara—which did business as Imrei Shufer (Aron Melber's school)—which did not receive all the invoiced services and equipment.

### 1.   The Schools

The defendants sought and obtained E-Rate funding in connection with a large number of schools. As part of the investigation, the Government investigated a subset of those schools, using confidential informants who went into the schools and recorded their experiences; reviewing information gathered during other, often unrelated, entries into the school (*e.g.*, fire safety inspections); and ultimately executing court-authorized searches at ten schools in March 2016.[23] The following summarizes some results of what the investigation revealed:

---

[23] A copy of the affidavit submitted in support of the search warrants—which details some of what the investigation learned—is attached as Exhibit A. That exhibit does not include the exhibits to the affidavit. As set forth in the affidavit, the schools searched were: (1) Congregation Mesivta Ziev Hatorah; (2) Cheder Ateres Tzvi; (3) Congregation Bnos Sara, d/b/a Imrei Shufer; (4) Bais Yehuda; (5) Yeshiva Chofetz Chaim; (6) Teacher Mommy Daycare Center; (7) Shaar Ephraim; (8) Ohr Yochanan; (9) Yeshiva Talpiot; and (10) Bais Chana Malka. (Exhibit A at 4–5). As further set forth in the affidavits, the Government had additional information about certain other schools.

### a.   Yeshiva Chofetz Chaim

Yeshiva Chofetz Chaim is a preschool program for children ages two to five. Not surprisingly, when a confidential informant went to Chofetz Chaim, the informant was told that Chofetz Chaim does not use information technology for instructional purposes. Because it is a preschool program for children ages two to five.

Nevertheless, from funding years 2009 through 2015, Chofetz Chaim sought over $1.1 million in E-Rate funding—over $700,000 in connection with Peretz Klein's Hashomer Alarm Systems, Inc., Multimedia Broadcasting Corporation, and NY NJ Telco Corp.—and received over $740,000—over half a million dollars in connection with Hashomer, Multimedia Broadcasting, and NY NJ Telco. Chofetz Chaim used two consultants: Simon Goldbrener and Moshe Schwartz.

When law enforcement officials searched Chofetz Chaim in 2016, they were looking for $120,979.55 in services and equipment—including a "Media Master System" for which E-Rate paid Hashomer more than $120,000—and, needless to say, found none of it.[24] Instead, they found a run-of-the-mill daycare center whose only technology was two computers in the administrative offices, one of which was used for the security/alarm system, as illustrated in pictures taken during the search:

---

[24] In all of the searches, law enforcement officials were looking for less equipment and services than had been funded because some of it was no longer expected to be there, or because some of it—particularly certain services—would be impossible to identify.

10





### b.    Bais Yehuda

Bais Yehuda is a school in Monsey for which Goldbrener "consulted." From funding years 2009 through 2015, Bais Yehuda sought $496,661.01 in E-Rate funding—almost $190,000 from Peretz Klein's Hashomer Alarm Systems, Inc. and IP Connect Inc.—and received $331,603.81 in E-Rate funding—almost $130,000 for Hashomer and IP Connect. When, in 2015, a confidential informant entered the school and spoke to some of the schoolchildren, the students indicated they did not have any technology available to them and did not use computers in their studies, and that the only technology of which they knew in the school were the "eyes," by which the boys apparently meant the closed-circuit television cameras in the hallways.

In March 2016, the FBI and FCC searched Bais Yehuda. They were looking for $248,585.63 of E-Rate equipment and services, of which they were unable to locate $148,935.18 worth, or 61.4%.

11

### c.    Shaar Ephraim

Shaar Ephraim was a school in Monsey for which Goldbrener "consulted." From funding years 2009 through 2015, Shaar Ephraim sought $1,060,184.59 in E-Rate funding—almost $700,000 from Peretz Klein's Hashomer Alarm Systems, Inc. and IP Connect Inc.—and received $457,429.32 in E-Rate funding—over a quarter-of-a-million dollars for Hashomer and IP Connect. In 2015, an administrator at Shaar Ephraim told a confidential informant that the only computers in the school are in his office, and that the school planned on introducing computers for educational purposes in the future, but was not yet ready to do so. The administrator then took the informant on a tour of the school, where the informant did not see any computers in the classrooms.

When Shaar Ephraim was searched in 2016, law enforcement officials were looking for $236,005.25 worth of equipment and services, but were unable to locate $135,369.63 of that, or 57.4%. Among things that were missing were computers in the classrooms where E-Rate had paid for cable drops and other items intended to wire the rooms, as seen in the following photos.



### d.    Ohr Yochanan

Ohr Yochanan was a school in Suffern for which Goldbrener "consulted." From funding years 2009 through 2015, Shaar Ephraim sought $456,201.84 in E-Rate funding—almost $200,000 from Peretz Klein's Hashomer Alarm Systems, Inc. and IP Connect Inc.—and received $232,452.97 in E-Rate funding—over $110,000 for Hashomer and IP Connect.

An administrator for the school told a confidential informant that computers and similar technology were not even mentioned at Ohr Yochanan, and that the students are not allowed to use electronics. Indeed, in 2012, the administration of Ohr Yochanan sent out a registration form in Yiddish that focused, among other things, on the need to banish technology, stating:

> With all seriousness and commitment the public undertook to carry out the 'decision' of the leaders of the generation, which was also proclaimed last Shavuot in the presence of a large crowd and our great Rebbe regarding our duty to stay away from the ugliness of all the technological devices, which open the way to sin.

It is therefore not terribly surprising that, when looking for $212,361.82 in equipment and services during a 2016 search, law enforcement officials were unable to find $105,818.71 worth, or 49.8%.

### e.    Cheder Ateres Tzvi

Cheder Ateres Tzvi was a school in Suffern for which Goldbrener and Moshe Schwartz "consulted." From funding years 2009 through 2015, Cheder Ateres Tzvi sought $760,714.98 in E-Rate funding—almost $650,000 from Ben Klein's TrustCorp—and received $450,541.67 in E-Rate funding—almost $420,000 for

TrustCorp. Among other things, E-Rate paid TrustCorp for video conferencing, modern PBX phone systems, high-speed internet connections, and a "homework hotline." When Ben Klein needed to convince USAC regulators that Cheder Ateres Tzvi had paid for the non-subsidized portion of its E-Rate purchases—as E-Rate regulations require—he had Cheder Ateres Tzvi send him checks to show USAC, then sent cash to reimburse the school. When law enforcement officials searched Cheder Ateres Tzvi in 2016, they were looking for $163,261.00 of equipment and services, but could not locate $106,066.73 worth, or 64.97%.

### f.    Imrei Shufer

Congregation Bnos Sara, which did business as "Imrei Shufer," was a school in Monsey for which Goldbrener "consulted," and at which Aron Melber was an administrator who signed and filed E-Rate filings. From funding years 2009 through 2015, Imrei Shufer sought $1,175,706.03 in E-Rate funding—almost half a million dollars from Sholem Steinberg's Simi Securites Inc. and CSI Communications & Security, Inc. and nearly $425,000 for Peretz Klein's Wolfson Communication Networking, Inc.—and received $458,170.67 in E-Rate funding—over $200,000 for Simi and CSI and almost $75,000 for Wolfson. Among other things, E-Rate paid Steinberg $108,000 for "Distance Learning" based on a certification personally signed by Melber:

| ITEM # | DESCRIPTION | QTY | MONTHLY | TOTAL |
|---|---|---|---|---|
| | DI Circuit Transmission | 12 | $850 | $10,200 |
| | Installation of high-end Circuit | 1 | $8,995 | $8,995 |
| | Digital Transmission services for up to 17 users | 12 | $6,995 | $83,940 |
| | Setup and configuration of digital transmission service | 1 | $4,995 | $4,995 |
| | The above system is a real-time distance learning service and includes wan access service, muti port access, and distribution video system for continous use throughout the school year | | | |
| | YEARLY TOTAL | | | $108,130 |

Imrei Shufer
Att. Rabbi Aaron Melber

DATE: Mar 18 14

In spite of the money sought and obtained for technology, when a confidential informant visited Imrei Shufer, the secretary for the school's administrator indicated that the school does not have computers or technology, and the administrator himself said that they do not "teach computers" at the school. When law enforcement officials searched Imrei Shufer in 2016, they were looking for $289,246.59 of equipment and services, but could not locate $182,137.35 worth, or 63%. Among the missing items was the "Distance Learning" for which E-Rate had just paid Steinberg $108,000. Rather, as was true with so many schools, there was minimal technology, and none in the classrooms:

  

  

### g.      Community Enrichment Center

The Community Enrichment Center ("CEC") was a daycare facility in Spring Valley, housed in a two-story, single-family home. Daycare facilities are ineligible for E-Rate funding. The Community Enrichment Center represented that it is a school in documents filed with USAC and the New York State Department of Education, even as it admitted that it was a daycare in documents filed with Rockland County.

From funding years 2009 through 2015, the Community Enrichment Center sought $204,810.45 in E-Rate funding—more than $140,000 for Peretz Klein's Crystal Clear Communications Inc. and a little more than $11,500 from Steinberg's CSI Communications & Security, Inc.—and received $124,133.01 in E-Rate funding—over $106,000 for Crystal Clear.

Based on documentation that the Community Enrichment Center submitted to USAC, it should have had should have, among other things, a PBX telephone system; a Dell PowerEdge R710 server;[25] and a network with 25 terminals, each of which has software licenses, for all of which the Community Enrichment Center, in conjunction with Crystal Clear and CSI, had sought over $175,000 to purchase, install, and maintain.

---

[25] The funding sought from USAC for a given item of equipment often appeared to be significantly higher than the market value of the corresponding equipment. For example, in 2013, the Community Enrichment Center sought and received $25,033.50 for a Dell PowerEdge R710 server, to be provided by Peretz Klein's Crystal Clear Communications. According to a website maintained by Dell, in 2016, a Dell PowerEdge R730 server—which the website described as the successor to the R710 server—sold for $2,019.00.

In 2015, the Rockland County District Attorney's Office executed a search warrant on the Community Enrichment Center in order to investigate a separate fraudulent scheme. Law enforcement officers learned that: (1) the first floor was used as a daycare facility; (2) the second floor was a personal residence used by the daycare center's proprietor, his wife, and their children; (3) a Panasonic KX-TDE200 PBX telephone system was located in a closet in the basement, with approximately ten handsets throughout the building, approximately half in each of the first and second floors; and (4) a single desktop computer, a single laptop computer, and a single laser printer were in an office on the first floor. During the search, law enforcement agents did not see any indication of a server, a network, or any technology other than the PBX telephone system, which serviced the residence as well as the daycare center, and the desktop computer, laptop computer, and laser printer in the office. An attendance summary for March 2015 was found in the office, setting forth the names of 34 children, ranging in age from three to eleven years old. According to that summary, only 22 of those children had attended the Community Enrichment Center at all that month, and only 13 of those children—all three to five years old—had attended more than three days that month.

### 2. The Vendors

#### a. Peretz and Susan Klein's Companies

Peretz and Susan Klein initially operated a single E-Rate vendor company, Hashomer. When Hashomer's business—and frauds—grew rapidly, they created over twenty shell companies, many with fictitious owners and addresses, through which they carried out the scheme. Because it was difficult to keep track of their many

fronts, the couple kept a chart in their house listing their multifarious companies, the banks at which they kept accounts, the usernames and the passwords:

| Company: | Bank: | Username: | Password: |
|---|---|---|---|
| Hashomer Alarm. | Bank of America ( Multimedia also Chase) | | |
| Multimedia. | | | |
| steady Connections. | | | |
| Crystal Clear. | | | |
| NY NJ Telco. | Wells Fargo | | |
| Lion Communication. | | | |
| Com Com. | | | |
| Hashomer Alarm. | | | |
| Bens Solution | Keybank | | |
| Daas Media. | Chase | | |
| United Media | | | |
| AV Conference. | Capital One | | |
| BNY. | M&T | | |
| B&Z. | Wells Fargo | | |
| NMA | Bank of America | | |
| Linas Hatzedek | Bank of America | | |
| Perfect Media. | Capital One | | |
| Princeton Video. | | | |
| PtoP. | Wells Fargo | | |
| Rockland Security. | Wells Fargo | | |
| Wolfson Communication | Wells Fargo | | |
| World of Conferencing | Capital One | | |
| Shore Conferencing. | Capital One | | |

The Kleins also maintained a separate list recording which companies were supposed to specialize in which types of E-Rates sales, so that they would not confuse them when choosing a vendor to make a fixed "bid":



| Internet, Telco, P2P, PRI |
|---|
| AAA Technology Solutions |
| BNY Communication |
| Com Com Communications |
| HS Broadband |
| NY NJ Telco |
| PtoP Communications |

| Distance Learning/ Vid Conf |
|---|
| AV Conference Solution |
| B&Z Slutions |
| Ben's Solutions |
| Daas Media Broadcasting |
| Multimedia Broadcasting |
| Perfect Media Broadcasting |
| Princeton Video Conferencing |
| Shore Conferencing |
| United Media Broadcasting |
| World of Conferencing |

| IC/ICM |
|---|
| BSD Communication |
| Crystal Clear |
| Hashomer Alarm |
| Lion Communications |
| Rockland Security |
| Steady Connections |
| Wolfson Communication |

Peretz Klein paid Goldbrener to act as his primary consultant, nominally representing the schools, but in fact accepting hundreds of thousands of dollars from Peretz Klein. In addition to helping the Peretz Klein companies complete the necessary paperwork to get paid by USAC, Goldbrener advised Peretz Klein when interacting with the program managers.

Goldbrener and the Kleins understood how important it was to maintain the illusion that their companies were unrelated. Peretz and Susan Klein claimed on a number of forms that some of these companies were run by "Ben Klein," [26] which is actually the name of one of their sons. At one point, USAC noticed that "Ben Klein" was the E-Rate contact for a number of different service providers—B&Z Solutions, Inc., Bens Solutions, Inc., Trust Corp, and Daas Media Broadcasting—and so e-mailed "Ben" at each of those addresses to ask why. Peretz and Susan Klein were in fact operating the sham email accounts kept in "Ben's" name. Each saw USAC's inquiry and separately reached out to their consigliere, Goldbrener, for advice (with Peretz Klein correctly noting that one of the companies—TrustCorp—actually belonged to Ben Klein, the defendant):

---

[26] Ben Klein, the defendant, is Peretz and Susan Klein's nephew. Here they appear to have used their son's name as the fictitious owner of these shell companies, because they called Ben Klein, the defendant, "Bentzy."



Presumably after speaking with Goldbrener, the Kleins responded, pretending to be "Ben Klein," falsely claiming that they "did not know anything about" Trust Corp., and falsely claiming that "Ben Klein" maintained three different companies because each company served different areas of the country and employed different sales teams:



This plan, however, failed to account for another problem: when USAC e-mailed "Ben Klein" at each of these different companies, USAC received an e-mail

read-receipt from Hashomer, the main E-Rate company operated by Peretz and Su-

san Klein. Within two-and-a-half hours, the Kleins again sought Goldbrener's advice:



Once again, that advice appears to have been to lie, because the Kleins responded,

again as "Ben Klein," concocting a complicated cover story to falsely explain

Hashomer's role:



21

Not everything that Peretz Klein did was wholly under-the-table. For example, he made sure to enter into a contract with at least one school administrator, memorializing the school's cut from the fraud. As translated from Yiddish, the contract reads:

> I, the undersigned [Administrator] am going with the E-rate with Peretz Klein [Illegible abbreviation] year 5775[27] and I'll receive $5,000 today and another $7,000 [Illegible two abbreviations] and $5,000 by late April, early May and the remainder of 25% (twenty five percent) for 15-16 I'll receive every quarter.

Peretz Klein and the administrator both signed the contract.

The Kleins fully understood how profitable it was to defraud E-Rate. At one point, they created a chart showing the huge profits they could make by marking up their products, knowing that no one was bidding against them:

| QTY | MODEL NO. | DESCRIPTION | list | TOTAL list | charge | Hasomer | has. ttl | Profit |
|---|---|---|---|---|---|---|---|---|
| 2 | E10G42BFSR | Intel Ethernet Server Adapter X520-SR2 - network adapter - 2 ports | $1,720 | $3,440 | $4,128 | $1,188 | $2,376 | $1,752 |
| 4 | E10GSFPSR | SFP+ GBIC Optics SR | $299 | $1,196 | $1,435 | $260 | $1,040 | $395 |
| 2 | Fiber Cable | 325 FT Fiber Cable W/ Protector | $1,325 | $2,650 | $3,180 | $600 | $600 | $2,580 |
| 12 | 3750G-48PS | Cisco Catalyst 3750G-48PS Stackable Gigabit Ethernet Switch | $21,990 | $263,880 | $263,880 | $10,456 | $125,472 | $138,408 |
| 24 | RCKMNT-E-1RU | RCKMNT-E-1RU  Cisco Univeaal Accessories | $58 | $1,380 | $1,656 | $15 | $360 | $1,296 |
| 48 | AIR-AP1252AG-A-K9 | Cisco Aironet 1252 Wireless Access Point (Auto) | $1,299 | $62,352 | $62,352 | $694 | $33,312 | $29,040 |
| 576 | cables to go 22801 | 3ft USA Cat6 550 MHz Stranded Snagless Patch Cable - Blue | $14 | $8,064 | $8,064 | $2 | $1,152 | $6,912 |
| 514 | cables to go 22803 | 7ft USA Cat6 550 MHz Stranded Snagless Patch Cable - Blue | $18 | $9,252 | $9,252 | $4 | $2,056 | $7,196 |
| 48 | cables to go 22804 | 10ft USA Cat6 550 MHz Stranded Snagless Patch Cable - Blue | $20 | $960 | $960 | | | |
| 514 | Computer Runs | Computer Network Runs - Cat.6 | $300 | $154,200 | $154,200 | $35 | $17,990 | $136,210 |
| 12 | 3120-3-001-42 | LINIER 42U High Density Cable Management Rack & Accs. | $935 | $11,220 | $13,464 | $200 | $2,400 | $11,064 |
| 1 | Installation | Installation, Configure and Programming | $18,500 | $18,500 | $18,500 | $10,000 | $10,000 | $8,500 |
| | | Total ——>> | | $537,094 | $541,071 | $23,454 | $196,758 | $344,313 |

*Wiring and Switches & Wireless - Beer Hagola*

Peretz Klein also hired Moshe Schwartz as a consultant, reinforcing Goldbrener in completing the necessary forms to obtain E-Rate funds. Purporting to act as a consultant for the schools, Schwartz completed paperwork as directed by Peretz

---

27 5775 on the Jewish calendar spanned from 2014 through 2015.

Klein and Simon Goldbrener, then filed the forms under the schools' names. In return, Peretz Klein paid Schwartz over $200,000.

### b.  Sholem Steinberg's Companies

From 2011 to 2013, Sholem Steinberg worked for Peretz Klein, but in 2012 he began to branch out on his own, using at least two companies, CSI Communication & Security, Inc. and Simi Securities Inc., as E-Rate vendors. He partnered with Imrei Shufer's administrator, Aron Melber, to obtain additional E-Rate business. The pair kept notes of their solicitation of various schools, including their plans to offer school officials larger bribes than Peretz Klein in order to take business from him:[28]



---

[28] It is ironic: USAC put in place procedures to ensure that competitive bidding would assign market rates to goods and services; the defendants instead bid competitively on the amount of kickbacks they would offer schools to participate in defrauding USAC.

The notes about ████████████ and ████████ were telling:





In other words, the administrator of one school was getting at least 25% of the gross E-Rate funding, and Steinberg and Melber "offered more %" to try to get that administrator to switch his fraudulent business from Peretz Klein, and Steinberg and Melber offered 30% of the gross E-Rate funding to the administrator of another school.

Like Peretz Klein, Steinberg and Melber also entered at least one formal contract with a school administrator detailing the kickback they would provide. A contract recovered during the search of Steinberg's office bore Melber's signature and that of a school administrator. As translated, it reads:

> With Heaven's Help
>
> March 13, 2013
>
> Party 1                              Party 2
>
> Note of Agreement between [Illegible 2 words] ([administrator]) and Mr. Shulem Steinberg company owner
>
> a) Party B agrees that any income coming from the E-rate (this year is only maintenance) after service, as described below, will be completely divided 50% half and half
>
> b) For the service—if they take it, the payments will be like any regular company and not bigger than the E-rate.
>
> c) If they want to receive the service from another provider, then Party 2 will pay the bill from the money coming from E-rate and the difference will be paid 50-50.
>
> d) The service provider will issue an invoice right away or in the near future, and if it is not possible, then at the latest in a few months but definitely when the money arrives from the government. Before he takes [money] for himself, he will issue an invoice in writing.
>
> e) Even before we get approved by the government, Party 2 will provide the service in a normal manner (like we were receiving it from Mr. Peretz Klein)
>
> This is a contract that should be treated like any contract according to the Jewish Law.
>
> [Signed:] Aharon Melber
>
> [Signed:] [administrator]

Also like with Peretz Klein's companies, Steinberg's companies worked primarily with Simon Goldbrener as their consultant.

### c.    Ben Klein's Companies

Ben Klein did far less to cover his tracks. He carried out his fraud through a single company that he openly owned, Trust Corp. However, he had guidance. Like every crooked vendor in this case, he worked primarily with Simon Goldbrener, who helped him engage in fraud, counseling Ben Klein's clients, and telling those clients that their only choices were between Peretz Klein and Ben Klein.

### C.    The Victims

There are many white-collar crimes against the Government that are termed "victimless crimes." This is not one of them. Here, instead, there are at least four distinct groups of victims beyond the Universal Service Fund: the schoolchildren at the schools that the defendants "serviced," the schools that believed they were receiving subsidized services and equipment, underprivileged schoolchildren at other schools, and every American who uses a phone.

First, and most directly, the defendants stole money, depriving schoolchildren in various schools that desperately needed access to technology and telecommunications services. As the FCC Office of the Inspector General explained, the schools that were searched[29] pursuant to the March 2016 search warrants "served 1,751 students, of which 80% (1,413) were low-income students and therefore eligible to participate

---

[29] The FCC refers to searches of eleven schools. That is because one of the ten schools searched in March 2016—Ohr Yochanan—was split into a lower school and upper school, each of which was searched separately.

in the National School Lunch Program (NSLP)." (Exhibit B at 2).[30] Clearly, such students are precisely the students who the E-Rate program was intended to help. The defendants deprived those students of the access to technology that they so desperately deserve.[31] The fact that some of the schools frowned upon the use of technology does not mitigate the defendants' actions; to the contrary, it highlights the desperate need for the students to have access to telecommunications services and equipment through the E-Rate program where the schools were less likely to provide them otherwise.

Second, the defendants effectively defrauded the schools themselves. While some school administrators received kickbacks or otherwise understood that they were involved with a fraud, many were unwitting participants in the defendants' scheme. Often, the vendors or consultants would tell the schools that a program existed that could provide certain items—often claiming that it could provide ineligible equipment and services, like alarms and school security services[32]—and that, if the

---

[30] The FCC Office of the Inspector General's letter to this Court in conjunction with this sentencing is attached as Exhibit B.

[31] The defendants were keenly aware of what is needed to educate children, and the importance of technology in modern society. Each of the defendants was working himself or herself in technological fields, selling or consulting about E-Rate services. Melber was also a teacher. Moreover, four of Peretz and Susan Klein's children are either programmers or web developers (P. Klein PSR ¶ 83); two of Goldbrener's children are teachers (Goldbrener PSR ¶ 86); and three of Melber's children are teachers (Melber PSR ¶ 84).

[32] Hashomer Alarm was originally a security firm, as were certain other vendors involved. Often, the defendants provided security systems to the schools and falsely charged E-Rate for eligible telecommunications equipment and services.

schools allowed them, the vendors and consultants would take care of all the paper-work. The consultants would keep copies of the schools E-Rate program PINs and passwords and fill out paperwork for them, or direct the schools about what to tell the program managers. As a result, the schools often did not know that they were receiving ineligible equipment and services, they were being overcharged in a non-competitive market, or that they did not receive that to which they were entitled. They trusted the defendants, and the defendants abused that trust.

Third, because E-Rate had limited funds, when the defendants diverted money to themselves, they deprived other needy children at other schools of the benefits that the E-Rate program offered. The FCC Office of the Inspector General explained it plainly, and provided examples that show the damage that theft from the program wreaks on other deserving students:

> Fraud in the E-rate program has serious real-world conse-quences for schools and students. Funds wasted through fraud diminishes the money available to fund legitimate equipment needs at schools nationwide. During the rele-vant time period for this case, the E-rate program lacked funding to provide funds for all requests nationwide every year the fraud was committed except for Funding Year 2010. The funding provided to these 11 schools was mis-used and, given the finite nature of the E-rate program fund, clearly could have been used to provide E-rate sup-port to deserving projects at other schools, or to the inno-cent students actually needing equipment and services at the affected schools.
>
> During 2009, 2011, 2012, and 2013, after exhausting all available E-rate funds, USAC was forced to deny funding to thousands of schools and districts located throughout the country for internal connections equipment and basic maintenance, including hundreds located in New York, re-sponsible for educating millions of students many of whom were underprivileged. By way of example, due to lack of

funds, USAC was forced to deny the following local school/district funding requests while expending funds to the defendants' fraudulent activities:

- FY 2013 Hyde Leadership Charter School, located in the Bronx serving approximately 700 students, 93% of whom qualified for a free or reduced-price lunch, requested equipment and services costing approximately $75,000 (Form 471 #918836);

- FY 2013 Cardinal Hayes High School, located in the Bronx serving approximately 420 students, 72% of whom qualified for a free or reduced-price lunch, requested equipment and services costing approximately $321,000 (471 # 932506);

- FY 2012 Harlem Village Academies, a group of schools located in Manhattan serving approximately 1,000 students, 80% of whom qualified for a free or reduced-price lunch, requested equipment and services costing approximately $235,000 (Form 471 # 844887);

- FY 2012 The Opportunity Charter School, located in Manhattan serving approximately 1,000 students, 80% of whom qualified for a free or reduced-price lunch, requested equipment and services costing approximately $70,000 (Form 471 # 874314);

- FY 2011 Academy of Mount St. Ursula School, located in the Bronx serving approximately 350 students, 75% of whom qualified for a free or reduced-price lunch, requested equipment and services costing approximately $47,000 (Form 471 #777256);

- FY 2011 St. Hope Leadership Academy, located in Manhattan serving approximately 300 students, 70% of whom qualified for a free or reduced-price lunch, requested equipment and services costing approximately $15,000 (Form 471 # 803808);

- FY 2009 Immaculate Conception School, located in Manhattan serving approximately 240 students, 48% of whom qualified for a free or reduced-price lunch, requested equipment and services costing approximately $4,800 (Form 471 # 659494).

(Exhibit B at 2–3). The defendants did not know these students, but had no problem stealing from them.

Fourth, each and every person who has a phone plan pays into the Universal Service Fund. And that fund is limited. When the defendants defrauded E-Rate, they stole from that fund and, therefore, from nearly everybody.[33]

## II.    The Applicable Guidelines

The Guidelines calculations found in each defendant's presentence investigative report ("PSR"), accurately state the Guidelines applicable to each defendant. For the convenience of the Court, this section details how the relevant calculations were applied across defendants.

Because each defendant negotiated a plea to the generic conspiracy charge, 18 U.S.C. § 371, rather than the originally-charged wire fraud offenses, their base offense level is six rather than seven, and their sentences are capped at the five-year statutory maximum. (*See, e.g.*, Goldbrener PSR ¶ 59).

The primary driver for each defendant's Guidelines range was the amount of gain or loss attributed to that defendant; no defendant was held accountable for the losses inflicted, or gains reaped, by the entire conspiracy. For the defendants who operated vending companies, the loss was calculated based on the value of the equipment requests for the eleven schools where physical inspections indicated that the request was fraudulent. That yielded an intended loss amount of $2,224,914.91 for

---

[33] This undermines Peretz Klein's attempt to imply that, to the extent that he was stealing money, it was from faceless "interstate telecommunication companies," because E-Rate is not funded with tax dollars. (P. Klein Sub. 6).

Peretz Klein, $547,948.31 for Ben Klein, and $277,109.13 for Steinberg. (P. Klein PSR ¶ 31; B. Klein PSR ¶ 45, Steinberg PSR ¶ 49). Although during the course of the scheme the defendants made millions of dollars in E-Rate requests for many other schools that were not physically inspected, the losses at those schools could not be confidently extrapolated, and so no attempt was made to estimate the additional intended losses at those schools. Based on these conservative figures, the offense level increases by 16 for Peretz Klein and 12 for Ben Klein and Steinberg. (P. Klein PSR ¶ 59; B. Klein PSR ¶ 60; Steinberg PSR ¶ 60).

For the consultants, Goldbrener and Schwartz, the parties did not use the intended losses reasonably foreseeable to these defendants—which would be difficult to estimate—but rather principally the amount that each consultant personally received in improper kickbacks from the vendors. *See* U.S.S.G. 2B1.1(b)(1)(G) & n. 3(B) (permitting use of actual gain where loss is difficult to estimate). For Goldbrener, this showed an actual gain to the defendant of $479,357.18, comprising $17,560.43 paid to Goldbrener by the affected schools and $461,796.75 by the vendors. (Goldbrener PSR ¶ 39). Schwartz received $219,000 in improper vendor payments, to which was added the losses from his own side scheme as an E-Rate vendor supplying a school at which he worked, totalling $275,160. (Schwartz PSR ¶ 43). This results in an increase of 12 offense levels for both consultants. (Goldbrener PSR ¶ 60; Schwartz PSR ¶ 59).

The parties estimated the amount of loss reasonably foreseeable to Susan Klein as $195,000. (S. Klein PSR ¶ 35). Because the evidence did not make clear whether Susan Klein understood the scope of her husband's fraud, this amount is

based on Hashomer's role in kicking back the 10% payments for the schools where fraud was confirmed, a fraudulent act of which Susan Klein was plainly aware. (*Id.*) This results in a ten-level increase in Susan Klein's offense level.

Aron Melber helped bill USAC for $191,082.00 in goods and services that the school he ran did not in fact receive. (Melber PSR ¶ 52). Although Melber also participated in the E-Rate scheme in other ways, *see* Section I.B.2.b above, the losses resulting from that additional criminal activity could not be confidently estimated. Based solely on the fraudulent billing he personally conducted, Melber's offense level increases by 10. (Melber PSR ¶ 59).

A two-level enhancement applies to every defendant because this conspiracy involved misrepresentations that the defendants were acting on behalf of educational and religious organizations—the schools—when in fact they were taking money to enrich themselves. *See* U.S.S.G. § 2B1.1(b)(9)(A); *United States v. Kinney*, 211 F.3d 13, 19-21 (2d Cir. 2000) (enhancement applies where defendants worked with real charitable organizations, but misrepresented that the funds would be used to benefit the charity rather than themselves).

Peretz Klein receives a three-level increase in his offense level because he was the manager and organizer of the extensive fraudulent activity at Hashomer and its many shell companies. (*See* P. Klein PSR ¶ 63). Susan Klein's offense level decreases by two levels because she was a minor participant in the scheme orchestrated and led by her husband. (S. Klein PSR ¶ 64). No other defendant received any adjustment for their role in the offense: The smaller vendors operated by Ben Klein and Steinberg

were essentially one-man shows; although Schwartz's role in the fraud was broad, he took direction from Peretz Klein and Goldbrenner; Aron Melber was a senior leader at his school, and abused that position to carry out the fraud, but the school itself was not a fraudulent operation within the meaning of the Guidelines; and Goldbrener was a senior and highly respected member of the conspiracy to whom others—even Peretz Klein—deferred, but his role in carrying out the fraud could more accurately be described as coordinating and advising rather than leading or managing.

Peretz Klein, Susan Klein, Goldbrener, and Schwartz received two-level enhancements under U.S.S.G. § 2B1.1(b)(10)(C) for the use of sophisticated means, such as the extensive deployment of shell companies with fake CEOs and sham mailing addresses. (P. Klein PSR ¶ 61; S. Klein ¶ 61; Goldbrener PSR ¶ 61, Schwartz PSR ¶ 61). Ben Klein and Steinberg, by contrast, operated their aspects of the fraud in a more straightforward manner, using one or two companies in their own name, and Melber participated principally in Steinberg's fraud.

As calculated in the parties' plea agreements and the PSRs, each defendant's offense level decreases by three for accepting responsibility. As discussed below, however, it appears that Goldbrener and Schwartz may deny material aspects of their crimes. Should a hearing be necessary to resolve these disputes, and should the Court resolve them against the defendants, it may no longer be appropriate to credit these defendants with accepting responsibility. *See* U.S.S.G. § 3E1.1 n. 1(A) ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.").

For every defendant, the Guidelines calculations in the parties' plea agreement match those used by the Probation Office in the PSRs. Assuming that the Court reaches the same calculations, and assuming that every defendant receives credit for accepting responsibility, the Guidelines sentences for each defendant are as follows:

| Defendant | Imprisonment | Supervised Release | Fine |
|-----------|--------------|--------------------|------|
| Peretz Klein | 60 months[34] | One to three years | $25,000 to $250,000 |
| Susan Klein | 18 to 24 months | One to three years | $7,500 to $75,000 |
| Goldbrener | 30 to 37 months | One to three years | $10,000 to $100,000 |
| Schwartz | 30 to 37 months | One to three years | $10,000 to $100,000 |
| Ben Klein | 27 to 33 months | One to three years | $10,000 to $100,000 |
| Steinberg | 24 to 30 months | One to three years | $10,000 to $100,000 |
| Melber | 18 to 24 months | One to three years | $7,500 to $75,000 |

## III.     The § 3553(a) Factors

Based on the factors listed in 18 U.S.C. § 3553(a), the Government respectfully requests the following sentences:

- Peretz Klein: 60 months' imprisonment (recommended sentence under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines))

- Susan Klein: Term of Probation (below Guidelines sentence)

- Simon Goldbrener: 37 months' imprisonment (top-of-Guidelines sentence)

---

[34] Peretz Klein's Guidelines range is capped by the statutory maximum sentence for violating 18 U.S.C. § 371, but would otherwise be 63 to 78 months' imprisonment. (P. Klein PSR ¶ 107).

- Moshe Schwartz: 30 months' imprisonment (bottom-of-Guidelines sentence)

- Ben Klein: 27 to 33 months' imprisonment (Guidelines sentence)

- Sholem Steinberg: 24 to 30 months' imprisonment (Guidelines sentence)

- Aron Melber: 18 to 24 months' imprisonment (Guidelines sentence)

## A.    The Defendants' Crimes Require Serious Punishment.

This section describes the individual defendants' particular conduct, and addresses defendants' arguments about their individual roles in the conspiracy. The defendants' claims of mitigating factors extrinsic to the charged crimes—which are strikingly similar across many defendants—are addressed in Section B.

### 1.    Peretz Klein

Peretz Klein ran a web of shell companies designed to deceive and defraud the E-Rate program out of millions of dollars. He supervised over a dozen employees carrying out this fraud, which he repeated for years. He profited far more than any other defendant, and paid others, such as Moshe Schwartz and Simon Goldbrener, hundreds of thousands of dollars to further his scheme. He did all this so that he and his family could enjoy a comfortable lifestyle by depriving underprivileged schoolchildren of the technology they needed to prepare for the information age. Peretz Klein fully deserves the Guidelines sentence of 60 months' imprisonment—Guidelines that would be higher but for the statutory cap on his possible sentence. Any lower sentence would fail to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

In his submission, Peretz Klein minimizes his conduct, depicting a venture that began with the best of intentions, but involved "some fraudulent steps" after he "allowed things to get out of control." (P. Klein Sub. 6–9). Not exactly. Peretz Klein made millions from the E-Rate program, often by lying to USAC about the cost of the equipment he provided or lying about providing the equipment at all—which is simply fraud, not a "fraudulent step." The supporting "fraudulent steps" included establishing more than 20 shell companies, which Peretz Klein operated through a series of sham email accounts, pretending to be the fictitious owners of these companies, such as "ben@daas-media.com," or "moshe@ptopcommunications." His failure to acknowledge that he managed a complex, long-running, and blatant fraud does not mitigate his conduct. It shows a lack of meaningful remorse.

Peretz Klein also attempts to shift blame, suggesting that it was the schools who "would often request equipment from e-rate for which they had little or no pressing need." (P. Klein Sub. 9). That makes no sense. A daycare center for toddlers would derive no benefit from having expensive electronic equipment it cannot use, even had Peretz Klein provided it. (*See* Section I.B.1.a above). It is Peretz Klein who profited, by being able bill for these unnecessary sales. USAC paid him, not the schools. That is why Peretz Klein, not the schools, went to such lengths to carry out the fraud. In particular, he acknowledges secretly covering the schools' 10% payments to USAC. (*See* P. Klein Sub. 8). He did that because he profited from the fraud even after making this payment to the schools, whereas the schools would not pay even 10% of the value of equipment that they did not need (much less 10% of the value of equipment

that they did not receive). This is also one reason why Peretz Klein paid Goldbrener and Schwartz to do the E-Rate paperwork for the schools: It made sense for him and his co-conspirators to do all the legwork—presenting the schools with a pre-fabricated fraud where school officials needed only sign on the dotted line (*see* PSR ¶ 24)—because it was Peretz Klein and his accomplices who stood to profit.[35]

Nor can Peretz Klein meaningfully reduce his culpability by noting that he sometimes provided alternative goods and services to the schools. (P. Klein Sub. 8). To start, he does not appear to dispute that he sometimes billed for equipment that he did not provide at all. (*See* P. Klein PSR ¶ 29). And although the parties disagree on how often Peretz simply stole money in return for nothing (*see id.* n.5), that dispute does not appear material. Even when Peretz Klein provided cheaper alternatives, he still defrauded E-Rate by stealing the hidden profit margin. Indeed, he committed multiple levels of fraud: *First*, he circumvented the bidding process, preventing competition which would drive the price down. *Second*, he sent the schools contracts for goods that they did not need and would not use, so that he could make a profit on the sale. *Third*, he replaced the expensive unnecessary goods listed in the contract with cheaper but still unnecessary goods, to increase his profit margin. None of that mitigates his guilt.

---

[35] To be sure, there is evidence that Peretz Klein and other defendants cut school officials in on some of the fraudulent gain. (*See* Sections I.B.2.b, III.A.4). But that does not make the schools the prime movers; it merely shows another corrupting act by Peretz Klein.

Peretz Klein also repeats the argument, common among white-collar defendants, that the Guidelines' reliance on loss amount results in an unreasonably high recommended sentencing range. (P. Klein Sub. 10–11). But whatever the merits of that argument in other cases, it has little application here. Peretz Klein is being held responsible only for the $2.2 million that he directly tried to steal from the program. Indeed, this is a conservative estimate. Peretz Klein solicited tens of millions of dollars in E-Rate business related to dozens of schools, but is being held responsible the losses only at the much smaller set of schools which the Government physically inspected. The defendant does not—and could not credibly—argue that his fraud just happened to be limited to those schools. Thus unlike the cases on which he relies, here the Guidelines merely, and fairly, hold Peretz Klein responsible for what he provably and personally tried to steal. *Cf. United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (rejecting Guidelines based on profits obtained by co-conspirators, "in which Mr. Gupta did not share in any direct sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 509-10 (S.D.N.Y. 2006)) (rejecting Guidelines based on total loss to shareholders, focusing on intended loss, and noting that defendant did not originate scheme but rather sought to cover it up); *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (rejecting application of Guidelines in securities fraud case, where defendants may be held liable for extensive losses of all shareholders).

Finally, this defendant cannot reasonably claim that the collateral consequences of his conviction suffice to punish his crimes. (*See* P. Klein Sub. 22–23). That he claims to feel shame (*id.*) should be expected—he stole money earmarked for poor

38

schoolchildren. But that shame should come from committing the crime, not getting caught. Because the shamefulness of his conduct did not deter Peretz Klein in the first place, clearly more is needed. Nor can he seriously ask for sympathy based on having to sell his "upstate vacation bungalow" and downsize his primary home. (*Id.* 23). Few of Peretz Klein's victims would have grown up in any residence owned by their parents, and his crimes only made it harder for them to obtain the sort of comfortable life he enjoyed for many years.

### 2. Susan Klein

Susan Klein worked for her husband, Peretz Klein, in implementing his fraudulent schemes. She regularly handled his deceptive correspondence with USAC, helping to operate the shell companies through their sham email accounts. She also interacted with Schwartz and Goldbrener, coordinating their fraudulent filings and answering their inquiries. Her felony conviction was entirely warranted by the evidence.

Nevertheless, a below-Guidelines sentence of probation and community service would be sufficient, but not greater than necessary, to achieve the purposes of § 3553(a). Susan Klein is the primary caregiver for a troubled relative (*see* S. Klein Sub. 9–13, 17–21). Assuming that her husband receives the five-year sentence that both the Guidelines and § 3553(a) suggest, Susan Klein will become the sole caregiver. In addition, the evidence indicates that she acted at the behest of her husband (who has accepted a three-level leadership enhancement for supervising Hashomer employees, including his wife), and it seems unlikely that she would have committed the instant offense but for his direction. Given the collateral consequences of her husband's conviction, a sentence of probation and community service for Susan Klein

suffices to provide deterrence and recognize the seriousness of the offense, and is warranted given the exceptional circumstances of her dependent family member.[36]

### 3.    Simon Goldbrener

Simon Goldbrener was the E-Rate consultant at the center of this wide-ranging conspiracy. He officially served as a consultant for each vendor defendant and almost every school described above, each of which was missing equipment and evidence of services for which these schools had obtained E-Rate funds. (Goldbrener PSR ¶ 36). As the schools' consultant, he was responsible for helping a school determine what it needs, conducting an open and fair bidding process to select cost-efficient vendors, and completing the necessary paperwork so the school could obtain reimbursement from USAC. And in fact, Goldbrener collected over $17,000 from the searched schools for his services as a consultant. But the schools were by no means Goldbrener's true clients. His real clients were the vendors—Peretz Klein, Ben Klein, and Steinberg— who paid him nearly half a million dollars to file fraudulent forms with USAC on behalf of the schools and conduct a sham bidding process choosing their companies

---

[36] The Probation Office has recommended a sentence of incarceration of one year and one day for Susan Klein, but a significantly below-Guidelines sentence of 36 months for Peretz Klein. (*See* S. Klein PSR at 34; P. Klein PSR at 29). This offers the worst of both worlds: Imposing below-Guidelines sentences of incarceration on both defendants would send the general message that courts do not take the sort of million-dollar fraud here seriously, while still depriving the Klein Family of any competent caregiver for many months. By contrast, a well-deserved 60-month sentence for Peretz Klein paired with a non-custodial sentence for Susan Klein will more effectively serve to provide general deterrence and reflect respect for the law, by imposing the normal sentence for the prime mover of the Klein family's crimes, while still accounting for the family's unique circumstances by leaving Susan Klein at liberty to serve as a caregiver.

as the winning bidders.[37] Because Goldbrener coordinated the frauds of all three de-
fendants, because he abused his expertise in administering a charitable program, and
because he held a senior position in this conspiracy, this Court should sentence him
to 37 months' imprisonment, at the top of the Guidelines range stipulated by the par-
ties.

E-mails and other documents recovered during the execution of search war-
rants confirm Goldbrener's central and knowing role in the conspiracy. As described
above, when a USAC inspector questioned why "Ben Klein" email addresses were
used by several of Peretz Klein's shell companies, Peretz and Susan Klein separately
forwarded the inquiries to Goldbrener, asking how to respond. (Goldbrener PSR ¶ 38.)
In other emails, schools forwarded their E-Rate passwords to Goldbrener and he di-
rected co-conspirators to take actions, such as directing a school to sign a contract
drafted by a vendor, or directing a vendor to send paperwork to Schwartz for comple-
tion. (*Id.*) In another email chain, USAC asked a school to explain why it supposedly
needed a $25,000 computer server. The school forwarded the request to Goldbrener,
who then forwarded it to Peretz Klein. (*Id.*) This is exactly the opposite of how the

---

[37] It is possible for a vendor to hire its own consultant to help complete the necessary
forms that a vendor must file. (Goldbrener PSR ¶ 37 & n.5.) But Goldbrener (like
Schwartz, the other consultant discussed below) held himself out as working for the
schools. Among other things, Goldbrener listed himself on forms (specifically the FCC
Form 470) that the schools filed with USAC seeking to begin the bidding process for
E-Rate projects—that is, during the stage of the process where schools had ostensibly
not selected vendors, and thus when there is no legitimate reason for a consultant
who worked for a vendor to be making USAC filings on the school's behalf.

process should have worked: Rather than the school working with Goldbrener to de-termine what equipment it needed, the vendor determined what equipment it wanted to be paid for, then provided the justification to USAC through Goldbrener and the school.

Goldbrener acknowledged that he was paid by the vendor defendants, knew that was wrong, and nonetheless repeatedly helped the schools select these same ven-dor defendants for contracts. (Goldbrener PSR ¶ 38). He also knew that he was im-properly working for the vendor defendants, rather than the schools, and by doing so circumventing the bidding process at the core of the E-Rate program. (*Id.*). He knew of the arrangement by which the schools, with his assistance, would select the vendor defendants who were paying him outside of the supposedly competitive bidding pro-cess. (*Id.*)

Goldbrener asserts that he "he believed that the equipment and services re-quested were being provided to the schools he serviced, and indeed took special pains to adjure the schools to apply only for services and equipment that they really needed and could beneficially use." (Goldbrener Sub. 5). This claim strains credulity, for mul-tiple reasons. To start, it is undisputed that Goldbrener worked closely with the same schools on every aspect of the E-Rate program including, "advis[ing] schools of the types of equipment and services that qualified for the e-rate program and the com-petitive bidding process," and "help[ing] the schools complete the necessary e-rate filings including communicating with the vendors and securing signed contracts after

42

the school had already reached an agreement, including pricing, with a service provider." (*Id.* 41). Put another way, Goldbrener was the person who advised a daycare for children ages two to five how to qualify for over $1.1 million for sophisticated information technology. And Goldbrener was the consultant who helped obtain over $200,000 in technology funding for a religious school that prohibited students from using electronics. Goldbrener's claimed surprise that much of this equipment was not in fact purchased for a school that officially denounced the "ugliness of all the technological devices" is as shocking the gambling at Rick's in *Casablanca*.[38]

Further, it is undisputed that the schools in question *were* in fact missing millions of dollars of equipment and services while being represented by Goldbrener. The E-Rate program required schools to make annual certifications on Form 486 attesting that the precise equipment and services for which they applied were being provided by the vendors. And while being advised by Goldbrener, the schools plainly made those false filings. Goldbrener's schools certified they received equipment that was never delivered, and even that the same corrupt vendors performed maintenance on equipment that did not exist. Goldbrener would have the Court believe that although the schools used three different vendors, each of these schools separately chose to

---

[38] Goldbrener's claim that he "avoid[ed] recommending to the schools … the equipment or services they should seek" is misleading. (Goldbrener Sub. 44). The affected schools obviously were not "seeking" all of the particular equipment, as they were not in fact receiving all the equipment. Although it was the vendors, rather than Goldbrener (and his fellow consultant Schwartz) who appear to have originally composed the lists of bogus requests used to defraud USAC, they relied on Goldbrener to steer the schools through the process. For example, Goldbrener repeatedly directed Moshe Schwartz to complete requests for such equipment.

make these fraudulent filings without ever discussing the matter with him, their expert consultant. In his implausibly self-serving narrative, it is the schools who chose to conspire with the vendors to deceive USAC and their own consultant—who just happened to be receiving corrupt payments from the vendors all along.

In any event, whatever the full scope of his knowledge about the missing equipment, Goldbrener acknowledges being told by at least one school that it was not receiving the services for which he helped Ben Klein receive payment. (Goldbrener PSR ¶ 38; Goldbrener Sub. 43). Having lost his cover of plausible deniability as to this school, Goldbrener's next move made plain his corrupt motive. He did not instruct the school to disclose the missing services on its sworn Form 486 certifications, to amend any prior false filings, or otherwise report the matter to USAC. He did not follow up with Ben Klein, review the school site, or inform USAC himself. Instead, Goldbrener advised the school official simply that if the school were unhappy, it could switch to Peretz Klein, another vendor who had been defrauding USAC and paying Goldbrener for years.

Goldbrener attempts to deflect attention from his criminal conduct to numerous solicited positive letters about his work as a consultant from schools not implicated in the charged scheme. (Goldbrener Sub. 45). However, these letters have no bearing on his participation in the fraud with the affected schools. If anything, these letters indicate that Goldbrener knew the importance of acting in the schools' best interests, confirming that equipment was actually provided, and adhering to USAC's competitive bidding rules—and deliberately chose to flout those requirements when

it got him a payoff from corrupt vendors. Goldbrener even boasts about "taking his time to review the entire process to make sure that everything is done properly and legally" in a collateral matter—a mortgage where he had no particular expertise. (Goldbrener Sub. 24). His claim to have lacked knowledge of the fraud all around him, in conspiracy where he was both the central hub and the subject matter expert, does not mitigate his responsibility; it manifests a lack of remorse and willingness to admit his conduct.

### 4.   Moshe Schwartz

Moshe Schwartz defrauded the E-Rate program as both a consultant and a vendor. While representing himself as a neutral school consultant to USAC, Schwartz was in fact systematically preparing and filing dozens of forms that funneled money to Peretz Klein in a rigged bidding process, and being paid by Peretz Klein to do so. (Schwartz PSR ¶ 41.) Those filings, as well as emails and other documents recovered during the execution of search warrants, show that Schwartz took direction from Peretz Klein and Goldbrener in creating the fraudulent E-Rate filings which were signed by school officials, then submitted by Schwartz or Goldbrener. (*Id.*) In addition, documents found during the search of Schwartz's residence show that he received solicitations from legitimate service providers of E-Rate supported services, such as Sprint, seeking to provide those services to schools for which Schwartz acted as consultant at far lower prices than Peretz Klein. (*Id.*) Schwartz did not, however, seek bids from those providers—as USAC procedures require—instead seeking USAC funds only for vendors as directed by Peretz Klein and Goldbrener. (*Id.*) In exchange

for his illicit assistance to corrupt the bid process, Schwartz received over $200,000 from Peretz Klein.

In his submission, Schwartz attempts to minimize his core misconduct as filing fraudulent Form 470s that opened the rigged bidding process for certain schools, while largely deflecting responsibility for every other form he filed and action he took to bring that rigged process across all affected schools to a successful conclusion. (*See* Schwartz Sub. 8, 25–26 (identifying his "most culpable conduct" as his filing of false Form 470s representing himself as a school consultant during a brief period in 2015); *id.* at 10 (asserting, contrary to his plea agreement, that his role in the scheme was "minimal")). Schwartz's involvement in the E-Rate program is far more extensive than he now claims. Over the course of at least four years, Schwartz worked closely with Goldbrener to file dozens of forms to obtain funding for Peretz Klein. Schwartz knew that Peretz Klein was using multiple companies masquerading as independent entities. He knew that the bid process was not open and fair. He knew that forms filed on the schools' behalf represented him as the schools' consultant, not as a vendor's consultant or someone being paid off by the vendor. He knew that as a result, Peretz Klein obtained millions of dollars in E-Rate funding. In fact, Schwartz admitted maintaining detailed spreadsheets capturing the millions of dollars in E-Rate business he helped Peretz Klein corruptly obtain, and further admitted that the purpose of these charts was to illustrate how much money he was helping Peretz Klein make, so that Peretz Klein would pay him more. Schwartz also used his authority at two schools where he worked directly to select Peretz Klein's companies. And he was

paid handsomely for it all. Schwartz began receiving documented payments from the Kleins from at least November 15, 2012, continuing for nearly the next four years through at least September 26, 2016. Schwartz received a total of $219,000 from the Klein companies.[39]

Schwartz further corruptly steered E-Rate funding to his own company. Between 2012 and 2015 Schwartz operated a New York corporation, nominally owned by his daughter, called "GPS Com Inc." ("GPS"). Schwartz set up this company to sell refurbished cellphones. The only schools that purchased these phones were Sheri Torah and B'nai Yoel, two schools where Schwartz worked as a consultant for both E-Rate and a separate lunch program—meaning that Schwartz completely circumvented the E-Rate bidding process, and simply submitted the E-Rate paperwork to steer Government funds to himself. Schwartz awarded USAC contracts from his schools to his own company on three occasions in 2012 and 2013, successfully obtaining $56,160 from USAC.

Schwarz claims that he started GPS to participate in a different USAC program, rather than E-Rate. (Schwartz Sub. 12). But whatever Schwartz's initial inten-

---

[39] Contrary to Schwartz's claims, 2015 was not the only year in which Schwartz was identified as the school's consultant. He appeared for 17 different schools on Form 470s that opened bidding in 2014 and 2015. Schwartz (and his home address) was identified as the school's consultant on at least 21 schools' Form 471 funding requests for equipment or services to be provided by Peretz Klein between 2013 and 2015. Collectively, Peretz Klein received over $1.41 million in funding from USAC on funding requests stemming from forms that listed Schwartz as a point of contact or consultant.

tions may have been, the history of GPS indicates that it operated solely to take ad-
vantage of E-Rate at two schools where he had vendor selection influence and author-
ity. The fact that Schwartz set up GPS in his daughter's name, yet plainly operated
the company himself, shows that he was trying to evade detection by USAC. That
Schwartz had no experience running a company reselling cell phones, yet shortly af-
ter its launch switched his schools' phone contract away from Sprint and to himself,
shows that his clear purpose was to bilk the E-Rate program. Tellingly, the two
schools where Schwartz controlled the E-Rate program were the *only* clients of GPS,
confirming that it existed solely as a vehicle to skim E-Rate funds.

GPS was not the only conflicted company to which Schwartz steered contracts.
Schwartz also helped choose Peretz Kleins' companies as vendors for Sheri Torah and
B'nai Yoel. These schools were not searched by investigators, and thus the Govern-
ment cannot say whether equipment or services were missing there. It is, however,
undisputed that while being paid by Peretz Klein, Schwartz chose him as a vendor
for Sheri Torah and B'nai Yoel. For example, between the 2013 and 2017 funding
years, Schwartz filed at least 53 forms listing himself as the applicant on behalf of
Sheri Torah, and selecting one of Peretz Klein's companies as the vendor. As a result,
for those four funding years, Peretz Klein received at least $747,552 from USAC for
equipment and services supposedly provided to Sheri Torah. Additionally, for the
2012 through 2016 funding years—the years during which Peretz Klein was paying
Schwartz over $200,000—Peretz Klein's companies were selected as the vendor on at
least 93 funding requests filed by B'nai Yoel, for which they received in excess of $1.1

million. Schwartz never disclosed to USAC that he was secretly being paid by Peretz Klein during this time.

At least one payoff from Peretz Klein is highly indicative of a kickback for a contract at one of the schools where Schwartz worked. In 2013 and 2014, Schwartz helped select Multimedia Broadcasting Corporation ("MBC"), one of Peretz Klein's companies, as a vendor for Sheri Torah. MBC received $89,856 in funding year 2013 and $189,000 for funding year 2014 for its supposed work for Sheri Torah. On June 3, 2014, MBC sent GPS a $35,000 wire. Notably, every other documented payment from Peretz Klein's companies to Schwartz for his assistance with form filing for other schools was made out directly to Schwartz, in regular amounts of $10,000 or less. This much larger, one-time $35,000 payment, to the company Schwartz set up in his daughter's name, by a company Schwartz selected as the winning E-Rate vendor, bears every hallmark of a poorly disguised kickback.

Schwartz seeks credit for "volunteer[ing] his own conduct to the government in connection with GPS.com" (Schwartz Sub. 13), but this characterization of Schwartz's proffers to the Government falls short of the mark. Rather, Schwartz initially lied to the Government and said that he did not remember "why he dealt with them." Schwartz held back information, "volunteering" it only after the Government confronted him with the apparent kickback from MBC to GPS. Even then, Schwartz indicated that he was admitting this conduct only in order to avoid legal consequences for his daughter, rather than due to genuine remorse for his own crimes.

Schwartz relatedly claims that it is "undisputed" that he was "entirely cooper-ative" with this investigation. (Schwartz Sub. 7). This is wrong; the Government knows of no law enforcement officer who shares this view. With respect to the search of his office (*id.*), Schwartz did not provide significant cooperation. The FBI had a warrant for his home, where they understood Schwartz to maintain his office. The office was at that location, but in a separate basement with a different entrance from the home, and thus arguably outside the existing warrant. While FBI agents secured but did not search the separate office, Schwartz met with his lawyer, first by phone and then in person. Approximately two hours after the FBI arrived, Schwartz con-sented to the search of his office—saving the Government only the minor inconven-ience of obtaining a supplement to the existing warrant to cover the office's separate door. And, with respect to Schwartz's proffers, the investigating agents generally found Schwartz evasive, largely willing to admit only facts the Government could already prove and not to acknowledge even obvious inferences from those facts, ulti-mately leading to the termination of the proffer process.[40] In short, much of Schwartz's "cooperation" could more accurately be considered wasting investigators' time in an unsuccessful bid to portray himself as innocent.

---

[40] Schwartz states that he inculpated himself during the proffer process. (Schwartz Sub. 6). But the only area where he *intentionally* inculpated himself was with respect to the GPS.com issue, and on that issue Schwartz made plain that he admitted re-sponsibility so that the Government would not believe his daughter—who was also involved in GPS.com—had any criminal liability. Although Schwartz also admitted some secondary facts that would have complicated his defense at trial, none of those admissions appeared intentionally inculpatory.

In sum, although Schwartz played a lesser role in the offense than Goldbrener (on the consulting side) or Peretz Klein (on the vendor side), his criminal conduct lasted years and involved deliberate acts of deception and self-dealing. The claim that he played a "minimal" role in the offense (Schwartz Sub. 9–10), is not only inconsistent with his plea agreement (in which he agreed to Guidelines without any mitigating role adjustment), but raises a serious question as to whether he accepts responsibility within the meaning of U.S.S.G. § 3E1.1(a) and (b).

At this time, a sentence of 30 months' imprisonment for Schwartz, at the bottom of the Guidelines, may be appropriate, solely because he shares the same Guidelines range at Goldbrener, but Goldbrener profited more and played a more extensive role in the conspiracy than Schwartz.[41] Should a hearing be necessary to address

---

[41] Schwartz engages in a lengthy analysis to encourage the Court to sentence him pursuant to so-called "Shadow Guidelines" proposed by the American Bar Association's Task Force on the Reform of Federal Sentencing for Economic Crimes, rather than the Guidelines to which he stipulated in his negotiated plea agreement. (Schwartz Sub. 23–27). The Court should decline this invitation. Schwartz's representation that the Second Circuit purportedly "not[ed] federal courts' frequent use of the ABA guidelines" in *United States v. Bayfield*, 796 F. App'x 19 (2d Cir. 2019) is simply incorrect. (*Id.* at 24.) The Second Circuit made no such statement or endorsed the use of the ABA guidelines in any way. What it actually did was remand a case in which the district court sentenced a defendant to a *higher sentence* pursuant to the ABA Guidelines to clarify the record with respect to any impact an error in the actual Guidelines range had on its sentencing decision and potentially resentence the defendant. In any event, although the ABA Guidelines deemphasize loss-based sentencing factors, that does little to help Schwartz, because the Government agreed to use the much more modest $275,160 gain figure for him, rather than the millions of dollars in losses caused by the scheme he helped carry out.

Schwartz's fantastic description of himself as a minimal player—effectively, a frivolous litigation of the facts of the case—Schwartz may end up deserving a longer sentence.

### 5.  Ben Klein

Ben Klein operated a single E-Rate vendor company, Trust Corp., that carried out a more straightforward version of Peretz Klein's scheme: For four years Ben Klein simply billed USAC for hundreds of thousands of dollars in equipment that he did not provide, while using Simon Goldbrener to handle the paperwork. Ben Klein's Guidelines are lower than Peretz Klein's because he profited less than Peretz Klein, but he fully merits the 27 to 33 months' imprisonment the Guidelines recommend for stealing and attempting to steal $547,948.31 intended for schools that served underprivileged children.

Ben Klein's perfunctory attempts to minimize his culpability bear little weight. He claims to have been "swept into the conspiracy" (B. Klein Sub. 5), but there is no evidence that anyone persuaded or induced him to commit his crimes. He owned his own business, and freely chose to join Goldbrener's stable of fraudulent vendors. His claim that his actions "have resulted in his now being a felon," imposing collateral consequences (*id.*), is simply wrong: Ben Klein was already a felon before embarking on this conduct, having been convicted of homicide by vehicle in 2004. (PSR ¶ 71). That makes a serious sentence of incarceration to punish and deter particularly necessary in this case. And although the Government has no reason to doubt his claim to have a learning disability and to lack formal education (B. Klein Sub. 6–7), those facts have little bearing here. Ben Klein does not claim to have been forced into the

52

instant crimes due to the limits of his education or intellect; he was a successful businessman who accumulated significant assets well before committing this fraud. (*See* PSR ¶¶ 104, 106). The sole explanation for his crimes is greed, and that is not a mitigating factor.

### 6.    Sholem Steinberg

Like Peretz Klein and Ben Klein, Steinberg operated vendor companies that billed USAC for equipment that he claimed to provide to schools, but that he did not in fact provide, thereby reaping illegal gains. As described above, Steinberg's correspondence provides a particularly clear illustration of this scheme, showing his negotiations with schools to split the proceeds of their fraud on the program. Because Steinberg ran a less successful operation than Peretz or Ben Klein, he stole and attempted to steal less than they did, and his Guidelines are correspondingly lower. Nonetheless, because for years he fraudulently steered hundreds of thousands of dollars designated for poor schoolchildren to himself, a Guidelines sentence of 24 to 30 months' imprisonment is necessary to reflect the seriousness of the offense and to achieve specific and general deterrence, among other factors under § 3553(a).

Steinberg claims that his crimes constitute "aberrant behavior," and thus merit less punishment. (Steinberg Sub. 15). That is wrong in at least two ways. *First,* no criminal scheme this long-lasting can reasonably be considered aberrant. Steinberg began working at Peretz Klein's E-Rate fraud factory in 2011, and then started operating his own E-Rate vendors a year later. This fraud continued until at least 2016. (PSR ¶¶ 47, 114–15). *Second*, this conviction does not appear to be Steinberg's only fraud. During the search of his home, Steinberg attempted to convince the agents

that certain papers lay outside their purview, because rather than concerning the E–Rate scheme, the papers were "all mortgage fraud."[42] Moreover, during the same period that he committed this fraud, Steinberg repeatedly applied for, and sometimes received, significant benefits from the Supplemental Nutrition Assistance Program ("SNAP"), without acknowledging that he and his wife owned, and profited handsomely from, his E-Rate businesses. In short, Steinberg is not a man who made a single mistake, but rather a man who led two lives—one seeming to be an upstanding member of the community, and the other as a habitual fraudster. Steinberg's behavior thus looks nothing like the "aberrant" behavior in the case he cites. *See Gupta*, 904 F. Supp. 2d 354–55 (finding defendant's crime "aberrant" where two months of insider trading were "the very antithesis of the values he had previously embodied" over an entire career).

Steinberg also suggests that the damage to his reputation alone should suffice to deter him, rendering a custodial sentence unnecessary. (Steinberg Sub. 16–17). But, as with Peretz Klein, the shame of stealing from schoolchildren should have convinced Steinberg to abstain from the crime, not merely caused him embarrassment once he got caught. Here too Steinberg's citation to *Gupta* is instructive. In that case, Judge Rakoff assumed that reputational harm would suffice for specific deterrence of the defendant, rendering a custodial sentence unnecessary for that purpose. 904 F. Supp. 2d at 355. But the court went on to explain that other § 3553(a) factors, such

---

[42] Although Steinberg also identified the fraudulent scheme to which the papers related, the FBI determined that this matter was outside the statute of limitations.

as the need to provide general deterrence and just punishment for the offense, required a sentence of 24 months' imprisonment. *Id.* In particular, the court found that because the fraud in question was difficult to detect, those "similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *Id.* And "[n]o sentence of probation, or anything close to it" would affirm the basic social need to show that crime will be punished. *Id.* If that was so when Gupta engaged in insider-trading to the detriment of Goldman Sachs, *id.* at 353–54, it is all the more true when Steinberg stole from schoolchildren.

### 7.   Aron Melber

Aron Melber abused his position as an educator and as a leader in his community to play a significant role in this fraudulent scheme. In addition to directly filing a false request for over $120,000 in equipment that his school did not use, he helped Steinberg recruit other schools to participate in the fraud. As discussed above (*see* Section I.B.2.b above), Melber and Steinberg plotted to entice other school officials away from Peretz Klein by offering them a greater percentage of the proceeds from defrauding the E-Rate program. And on at least one occasion Melber entered a contract with another school on Steinberg's behalf, agreeing, among other things, to split the profits of their theft 50/50. (*See id.*). A Guidelines sentence—meaning 12 to 18 months' incarceration—is necessary to punish this school teacher for stealing thousands of dollars from schoolchildren.

Melber claims that "[w]hatever misguided reasons" motivated him to commit this crime, "there is no evidence that [he] personally received any ill-gotten gains." (Melber Sub. 33). It is important to note that Melber does not deny that he received

ill-gotten gains; he merely observes that the discovery does not contain any direct evidence of a check going into his pocket. Moreover, he denies evidence only that he *received* ill-gotten gains—he does not deny the clear proof that he *tried* to profit from this scheme. Indeed, it is impossible to imagine any other motive for Melber to help Steinberg recruit schools to participate in his fraud, to consult with Steinberg about how large a kickback to offer a school official, or to broker a contract provided for an even split of the stolen money. Melber thus fails to distinguish himself from the cases he cites, in which courts found significant sentences of incarceration necessary to deter white collar criminals seeking to profit from their crimes. (*See* Melber Sub. 33 (citing *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (tax fraud defendant sentenced to 70 months' imprisonment) *United States v. Nehmad*, No. 16-CR-829 (AKH), 2020 WL 4586798 (S.D.N.Y. Aug. 10, 2020) (tax fraud defendant sentenced to 75 months' imprisonment); *United States v. Baldassarre*, No. 11-CR-801-02 (JBW), 2013 WL 3466562, at *3 (E.D.N.Y. Mar. 27, 2013) (securities fraud defendant sentenced to one year and one day imprisonment)).

Melber also claims a "relatively minor role in the conspiracy," comparing himself to other school administrators who participated the fraud scheme. (Melber Sub. 34). But Melber was the only school official the investigation revealed had participated in fraud at his own school *and* recruited additional schools into the scheme, negotiating kickback amounts along the way. No one told Melber to do this; he had no boss in the conspiracy and owed no obedience to Steinberg. He simply chose to enter a wide ranging fraud conspiracy. That makes Melber's role far from minor. He

may have profited less than others, which is why Melber's Guidelines are lower, but Melber was a full player in this crime, and so unlike his fellow corrupted school officials, merits a sentence of incarceration.[43]

## B.   The Defendants' Claims of Mitigation Are Exaggerated.

The defendants claim many of the same mitigating factors. For example, every defendant except Ben Klein claims to be an exemplary member of the community—aside from participating in a scheme to steal millions from needy school children. The Government can therefore address these mitigating factors more efficiently by topic, although each defendant must of course be evaluated individually.

### 1.   The Defendants' Childhoods Do Not Suggest Lighter Sentences.

Peretz Klein, Goldbrener, Ben Klein and Aron Melber all state that they grew up circumstances of varying difficulty. (P. Klein Sub. 4; Goldbrener Sub. 5; B. Klein Sub. 1–2; Melber Sub. 17–20).[44] The Government is in no position to evaluate these claims, but the Court should not assign great weight to them. The defendants' crimes are far separated from their childhoods. These defendants' ages range from 41 (Ben Klein) to 65 (Peretz Klein). Each started their own family and developed means to

---

[43] Melber's forfeiture order should be joint and several with Steinberg, since it represents funds that they stole together. (*See* Melber Sub. 35–36). But that takes some of the force from Melber's repeated claim that he will pay $127,654.55 (*id.* at 29, 33 & n.2), given that he clearly intends to pay much less than that.

[44] Susan Klein has also advanced claims of a difficult childhood. (*See* S. Klein Sub. 3-5). Because the Government agrees with Susan Klein's request for a non-custodial sentence (*see* Section III.A.2), her mitigating arguments are not generally discussed in this section.

support themselves and their families well before committing these crimes. None claims that their upbringing influenced their decision to perpetrate this massive fraud. These defendants thus bear no resemblance to the archetypal young defendant who may claim difficult upbringing as a mitigating factor because he fell immediately from a harsh childhood into gang or drug circles that surrounded him from youth. Moreover, the defendants here victimized children inside and outside their community. Thus, having escaped their own purportedly difficult childhoods long ago, these defendants have particularly little excuse for imposing suffering on today's children.

### 2. With the exception of Susan Klein, the Defendants' Family Circumstances Do Not Support Lighter Sentences.

Every defendant claims that their incarceration would impose collateral consequences on their family. (P. Klein Sub. 18–20; Goldbrener Sub. 34–38; Schwartz Sub. 17–19; B. Klein Sub. 2–3; Steinberg Sub. 14–15; Melber Sub. 20–28). This is unfortunately likely to be true, as it is in the case of every defendant who chooses to commit a felony after starting a family. For that reason, courts will not typically consider a defendant's claim of family hardship at sentencing absent truly "extraordinary" circumstances. *See United States v. Nivar*, 2003 WL 21488061, at *4 (S.D.N.Y. June 26, 2003) (collecting cases); *cf.* U.S.S.G. § 5H1.6 ("family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted"). The defendants here have particularly weak claims to leniency on this ground, because they chose to steal from countless children, harming other people's families so that they could provide a more comfortable lifestyle for their own.

None of the male defendants can show extraordinary burdens on their family would result from incarceration, as each acknowledges having a spouse who can provide care for their children. And it is offensive to suggest, as Schwartz does, that the Court should sentence defendants in his "close-knit" community more leniently than defendants in other communities because of the supposedly greater familial "stigma" of incarceration where "few children … have been exposed to such a wrenching experience." (Schwartz Sub. 18). All children—regardless of community and neighborhood crime rates—feel the collateral consequences of their parents' crimes. Affording a special break to one community would necessarily be seen as sanctioning harsher punishment for other defendants simply because they come from communities with higher crime rates. Moreover, with the possible exception of Ben Klein, it seems that each defendant here can depend on a large and supportive extended family and community to ameliorate their personal absence. The cases cited by Steinberg (*see* Steinberg Sub. 14) thus serve only to illustrate the gap between these defendants and those where courts found an extraordinary effect on a family, warranting leniency. *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (downward departure reasonable where defendant was sole caregiver for her "three young children, including an infant, and of the young child of her institutionalized daughter"); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) ("Gonzalez' incarceration in accordance with

the Guidelines might well result in the destruction of an otherwise strong family unit.").[45]

With respect to Susan Klein, however, her physical presence appears particularly important to address a specific and exceptional need, assuming that her husband receives the lengthy sentence of incarceration that his conduct merits. For Susan Klein alone, family hardship presents a significant mitigating factor, and this forms one of the reasons she should receive a non-custodial sentence. (*See* Section A.2 above).

### 3. The Defendants' Status and Charitable Works in Their Community Do Not Mitigate Their Crimes.

Several defendants argue that their charitable deeds and good standing in their community justifies leniency. (*See* P. Klein Sub. 12–16; Goldbrener Sub. 6–26; Steinberg Sub. 8–12; Melber Sub. 4–17). Like claims of family hardship, sentencing courts do not typically consider claims of charitable works and standing in the community, absent an extraordinary showing. *See United States v. Canova*, 412 F.3d 331, 358–59 (2d Cir. 2005) (requiring "exceptional degree of public service and good works").[46] That is in part because many defendants do not have the resources—in

---

[45] Steinberg also cites *United States v. Kilgannon*, No. 08 Cr. 76 (JBW), 2008 WL 5423274, at *2 (E.D.N.Y. Dec. 29, 2008). In addition to committing a much smaller crime than any of these defendants, Kilgannon provided substantial assistance to the Government's investigation of his co-conspirators, and was sentenced as a cooperator. *Id.* None of these defendants has similarly chosen to admit the full scope of his and his co-defendants' crimes.

[46] In *Canova*, the question was whether the defendant qualified for a departure despite U.S.S.G. § 5H1.11, which states that "[m]ilitary, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable

time, money, or social standing—to perform such deeds, and so the law is reticent to show leniency to the few defendants who are fortunate enough to have such options. *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."); *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status … have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. Morken,* 133 F.3d 628, 630 (8th Cir. 1998) (prominent community member's public service and charitable activities provided no basis for departure, because although "laudable," they were "neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand."); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) ("[W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in

---

guideline range." *Canova*, 412 F.3d at 358. Because *Booker* had been decided between the defendant's sentencing and appeal, and because the Circuit remanded to the district court on other grounds, the Circuit discussed the propriety of considering the defendant's public service both under the Guidelines and under § 3553(a). *Id.* at 358-59 & n.29. Although many of the cases discussed in this section concern U.S.S.G. § 5H1.11, the cases' reasoning—and the reasoning of the Sentencing Commission in enacting § 5H1.11—bears on the weight that should be accorded to these defendants' claims under § 3553(a). *See, e.g.*, *United States v. Repking*, 467 F.3d 1091, 1095–96 (7th Cir. 2006) (faulting sentencing analysis under § 3553(a) because defendant's charitable works were not so extraordinary "that they should be given weight despite the contrary view of the Sentencing Commission").

charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.").

Peretz Klein's claims fall squarely within the category of arguments that fail to show such extraordinary charity or good character as to warrant leniency. He cites support from other people with whom he did business (P. Klein Sub. 13–14), but "excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003). Here, had Peretz Klein not been a prominent and successful local businessman, it is unlikely that he would have been able to persuade so many other members of his community to engage in this corrupt conspiracy with him. *See Fishman*, 631 F. Supp. 2d at 402 ("[I]t is the widespread recognition in the community that the defendant enjoys for strong character, integrity, sound values and good public deeds that facilitates his hidden life of crime."). Klein also claims significant charitable contributions in the community where he lives and does business (P. Klein Sub. 14–16), but such donations are not uncommon for wealthy and prominent businessmen. *See Vrdolyak*, 593 F.3d at 682 (discounting charitable contributions by defendant who was "by normal standards (not Warren Buffett or Bill Gates standards) wealthy"); *cf. United States v. Repking*, 467 F.3d 1091, 1095 (7th

Cir. 2006) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives … to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts.").

Goldbrener details many more good deeds, including extensive tutoring of challenged students, matchmaking, and resolving disputes between members of the community. (Goldbrener Sub. 8–26). These actions, however, must be taken within the context of Goldbrener's employment and status. He depicts himself as a prominent and influential clergyman, educator, and community leader. (*See id.*). That is consistent with the Government's investigation, which uncovered emails in which Goldbrener's co-conspirators took guidance from him, used respectful titles to address him, and generally showed him notable deference. This Court should thus consider the gratitude of Goldbrener's beneficiaries in the context of a man whose occupation and lifestyle necessitated earning goodwill and gratitude. *See, e.g.*, *Morken,* 133 F.3d at 630 (discounting charitable and public oriented acts of prominent local businessman); *Vrdolyak*, 593 F.3d at 683 (discounting public services of "influential Chicago alderman" because "[p]oliticians are in the business of dispensing favors").

Put another way, Goldbrener's charitable acts within his community were not entirely selfless; rather, they enabled him to build a reputation which supported his consulting business—to include the illegal business at issue here—in addition to allowing him to enjoy higher status. Goldbrener's decision to help those who could help him thus differentiates many of the cases he cites, in which the defendants helped those outside their circles, or were lauded even by those they harmed. *See, e.g.*, *United*

*States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) ("Adelson's good deeds were not performed to gain status or enhance his image," and even victims of his fraud supported leniency); *United States v. Serafini*, 233 F.3d 758, 775 (3d Cir. 2000) (noting exceptional good deeds of politician who selflessly helped even people living outside his district); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (finding exceptional circumstances where defendant sheltered a person who had stolen from her).

In an apparent effort to show good deeds extending beyond his community, Goldbrener recites paying $20—rather than the expected $5—to a man who cleaned his garbage cans, and providing drinks to his landscapers. (Goldbrener Sub. 26). Kind gestures, to be sure, but being a flashy tipper and a generous employer do not qualify as exceptional charity. To the contrary, these acts of noblesse oblige are consistent with Goldbrener's general effort to portray himself as a big man in local circles, doing favors, settling disputes, and collecting gratitude. But he supported that lifestyle— and earned that gratitude—by stealing from children who would never be able to question the lofty status he has assigned himself. This Court should not unduly credit the gratitude of Goldbrener's neighbors, when he earned that gratitude through resources gained by hurting others. *Cf. Vrdolyak*, 593 F.3d at 683 ("[W]hile gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largesse should not weigh in sentencing.").

Melber claims to have been a particularly effective and kind school teacher and administrator. (Melber Sub. 4–17). These are important jobs, and doing them well

has real value. But it is still the case that establishing a reputation as an open, effective and giving educator is consistent with Melber's chosen employment, which tends to make it less than exceptional. *See Repking*, 467 F.3d at 1095-96 (discounting "charitable works" that were "entirely consistent with [the defendant's] business development plan"). And Melber's argument that his school would suffer in his absence "cannot inoculate [Melber] from his fraudulent conduct, which too created its own other victims." *Fishman*, 631 F. Supp. 2d at 405 (finding risk to school which employed white collar defendant insufficient to justify non-custodial sentence). Indeed, Melber suffers by comparison to the defendant in *Fishman*. That defendant was a lawyer who defrauded wealthy clients, then claimed his significant charitable works at a school in mitigation. *Id.* at 401–5. Yet after rejecting essentially the same arguments raised by the defendants here, the court sentenced him to imprisonment. *Id.* By contrast, Melber wants consideration for doing his job as an educator, despite committing a crime that victimized schoolchildren.

Steinberg claims an extensive set of charitable deeds, some of which—such as his service in the Coast Guard reserves—did not benefit those who could be expected to return a benefit to Steinberg. (Steinberg Sub. 8–12). That distinguishes him from defendants like Goldbrener. The Government thus believes that Steinberg's charity should be given some weight under § 3553(a). Nonetheless, that weight should not be so great as to result in a below-Guidelines sentence, for three reasons: *First*, many of Steinberg's actions did benefit neighbors or people in the educational community, and thus would help Steinberg in operating a small business in those circles, to include

committing the instant crime. *Second*, this does not appear to be the only instance of fraud by Steinberg. (*See* Section A.6 above). *Third*, although significant, it is not clear that Steinberg's charitable works rise to the extraordinary circumstances found by the Second Circuit in *Canova*, where the defendant had served in the Marine Corps; served as volunteer firefighter "sustaining injuries in the line of duty three times," and "entering a burning building to rescue a three-year old;" "participated in the successful delivery of three babies;" and administered CPR to persons in distress both while volunteering as a firefighter and as a civilian. 412 F.3d at 358–59.

### 4.   The Defendants Pose a Risk of Recidivism.

Melber and Goldbrener argue that they pose a lower risk of recidivism than most defendants, because they are older than many, and because they committed fraud offenses rather than "street" crimes. (*See* Melber Sub. 31–32; Goldbrener Sub. 58–59). But both defendants committed the instant fraud offenses recently, at an age that is far older than the typical defendant, and over an extended course of time. Under those circumstances, there is every reason to believe that they would offend again if given the extremely short sentences they seek. *See United States v. Matthews*, 828 F. App'x 793, 795 (2d Cir. 2020) (describing with approval district court's rejection of arguments about the general effect of aging on recidivism, because instant defendant had committed offense while relatively old); *United States v. Almonte*, No. 16 Cr. 670 (KMW), 2020 WL 6482874, at *2 (S.D.N.Y. Nov. 4, 2020) (55-year old defendant posed risk of recidivism given that she committed instant crime between ages of 48 and 51). By contrast, most of the cases cited by the defendants concern courts imposing long sentences for drug-trafficking, but varying downward

from even harsher Guidelines where the defendants would be far older when they completed their sentences. *See United States v. Sanchez*, No. 99 Cr. 338 (RWS), 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) (sentencing crack dealer to 240 months' imprisonment; explaining downward variance from 360-months-to-life Guidelines because defendant will be nearly 50 years old when released); *United States v. Ruiz*, No. 04 Cr. 1146 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (sentencing 46-year-old cocaine dealer to 135 months' imprisonment; explaining downward variance from 188 to 235 months Guidelines in part based defendant's age); *United States v. Hodges*, No. 07 Cr. 706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (stating intention to sentence 43-year-old drug dealer below 151 to 188 months Guidelines range, and listing age as factor).[47]

Similarly, Goldbrener argues that his employment and family reduce the risk of recidivism. (Goldbrener Sub. 58–59). But Goldbrener committed the instant offense in the course of his employment, and with his family—his daughter assisted him in many of the filings here, although the Government expresses no view on her *mens rea*. His case is thus wholly unlike the cases he cites. One concerns a repeat "street criminal" who the district court hoped might finally turn his life around based on recent hard work and recently formed family relationships. *United States v. Coello*,

---

[47] Both defendants also cite *United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009). But that case provides no guidance: The Circuit merely remanded because a district court failed to consider a defendant's arguments about his age, but did not opine on what weight, if any, those arguments should receive.

415 F. Supp. 3d 306, 310 (E.D.N.Y. 2019). Another concerned not a sustained, complex fraud like Goldbrener's, but a one-time mistake by a hard-working family man who "minimally" helped his brother and others build a place to grow marijuana for sale. *United States v. Schmoll*, No. 07 Cr. 762 (JBW), 2008 WL 4646161, at *2 (E.D.N.Y. Oct. 20, 2008).[48]

### 5.   Prior Sentences in E-Rate Cases Support Substantial Sentences Here

Several defendants criticize the Guidelines fraud table, or claim that Guidelines sentences in this case would be outside the typical punishment in a similar case. (P. Klein Sub. 17, Goldbrener Sub. 57–58, Schwartz Sub. 23–27). As an initial matter, the highly conservative method by which the parties' plea agreements counted individualized loss or gain makes this case a poor target for generalized defense arguments about off-the-chart loss-driven Guidelines. Further, the individual sentences sought by the Government are eminently reasonable. Courts around the country have not hesitated to impose significant sentences of incarceration on defendants, like the ones in this case, that have fraudulently pilfered the E-Rate program for their personal gain. Although each case has its own individual circumstances, courts have made clear that these frauds are extremely serious, cause substantial harm to schools and the Government, and must be punished appropriately. *See, e.g.*, *United States v.*

---

[48] Goldbrener also cites *United States v. Bleau*, 930 F.3d 35, 42 (2d Cir. 2019). In that case, the Circuit affirmed a 78-month sentence for a child pornography defendant, noting that the district court had considered the defendant's lack of criminal history and steady employment before imposing sentence. The Government agrees that this Court should consider all of Goldbrener's arguments, then impose a substantial sentence of incarceration here.

*Woods*, 17 Cr. 665 (N.D. Tex. Jan. 30, 2020) (87-month sentence (post-trial) for school official who, in exchange for kickbacks, steered contract to vendor that received $337,951 in E-Rate funds for work it did not perform for the school; 30-month sentence for vendor (post plea)); *United States v. LaDuron*, 400 F. App'x 396, 398 (10th Cir. 2010) (57-month sentence for vendor who funneled "donations" to schools to fund their E-Rate copayments in a four-year scheme through which defendant's companies obtained over $890,000); *United States v. Green*, 592 F.3d 1057, 1072 (9th Cir. 2010) (affirming 90-month sentence, post-trial, for consultant who rigged bids for pre-selected vendors to waive schools' 10% copay, provide free "bonus" equipment ineligible for E-Rate funding to schools, and submit highly inflated bids to cover the cost of those items), *United States v. Marchelos*, Doc. No. 650, 05 Cr. 208 (N.D. Cal. Apr. 10, 2008) (18-month sentence for vendor that participated in the bid-rigging scheme in *Green*, who cooperated and testified at trial); *United States v. Benit*, Doc. No. 159, 06 Cr. 20285 (E.D. Mich. Apr. 20, 2009) (46-month sentence and $1.34 million restitution order for school official who rigged bid toward company in which he had an interest, and also separately committed mortgage fraud); *United States v. Adame*, Doc. No. 88, 06 Cr. 1082 (S.D. Tex. Mar. 3, 2008) (36-month sentence and $106,514 restitution order for vendor who obtained USAC funding for work that was not performed); *United States v. Bohuchot*, Doc. No. 223, 07 Cr. 167 (N.D. Tex. Nov. 14, 2008) (11-year sentence for chief technology officer at school district who rigged $120 million in bids toward E-Rate vendor that paid millions of dollars in kickbacks and other benefits back to defendant; 10-year sentence for the vendor); *United States v. Harris*, 07

69

Cr. 287 (N.D. Ga 2008) (60-month sentence for vendor who received over $11 million in E-Rate funds for a rigged bid and paid over $200,000 in kickbacks to the school district official that selected him; 37-month sentence for school official); *United States v. Hornsby*, 06 Cr. 376 (PJM) (D. Md. 2008) (six-year sentence for school consultant who received kickbacks from vendor to whom he steered school bid; defendant also received non E-Rate kickbacks and obstructed the investigation into his conduct).[49]

The defendants in this case did not fall prey to some fleeting impulse, misapprehension of the program rules, or one-time mistake in judgment. They made a series of deliberate, knowing criminal decisions spanning years. In the E-Rate context, courts have readily concluded that such persistent criminal conduct warrants a substantial sentence. As one court noted, in imposing a 46-month sentence on a school official, "[T]his is not a one time thing. This is a thing that went on for a number of years. So it wasn't that you just fell off the straight and narrow once, but once you

---

[49] Peretz Klein cites the 37-month post-trial sentence imposed in *United States v. Willard Lanham*, No. 11 Cr. 548 (GBD) (S.D.N.Y. Oct. 18, 2012) in support of Klein's own bid for a lesser sentence. *Lanham* is not a typical E-Rate case. It concerned a former New York City Department of Education employee-turned-consultant who overbilled the DOE directly for a number of services without entity oversight, leading the sentencing court to remark "the process … still gives Mr. Lanham an opportunity to argue that he did absolutely nothing wrong and totally above board, because there was absolutely no checks and balances, no process to identify and prevent the kind of overbilling that went unchecked at the DOE with regard to this contracting process…. And Mr. Lanham decided to take advantage of it to the extent of $1.7 million on contracts that really were supposed to provide money and services for direct benefit to students in terms of upgrading computers. And turned out to be bills for hundreds of dollars an hour for individuals simply to check whether Verizon charged the right phone bill to the Department of Education. It was total chaos." *Id.* at 36–37. Whatever the merits of Lanham's sentence, there is no question that Klein did far more than overbill a former employer for provided services without sufficient oversight.

did you continued that behavior, and I find that to be a very repulsive thing, particularly when you're dealing with monies intended for the benefit of children." *Benit* Sent. Tr. 14.

Judges have emphasized that defendants' conduct in these cases robs the neediest schools and students of the resources they need. Earlier this year, in justifying an 87-month sentence, a court described E-Rate as a "program that has a significant benefit to those who are greatly in need. It relies upon the voluntary truthfulness and accuracy of applications for need. It assumes that those who apply for funding are going to tell the truth about the funds that they need." *Woods* Sent. Tr. 29–30. "Therefore, when we have here a situation where a false bid was presented, where kickbacks were paid to get the bid, so to speak, that undermines the integrity of this program. Indeed, this is a circumstance where the government has established that not only was the E-Rate program injured but the [] school itself was injured." *Id.* at 30.

Relatedly, as another court observed, "this is an area where deterrence is especially important. The E-Rate program is a program designed to help the neediest schools and libraries who need the opportunity to be part of the internet world, the digital world. It is important that that program be able to rely on the accuracy and the truth of applications that are made for funding…. So having considered that and the importance of deterrence and the conduct involved here, I find that the sentence should be within the advisory guideline range." *United States. v. Anyanwu,* Doc. No. 197 at 27, 17 Cr. 665 (N.D. Tex. Feb. 28, 2020) (imposing 30-month sentence for

vendor who received over $300,000 in E-Rate funds on rigged bid for services it did not actually provide).

Courts have imposed significant sentences of imprisonment even where the E-Rate vendors actually provided all the paid-for services, unlike here. In *Harper*, upon imposing a 30-month Guidelines sentence on the vendor, the Court observed, "It does look like even though you and your co-defendants rigged the system and bribed your way to get these contracts, from what I'm told, information I have, after you got the contracts, although probably at an inflated rate, you did provide the services. So it wasn't a total scam of being paid for no services, but nonetheless it was a very significant crime that you committed." *Harper*, Doc. No. 52 at 6.

In sum, the sentences requested by the Government are entirely consistent with, and in some instances fall significantly below, the types of sentences routinely meted out to defendants in similar E-Rate schemes. The defendants' requests for non-custodial or minimal prison sentences, by contrast, would be seen as a slap on the wrist and an insufficient disincentive for those tempted to steal resources meant for the country's neediest children.

### 6.   If Necessary, Reasonable Delays of Incarceration Can Mitigate the Risk from COVID-19

Several defendants cite the COVID-19 pandemic as a basis for leniency. (P. Klein Sub. 20–22; Goldbrener Sub. 63–68; B. Klein Sub. 7–8; Melber Sub. 2, 19–22). To the extent the defendants identify personal or family suffering from the disease, the Government extends its condolences. But the widespread misery caused by COVID-19—which as of this writing has killed over 275,000 Americans—does not

provide a basis for leniency. The underprivileged schoolchildren who the defendants harmed by their crimes also live in communities particularly hard hit by COVID-19.[50] The defendants should not receive lenient treatment for depriving such communities merely because of a pandemic that affected the entire nation, their victims included.

To the extent that certain defendants are particularly vulnerable to COVID-19 exposure once imprisoned, that can be mitigated by a delay in their surrender to custody. The Government understands that the sentencings in this case will not occur until late January 2021, at the earliest. Each of the defendants raising COVID-19 concerns appears to be a candidate for self-surrender. Thus if the defendants face excessive risk from COVID-19 when they are actually scheduled to report to prison, they can seek further delay at that time.[51] But the Court should not give any discount for COVID-19 fears. A short sentence for a serious crime will not achieve general deterrence, because it will be perceived merely as a short sentence, without the nuance of COVID-19. Instead, this Court should send a strong message that stealing funds intended for poor children will be sternly punished, even if that punishment must be somewhat delayed due to COVID-19.

---

[50] *See* https://www.ama-assn.org/delivering-care/health-equity/data-10-cities-show-COVID-19-impact-based-poverty-race.

[51] This is not to say that all the defendants' claim are legitimate. Ben Klein, for example, states that he is a 41-year-old man in good health (B. Klein Sub. 6), which indicates that he does not face any particularized risk from COVID-19. *See generally* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

## IV.    Conclusion

For the reasons set forth above, the sentences recommended above are suffi-

cient, but not greater than necessary, to achieve the legitimate goals of sentencing.

Dated:  White Plains, New York
        December 8, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:  _____

Michael D. Maimin
Hagan Scotten
Vladislav Vainberg
Assistant United States Attorneys
(914) 993-1952 / (212) 637-2410 / 1029