UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                 **TO BE FILED UNDER SEAL**

IN THE MATTER OF THE APPLICATION OF   :
THE UNITED STATES OF AMERICA FOR 24       Case No. 16 Mag. 1751
SEARCH WARRANTS                     :

                                 AFFIDAVIT IN SUPPORT OF AN
                             :     APPLICATION    FOR    SEARCH
                                   WARRANTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK               )
WESTCHESTER COUNTY          ) ss.:
SOUTHERN DISTRICT OF NEW YORK   )

      I, MARTIN ANCIN, being duly sworn, depose and say:

## INTRODUCTION

      1.      I am a Detective with the Rockland County District Attorney's Office (the

"RCDAO"). I have been employed as a Detective with the RCDAO since 1989, investigating

white-collar crimes. I am also a member of a federal task force, comprised of law enforcement

officers from various federal and state agencies, investigating white collar crimes in Rockland

County. As a Detective with the RCDAO, and a task force officer, my responsibilities include

investigations of mail and wire fraud and frauds involving government monies, false statements,

and conspiracy to commit those offenses, in violation of Title 18, United States Code,

Sections 371, 641, 666, 1001, 1341, 1343, and 1349. As a Detective investigating white collar

crime, I have obtained and executed search warrants for documentary evidence and other evidence

of fraud.

      2.      I have participated in the investigation of this matter. I am familiar with the

information contained in this affidavit based on my own personal participation in the investigation,

my review of documents, my interviews of witnesses, conversations I have had with other law

enforcement officers about this matter, and my training and experience. Because this affidavit is

being submitted for the limited purpose of establishing probable cause to search the locations

described below, and all closed containers and closed items found therein (collectively, the

"Premises"), I have not included the details of every aspect of this investigation.  Where actions,

conversations, and statements of others are described in this affidavit, they are described in

substance and in part, except where otherwise indicated.

3.      I respectfully submit this affidavit in support of an application for warrants to search

the Premises described below.  Based on the facts set forth in this affidavit, there is probable cause

to believe that the Premises contain the items described in the attachments to this affidavit, which

items constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code,

Sections 371 (conspiracy to violate the laws of the United States), 641 (theft of government

property), 666 (theft or bribery concerning programs receiving federal funds), 1001 (false

statements), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit fraud) (the

"Subject Offenses").

## I.    SUMMARY OF PROBABLE CAUSE

4.      This affidavit arises from an investigation of a scheme formed by certain schools

located in Rockland County (the "Schools"), purported vendors of goods and services (the

"Vendors"), and certain consultants (the "Consultants") to defraud a United States Government

program known as "E-Rate" (the "E-Rate Program" or "the Program") by billing the program for

goods and services that were not in fact provided.[1]

---

[1] Other law-enforcement officers and I have identified many E-Rate applicants, E-Rate service
providers, and E-Rate consultants that, I believe, are committing the offenses described herein.
The Schools, Vendors, and Consultants named in this affidavit comprise only a subset of those
entities.  Accordingly, this affidavit refers to other applicants, service providers, and consultants
that may be relevant to this investigation even if we are not, at this time, seeking warrants to search

5.      The E-Rate Program provides funds to help qualified schools and libraries obtain telecommunications equipment and Internet access.  The Program is administered by the Universal Service Administrative Company ("USAC"), a non-profit corporation which is in turn regulated and funded by the Federal Communications Commission ("FCC").  Institutions applying for funds under E-Rate certify to USAC that they are purchasing goods and services, such as specific telecommunications equipment, computer equipment, maintenance of such equipment, and services related to the use of such equipment.  The putative vendors for those goods and services submit invoices to USAC.  If USAC approves some or all of the funding requested, USAC causes funds to be transferred to defray the cost of the goods or services in question.

6.      The Schools, Vendors, and Consultants that are the subject of this investigation have sought significant funding through E-Rate; from 2009 through 2015, the Schools requested over $11 million through E-Rate (over $6 million of which was with the Vendors alone).  In response to the Schools' requests, USAC caused significant funds to be disbursed to the Vendors; from 2009 through 2015, USAC disbursed over $3.3 million to the Vendors (and over $5.1 million to all service providers in response to the Schools' requests).  During that same time, all schools and libraries working with the Vendors alone requested over $50.3 million; over $22.8 million was distributed in response to those requests.

7.      Among other things, I and other law-enforcement officers have: reviewed documents maintained by USAC related to the Schools' requests for funding through the E-Rate Program; reviewed certain bank and credit card records for the Schools, Vendors, and Consultants;

those entities' premises.  Additionally, as explained below, the Government is not seeking warrants to search all of the Schools or Vendors described herein at this time.

spoken with individuals who have been inside certain Schools; reviewed photographs taken inside certain Schools; performed surveillance on certain Schools and Vendors; reviewed records of various service providers for telecommunication services such as telephone and internet providers; and spoken with representatives of USAC and the FCC.

8.      From this investigation, I have learned that the Schools, Vendors, and Consultants have billed USAC for goods and services that do not appear to have been provided to the Schools. For example, one of the Schools would, with the aid of a Consultant, request funding for a computer server, maintenance for that server, and services related to that server.  One of the Vendors would submit one or more invoices confirming that it had provided or would provide that computer server, maintenance for that server, and services related to that server, including internet connectivity.  In successive years, that School, Vendor, and Consultant would submit paperwork seeking funding for continued maintenance for that server and services related to that server. However, individuals who had inspected the School for other reasons report that there is no computer server in the School, or any indication that there ever had been such a server, and indeed that the School did not appear to utilize any computer technology.

9.      For these reasons, and the reasons set forth in detail below, there is probable cause to believe that the Premises contain evidence and instrumentalities of the Subject Offenses, which evidence includes the absence of certain goods and instrumentalities of various services.

## II.   THE PREMISES

10.      The Premises that are the subject of this Affidavit (the "Subject Premises") are as follows:

      a.      50-52 Carlton Road, Monsey, New York 10952 (Congregation Mesivta Ziev Hatorah);

b.      4 Campbell Avenue, Suffern, New York 10901 (Cheder Ateres Tzvi);

c.      186 Saddle River Road, Monsey 10952 (Congregation Bnos Sara, d/b/a Imrei Shufer);

d.      72 Main Street, Monsey, New York 10952 (Bais Yehuda);

e.      82 Highview Road, Suffern, New York 10901 (Yeshiva Chofetz Chaim);

f.      230 West Route 59, Suite 10-11, Spring Valley, New York 10977 (Teacher Mommy Daycare Center);

g.      174 Maple Avenue, Monsey, New York 10952 (Teacher Mommy Daycare Center: Administrative Office);

h.      5 Acer Court, Monsey, New York 10952 (Shaar Ephraim);

i.      97 Highview Road, Suffern, New York 10901 (Ohr Yochanan);

j.      93 Highview Road, Suffern, New York 10901 (Ohr Yochanan (lower school);

k.      93 College Road, Monsey, New York 10901 (Yeshiva Talpiot);

l.      185 North Main Street, Spring Valley, New York 10977 (Bais Chana Malka);

m.      29 Robert Pitt Drive, Monsey, New York 10952 (Hashomer Alarm System Inc.);

n.      44 Ellish Parkway, Spring Valley, New York 10977 (Hashomer Alarm System Inc., second location);

o.      13 Mosier Court, Monsey, New York 10952 (IP Connect Inc.);

p.      16 Laura Drive, Airmont, New York 10952 (Crystal Clear Communications Inc.);



██ ████████████████████████████████████

u.    21 Robert Pitt Drive, Suite 224, Monsey, New York 10952 (NY NJ Telco Corp);

v.    6 Carlton Lane, Monsey, New York 10952 (SIMI Securities and CSI Communication & Security Inc.);

w.    5 Yale Drive, Monsey, New York 10952 (S. Goldbrenner Ltd.); and

x.    4 Zlotchev Way, Unit 201, Monroe, New York 10950 (Moshe Schwartz).

## III.    THE E-RATE PROGRAM

11.    As summarized above, this Affidavit establishes probable cause to believe that the Schools, Vendors and Consultants have participated in a scheme to defraud a federal program regulated by the FCC.  This program is officially titled the Universal Service Fund Schools and Libraries Program, and often referred to as "E-Rate."  Based upon my knowledge, training, experience, employment, participation in investigations, and having read the E-Rate Program description publications, I know that:

a.    The Telecommunications Act of 1996 (47 U.S.C. § 251, *et seq.*) directed the FCC to gather funds from telecommunications users and establish a program—the E-Rate Program—to distribute funds to economically disadvantaged schools and libraries for telecommunication services, internet access, and internal connections (such as wiring and servers, but not end-user equipment like computers, telephone sets, and printers). E-Rate Program funds come from the Universal Service Fund.  The Universal Service Fund is a system of telecommunications subsidies managed by the FCC, which is intended to promote universal access to telecommunications services in the United States, and is funded through fees charged to companies that provide interstate or international telecommunications services.  The FCC

designated USAC, a not-for-profit corporation, to administer the E-Rate Program, but the FCC continues to oversee and regulate USAC.   USAC subcontracts with Solix Inc., located in Parsippany, New Jersey, to handle all communications and paperwork between applicants for E-Rate funds and USAC.

   b.  USAC began distributing E-Rate funds for goods and services delivered in E-Rate Funding Year 1998.   The Program operates through a yearly application, review, and disbursement process.   E-Rate funding years run from July 1 to June 30, approximating the typical school year.   Thus, for example, Year 2 of the E-Rate Program ran from July 1, 1999, to June 30, 2000.   Schools and libraries applying for E-Rate funding—which the relevant regulations refer to as "applicants"—typically seek bids from service providers beginning in December of the year prior to the year for which they are seeking E-Rate funding.   Thus an applicant applying for funding in Year 2 of the E-Rate Program would typically have applied in December 1998.   Over 30,000 applications are received and approved each year.   E-Rate Program funds available for disbursement were capped at $2.25 billion, although that cap is automatically increased for inflation.   Requests for E-Rate funds have exceeded available E-Rate funds in each program year.

   c.  Several features of the E-Rate Program are relevant to this Affidavit:

   i.  E-Rate requires applicants to follow not only local and state procurement laws and competitive bidding rules and regulations to select vendors—which the relevant regulations refer to as "service providers"—for telecommunications goods and services, but also the federal rules and regulations set forth in the Code of Federal Regulations and elsewhere.   *See* 47 C.F.R. § 54.503.

ii.       E-Rate provides up to 90% funding for funded projects and requires applicants to pay the remaining amount (referred to as the "co-pay"), some of which may be funded by grants from the Department of Education.  *See* 47 C.F.R. §§ 54.505, 54.523.

iii.       An applicant may employ a consultant to help it determine its telecommunication needs, assist in the competitive bidding process, and help complete the E-Rate application and back-up documentation.  The consultant must, however, be independent of the service providers chosen for the projects and may not steer contracts to, or hand pick, a favored service provider.  *See* 47 C.F.R. § 54.503.

d.       In applying for E-Rate funds, an applicant first submits to USAC a Form 470, the "Description of Services Requested and Certification."  The Form 470 describes services and equipment the applicant will need to implement its technology plan, as well as the applicant's eligibility for E-Rate funding.  The completed form is posted to USAC's website for potential bidders to review, which opens the competitive bidding process for services eligible for discounts under the E-Rate Program.  The competitive bidding process is a requirement of participating in the E-Rate Program, but is conducted exclusively by the applicant.  As further discussed below, regulations require a fair and open competitive bidding process to ensure that the applicant considers all bids and selects the most cost-efficient service provider.  Once a service provider is selected, the applicant orders products and services through the selected service provider.  *See* 47 C.F.R. §§ 54.503, 54.511.

e.       Under the applicable regulations, a service provider participating in the E-Rate program must have a "Service Provider Identification Number" ("SPIN"), a unique number that USAC assigns service providers that submit an FCC Form 498.  The Form 498 collects

8

contact, remittance, and payment information for service providers that receive universal service support.  The Form 498 must be filed by service providers to participate in E-Rate (as well as any of the other programs also funded by the Universal Service Fund) and to receive payments from USAC.

        f.      A contract may be awarded to a single service provider or to multiple service providers.  Once an applicant selects a winning bidder (or bidders), it enters into a contract with that service provider to purchase the required services and equipment at the rates specified in the service provider's proposal or bid.  The applicant then submits to USAC a Form 471, the "Services Ordered and Certification Form."  Form 471 reports goods or services ordered, the E-Rate funds requested, and the service provider or service providers that will be used.  Form 471 also specifies the percentage of the contract that the school is required to pay (that is, the portion of the contract that E-Rate will *not* be funding) and lists the individual funding requests, which must be separated by service category (*e.g.*, telecommunication service, internet access, internal connections).  The Item 21 Attachment to FCC Form 471 provides details on the products or services requested.  *See* 47 C.F.R. § 54.504.

        g.      USAC can make payments directly to the service provider providing the requested goods or services by the applicant.  As part of the invoicing process, USAC sends a letter to the applicant and to the selected service provider, stating that a certain amount of funds have been committed to the applicant's request.  Once the applicant receives that letter, it then files a Form 486, the "Receipt of Service Confirmation" form, certifying that services have begun.  Before receiving funds, a service provider must also have filed a Form 473 (Service Provider Annual Certification form) for the relevant funding year.  Only when the Form 473 and Form 486

are received and approved by USAC can the service provider invoice USAC.  Invoicing by the service provider can take two methods:  The service provider can bill the applicant for 100% of the contract price and the applicant can request reimbursement of the discount from USAC, or the service provider can bill the applicant for only the portion of the contract not funded by USAC, and then can seek reimbursement for the remainder of the contract price from USAC.  Service providers can submit invoices through email, through USAC's web portal, or through paper.  Invoices are processed for payment as they are received, so it is possible that a single provider may have accumulated invoices waiting for payment; those multiple invoices will be paid via a single payment, typically through a wire transfer.

      h.    There is a record retention requirement for all applicants and service providers that participate in the E-Rate Program.  These participants are required to keep all related documents for five years from the last day of service delivered in a particular funding year.  *See* 47 C.F.R. § 54.516.  Applicants are required to retain all documents related to the application for, receipt of, and delivery of, telecommunications equipment and other support and services partially funded through E-Rate.  Applicants must maintain asset and inventory records of equipment purchased as components of supported internal connections services sufficient to verify the actual location of such equipment for a period of five years after purchase.  Similarly, service providers are required to retain documents related to the delivery of discounted telecommunications and other supported services for at least five years after the last day of the delivery of funded services.  Any other document that demonstrates compliance with the statutory or regulatory requirements for the schools and libraries mechanism must be retained as well.  *See* 47 C.F.R. § 54.516.

12.     The E-Rate Program relies on a "fair and open" competitive bidding process to protect the program from waste, fraud, and abuse.  Although the FCC has determined that state and local procurement laws should provide the foundation for the process, the FCC has also promulgated numerous specific E-Rate Program rules to supplement state and local requirements.  Compliance with these E-Rate rules is mandatory for program participation.  As the FCC has stated, "we cannot rely solely upon state and local laws to effectuate our goals of ensuring support is provided without waste, fraud and abuse" and "[c]ompliance with state and local procurement rules is necessary, but not to the exclusion of compliance with other Commission requirements." *See* Ysleta Order (2003), 18 FCC Rcd. 26407, ¶¶ 42-43.

13.     Thus, for example, while state and local rules could exempt applicants from undergoing a competitive bidding process for products and services under a certain dollar threshold, the E-Rate rules require an E-Rate applicant to seek competitive bids for all such services, regardless of the dollar amount.

14.     Code of Federal Regulations §§ 54.503(a) and (b) generally set forth the E-Rate Program's competitive bidding requirements as follows:

> (a) All entities participating in the schools and libraries universal service support program *must conduct a fair and open competitive bidding process*, consistent with all requirements set forth in this subpart.  Note to paragraph (a): The following is an *illustrative list* of activities or behaviors that would not result in a fair and open competitive bidding process: *the applicant for supported services has a relationship with a service provider that would unfairly influence the outcome of a competition or would furnish the service provider with inside information*; someone other than the applicant or an authorized representative of the applicant prepares, signs, and submits the FCC Form 470 and certification; *a service provider representative is listed as the FCC Form 470 contact person and allows that service provider to participate in the competitive bidding process*; *the service provider prepares the applicant's FCC Form 470 or participates in the bid evaluation or service provider selection process in any way*; the applicant turns over to a service provider the responsibility for ensuring a fair and open competitive bidding process;

11

> *an applicant employee with a role in the service provider selection process also has an ownership interest in the service provider seeking to participate in the competitive bidding process*; and the applicant's FCC Form 470 does not describe the supported services with sufficient specificity to enable interested service providers to submit responsive bids.
>
> (b) Competitive Bid Requirements.  Except as provided in § 54.511(c), an eligible school, library, or consortium that includes an eligible school or library shall seek competitive bids, pursuant to the requirements established in this subpart, for all services eligible for support under § 54.502.  *These competitive bid requirements apply in addition to state and local competitive bid requirements and are not intended to preempt such state or local requirements.*

C.F.R. §§ 54.503(a) and (b) (emphasis added).

15.     Further, all potential bidders must have access to the same information and be treated in the same manner throughout the process.  Any additions or modifications to a Form 470, or other requirements or specifications must be available to all potential bidders at the same time and in a uniform manner.  *See* 2010 E-Rate Order, 25 FCC Rcd. 18762, ¶86.

16.     USAC provides additional guidance to applicants on conflicts of interest that would impair a fair and open competitive bidding process.  For example, regarding consultants:  "[A] conflict of interest exists when the applicant's consultant is associated with a service provider that is selected and is involved in determining the services sought by the applicant and the selection of the applicant's service provider(s)."  *See* USAC rules summarized at *http://www.usac.org/sl/applicants/step02/competitive-bidding.aspx.*

17.     Although Form 470 has changed over time, the Code of Federal Regulations requires that the applicants make certain certifications under oath on Form 470:

> (2) The FCC Form 470 shall be signed by the person authorized to order eligible services for the eligible school, library, or consortium including such entities and shall include that person's certification under oath that:
>
>> (i) The schools meet the statutory definition of "elementary school" or "secondary school" as defined in § 54.500(c) or (k) of these rules,

*do not operate as for-profit businesses*, and do not have endowments exceeding $50 million.

\* \* \*

(v) *The services the school, library, or consortium purchases at discounts will be used primarily for educational purposes* and will not be sold, resold, or transferred in consideration for money or any other thing of value, except as allowed by § 54.513.

\* \* \*

(vii) *All bids submitted for eligible products and services will be carefully considered, with price being the primary factor, and the bid selected will be for the most cost-effective service* offering consistent with § 54.511.

*See* C.F.R. § 54.503(c)(2) (emphasis added).

18.     Although Form 471 has also changed over time, the Code of Federal Regulations requires that the applicants make certain certifications under oath on Form 471:

(1) The FCC Form 471 shall be signed by the person authorized to order eligible services for the eligible school, library, or consortium and shall include that person's certification under oath that:

(i) The schools meet the statutory definition of "elementary school" or "secondary school" as defined in § 54.500(c) or (k) of these rules, *do not operate as for-profit businesses*, and do not have endowments exceeding $50 million.

\* \* \*

(vi) *The entities listed on the FCC Form 471 application have complied with all applicable state and local laws regarding procurement of services for which support is being sought.*

(vii) *The services the school, library, or consortium purchases at discounts will be used primarily for educational purposes* and will not be sold, resold, or transferred in consideration for money or any other thing of value, except as allowed by § 54.513.

(viii) *The entities listed in the application have complied with all program rules and acknowledge that failure to do so may result in denial of discount funding and/or recovery of funding.*

13

* * *

    (x) The applicant recognizes that it may be audited pursuant to its application, *that it will retain for five years any and all worksheets and other records relied upon to fill out its application, and that, if audited, it will make such records available to the Administrator*.

    (xi) *All bids submitted to a school, library, or consortium seeking eligible services were carefully considered and the most cost-effective bid was selected in accordance with § 54.503 of this subpart, with price being the primary factor considered, and is the most cost-effective means of meeting educational needs and technology plan goals*.

*See* C.F.R. § 54.504(a)(1) (emphasis added).

    19.    Likewise, although Form 473 has changed over time, the Code of Federal Regulations requires that service providers make certain certifications under oath on Form 473:

    (f) The FCC Form 473 shall be signed by an authorized person and shall include that person's certification under oath that:

    (1) *The prices in any offer that this service provider makes pursuant to the schools and libraries universal service support program have been arrived at independently*, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to those prices, the intention to submit an offer, or the methods or factors used to calculate the prices offered;

* * *

    (3) No attempt will be made by this service provider to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

*See* C.F.R. § 54.504(f) (emphasis added).

    20.    As part of this investigation, I and other law enforcement officers, in cooperation with USAC and FCC employees, have reviewed the relevant forms discussed above submitted by the Schools, Vendors, and Consultants that are the subject of this investigation. The forms indicate

14

the goods and services for which the Schools and Vendors have sought and received E-Rate funding between the years 2009 and 2015.

IV.    THE SCHOOLS

   A.    **Congregation Mesivta Ziev Hatorah**

21.    Congregation Mesivta Ziev Hatorah ("CMZH") is a school located at 50-52 Carlton Road, Monsey, New York 10952.  According to records provided by USAC, ████████ ████████ is the proprietor of CMZH.  50-52 Carlton Road is a one-story single-family home with a full basement.[2]  It has a red brick entry with a wooden front door, surrounded by a red-brick and white-shingle façade.  On the west side of the building are two trailers/modulars designated as 50A and 50B, which are a part of CMZH.[3]

22.    Based on documentation that CMZH submitted to USAC, CMZH should have, among other things, a PBX telephone system; two Dell PowerEdge 1950 III servers, and a network with 15 terminals, each of which had software licenses, for all of which CMZH, in conjunction with the purported service provider for these goods and services, Hashomer Alarm Systems, Inc.

---

[2] According to the certificate of occupancy, the building is not zoned for a school.  On or about April 10, 2013, a representative of the NYSED spoke with ████████████████, who purports in documents submitted to USAC to be the dean of Talmud Torah, another school. ████████ told the NYSED that: (1) 49 Carlton Avenue, 50 Carlton Avenue, and 52 Carlton Avenue in Monsey, New York are all addresses for the same building; (2) that building is shared by (a) high school students from Talmud Torah; (b) Bais Hillel; and (c) Mesivta Ziev Hatorah; and (3) each of those three schools is a separate school with separate principals.

[3] Based on invoices reviewed by a law enforcement officer, it appears that from approximately 2009 to 2011, CMZH was located at 63 Blauvelt Road, Monsey, New York which is a single-family home.  CMZH also appears to have used letterhead listing the 63 Blauvelt Road address even after moving to 50-52 Carlton Road.  Based on the most recent documents provided to USAC, and the observations of CI-1 discussed above, I believe that the current address of CMZH is 50-52 Carlton Road, Monsey, New York 10952.

("Hashomer"), had sought over $461,000, and received over $211,000,[4] since 2008 to purchase,

install, and maintain.[5]   Additionally, based on documentation that CMZH submitted to USAC,

---

[4] Throughout this affidavit, I discuss what technology Schools should have based on information from documents provided to USAC, and from a website maintained by a private consultant that summarizes information from those documents.   Based on my understanding of the E-Rate program, discussed above, I believe that Schools should have equipment for which they have received funds in the past five years, equipment for which they have sought funds for maintenance in the past five years—which is, effectively, a representation that the Schools have that equipment—and services for which they have sought funds in recent years.   I have attached charts, at Exhibit A, for each of the Schools herein, summarizing the information from the website I consulted.   In those charts, the first column refers to the funding year, the second column refers to the associated Vendor, the third column refers to the equipment and services sought—which entry is blank where the website or paperwork I received from USAC did not delineate the equipment and services—the fourth column refers to the amount of money requested, the fifth column refers to the amount of money committed—that is, the money that USAC agreed to provide if the money were available—and the sixth column refers to the amount of money actually disbursed by USAC.   (On rare occasion, due to what I understand to be clerical errors, more money was listed as disbursed than was committed).   I learned from representatives of USAC and the FCC that, due to budgetary concerns, USAC has not funded or disbursed as much money in approximately the past three years as it had in prior years.   For the ease of the reader, I have placed each funding year on a different page for each school—from 2015 to 2009 or the last funding year for which there are records, whichever is later—and two summary charts at the end of each School: one summarizing the annual USAC requests, commitments, and disbursements for the School, and one summarizing the USAC requests, commitments, and disbursements for the School by Vendor.   Finally, I have created three charts summarizing the requested, committed, and disbursed USAC funds for each School by each Vendor.   As explained herein, each School used more service providers—including service providers that appear to be engaged in fraudulent activity—than the Vendors, and, conversely, each Vendor worked with more E-Rate applicants—including E-Rate applicants that appear to be engaged in fraudulent activity—than the Schools.   In the summary charts, the penultimate column summarizes the total funds requested, committed, and disbursed using the Vendors for each School, and the final column summarizes the total funds requested, committed, and disbursed using all service providers for each School.   For example, on the summary chart for requested funds, CMZH requested $447,576,78 using the Vendors for funding years 2009 through 2015, and requested a total of $490,660.47 for those funding years.   All of the Schools, together, requested $6,022,337.66 using only the Vendors for funding years 2009 through 2015, and requested a total of $11,105,428.68 in E-Rate funds for those same years.   Similarly, in the summary charts, the penultimate row summarizes the total funds requested, committed, and disbursed using the Schools for each Vendor, and the final row summarizes the total funds requested, committed, and disbursed using all schools for each Vendor.   For example, on the summary chart for requested funds, Hashomer Alarm Systems, Inc. requested $1,417,166.42 using the schools for funding years 2009 through 2015, and requested a total of $19,098,910.90 for those

16

CMZH should have 12 land-based telephone lines and two internet connections, provided by

Xchange Telecom ("Xchange") and Central Telecom, Inc. ("Central Telecom"), and 12 cellular

telephones, provided by Selectcell, Inc. ("Selectcell").

23.     In or about 2012, in response to questions regarding USAC funding, CMZH told

USAC that it had 46 students, and further stated the following (errors in original):

> We have two buildings and Ten rooms.  We have a staff of over twenty.  Our school
> are for students who are underachieving young men suffering from a lack of
> attention while children.  This emotional abuse translated into low self-esteem and
> under-achievement in school.  During their crucial teenage years it is essential that
> we reach out to these individuals, provide them with an education they should
> productive in life.  This is the mission of Mesivta Ziev Hatorah.
>
> We have very small classes.  Staff members often work 1:1 with students and must
> maintain constant contact with each other to ensure maximal educational benefit
> for the student.  Aside from the academic part we also have private therapists and
> mentors to assist our students for their emotional needs.
>
> Computer technology also plays a very important role for our students' education.
> The use of a student computer lab with the latest in remedial software for students
> is essential to the success of our school.  As we use technology for communication
> and educational exercises.  Many of the remedial software require a high end server
> to run.

24.     According to a form submitted by CMZH to USAC on or about September 5, 2014,

CMZH had 35 students.

---

same funding years.  All of the Vendors, together, requested $6,022,337.66 using only the Schools
for funding years 2009 through 2015, and requested a total of $50,382,304.74 in E-Rate funds for
those same years.

[5] Some of the requests were for equipment for a "new" building on Saddle River Road; those
requests were not funded.

25.     On or about August 5, 2015, a confidential informant ("CI-1")[6] spoke with a man who identified himself as "███████" at 50-52 Carlton Road.[7] ███████: (1) confirmed that he was the "menahel" of the school;[8] (2) explained that they only spoke Yiddish at the school; (3) explained that there were no general studies classes—such as English or social studies—at the school; and (4) advised that approximately 80 boys attend the school.

26.     On or about January 23, 2014, the Director of Rockland County Department of Fire and Emergency Services performed an inspection of 50-52 Carlton Road.  I have spoken with an individual who performed that inspection, and reviewed photographs taken during that inspection, and learned that: (1) other than a small office that may have contained a single computer and a single telephone, there were no signs of computers or telephones anywhere in the main building or the two trailers; (2) there were no signs of network connections or wiring, or computer terminals; and (3) the buildings themselves were in significant disrepair, and did not appear to have the infrastructure necessary to sustain technology like that described in CMZH's submissions to USAC.

---

[6] CI-1 is providing information to law enforcement in return for pay, and has been doing so for more than one year.  Information provided by CI-1 has proven reliable in the past, and has been corroborated by, among other things, video and audio recordings and information later learned by law enforcement.  CI-1 has previously been convicted of a fraud felony, as well as a misdemeanor.

[7] In a complaint provided by a Town of Ramapo inspector dated April 2010, ███████ is listed as the owner of Congregation Khal Yeriem / Yeshiva Bais Hillel, which was, at the time, located at 49 Carlton Road, Monsey, New York, and is now located at 50-52 Carlton Road, Monsey, New York—the same building as CMZH.

[8] During my investigation, I have learned that a "menahel" is the principal or supervisor of a yeshiva.

B.      **Cheder Ateres Tzvi**

27.     Cheder Ateres Tzvi ("CAT") is a school located at 4 Campbell Avenue, Suffern, New York 10901.  According to records maintained by USAC, Toby Tennenbaum is the current executive director of CAT.  4 Campbell Avenue is a white, single-story building, set back from the street, with windows around the building, a parking lot in front of the building, and an extension on the back.  4 Campbell Avenue is surrounded by a low-stone wall and white gates.

28.     Based on documentation that CAT submitted to USAC, CAT should have, among other things, a PBX telephone system with Primary Rate Interface; a server; a local area network with 12 stations; a T1 line; 14 cellular telephones; video conferencing services; and homework hotline services, for all of which CAT, in conjunction with Trust Corp., had received over $172,000 since 2011 to maintain.

29.     CI-1 had regular access to all parts of CAT in 2013 and 2014.  According to CI-1, between approximately 100 and 120 students attended CAT.  CI-1 knew of no high-speed internet connections, such as a T1 line, located in CAT; there were no classrooms with computers in CAT (although there were four or five computer workstations in a teacher's room); there was no video conferencing available at CAT; there was no homework hotline at CAT; there were no modern PBX phone systems visible at CAT; and there were no network drops in any classrooms.  CAT discouraged the use of cellular telephones.[9]

---

[9] In addition to the E-Rate requests described above, in 2014 CMZH requested, among other things, $485.89 for a DSL line, and $2,700.00 for a DSL line in 2015, from an established provider (Verizon LLC).  I have observed this sort of request for many of the Schools described herein: requests for sophisticated and expensive communications technology from Vendors, alongside modest requests for the sort of routine communications services a typical small school would actually use from an established provider.  I believe these latter requests may be valid—for example, CMZH may actually use Verizon LLC to provide connectivity for the single computer actually present in its administrative office—but also further evince commission of the Subject

### C.    Congregation Bnos Sara, d/b/a Imrei Shufer

30.    Congregation Bnos Sara, d/b/a Imrei Shufer ("Imrei Shufer") is a school located at 186 Saddle River Road, Monsey 10952.  Imrei Shufer was previously located at 100 South Central Avenue, Nanuet, New York 10954, and moved to 186 Saddle River Road in or about late 2013.[10] According to records maintained by USAC, ███████████ is an administrator for Imrei Shufer.[11] 186 Saddle River Road is a two-story brown-brick building, with a darker color of brick dividing the first and second stories.  The front entrance is a door in the middle of the building along a semi-circular driveway, with a dark red or brown awning above it.  On the front side of the building, there are four light-stone columns set against the brick from the ground to the roof, and the number "186" on the left side of the building.

---

Offenses, because if the Schools truly possessed the extravagant services and equipment purportedly provided by the Vendors, the basic services provided by established service providers would be redundant.  Moreover, the Schools often request the same or similar service from Vendors as well; for example, in 2014, CMZH also requested and received $9,450.00 for a T1 line from Trust Corp and requested $1,036.26 for an additional DSL internet line from Trust Corp.  Requests for E-Rate funding for nationally known service providers (for example, Cablevision or Verizon) for which no evidence of fraudulent activity has been uncovered during this investigation are not described herein.  Rather, the service providers discussed herein are certain service providers that appear to be billing E-Rate for goods or services that the service providers did not in fact provide, including many of the Vendors discussed further below.

[10] In or about November 2013, Imrei Shufer submitted a change-of-address form to the NYSED indicating that it was moving from 100 South Central Avenue to 186 Saddle River Road.  Prior to that, there were multiple schools in a compound at 100 South Central Avenue.  On or about October 3, 2013, following a fire inspection, the Honorable Margaret Garvey, J.S.C., County of Rockland, issued a temporary restraining order enjoining various schools from occupying parts of 100 South Central Avenue.

[11] Imrei Shufer's Certificate of Incorporation, executed on or about December 28, 2008, lists ███████████ as a trustee of Imrei Shufer.

31.     On or about March 3, 2015, Imrei Shufer submitted paperwork to USAC indicating that it had 134 students, and that it was still located at 100 South Central Avenue.

32.     Based on documentation that Imrei Shufer submitted to USAC, Imrei Shufer should have, among other things, a PBX telephone system with Primary Rate Interface; 15 additional local and long distance telephone lines; 20 cellular telephones; multiple servers, including a DNS server; technological infrastructure for all, including DSL connectivity, broadband/T1 connectivity, and Lit Fiber Service; and access to video conferencing and a Distance Learning Service, for all of which Imrei Shufer, in conjunction with SIMI Securities Inc. ("SIMI"), CSI Communication and Security Inc. ("CSI"), Central Telecom, Selectcell, Xchange, Wolfson Communication Networking, Inc. ("Wolfson"), and The Safe Zone Network ("Safe Zone"), had sought over $1.15 million, and received over $435,000, since 2009 to purchase, install, and maintain.  In 2015 alone, Imrei Shufer sought $44,813.24 in E-Rate funds in conjunction with Central Telecom, $16,575 in E-Rate funds in conjunction with CSI, $6,720 in E-Rate funds in conjunction with Selectcell, and $23,399.93 in E-Rate funds in conjunction with SIMI.  Simon Goldbrenner is listed on documents filed with USAC as the consultant for many of these E-Rate requests, including all the 2012 and 2013 requests and the 2014 requests in conjunction with Central Telecom and Selectcell.

33.     On or about August 20, 2015, CI-1 entered 186 Saddle River Road and spoke with an individual named ▮▮▮▮▮▮▮▮ and a woman who appeared to be his secretary, surreptitiously recording the meeting at my request.  I have spoken with CI-1 and reviewed a video-recording of that event, and learned the following: (1) 186 Saddle River Road appears to house a school; (2) ▮▮▮▮▮▮ appears to be an administrator at that school; (3) ▮▮▮▮▮▮ secretary indicated to CI-1 that the school does not have computers or technology; (4) ▮▮▮

███████ indicated that they do not "teach computers" at the school; (5) ███████████ indicated that the school has approximately either 107 or 170 students; (6) an individual who appeared to be a student confirmed that the school was Imrei Shufer; and (7) none of the equipment which Imrei Shufer had purportedly purchased with E-Rate funds was visible in the portion of the facility observed by CI-1.

### D.    Bais Yehuda

34.    Bais Yehuda is a school located at 72 Main Street, Monsey, New York 10952. According to records maintained by USAC, ███████████ is an administrator for Bais Yehuda. 72 Main Street is a brown-brick building with gray siding on the sides that, from the outside, appears to have one main floor, and a second floor, with one window on either side of the building, where an attic would be.  The front of the building has four windows—three to the left of the main entrance and one to the right—and stairs leading to the main entrance through two columns, as well as a ramp leading to the main entrance from the right.  There is Hebrew lettering in gold paint above the main door and on the wall of the school between the two windows on the far left of the front side of the building.

35.    Based on documentation that Bais Yehuda submitted to USAC, Bais Yehuda should have, among other things, a PBX telephone system with Primary Rate Interface and a Bogen PBX expansion; three additional local and long distance telephone lines; three additional voice-over-internet-protocol ("VOIP") lines; a multi-media video system; and access to a homework hotline, for all of which Bais Yehuda, in conjunction with Hashomer, IP Connect Inc. ("IP Connect"), Satteline Communications Corp. ("Satteline"), Platinum Wireless Services, Inc., Techline Corp., and Xchange, had sought over $429,000, and received over $315,000, since 2009

to purchase, install, and maintain.  In 2015 alone, Bais Yehuda sought $2,100 in E-Rate funds in conjunction with Xchange and $65,579.89 in E-Rate funds in conjunction with Techline.

36.     On or about August 20, 2015, CI-1 entered 72 Main Street and spoke with a number of boys who appeared to be students, approximately 10 to 13 years old, and attempted to speak with one of the school's administrators, surreptitiously recording the meetings at my request.  The boys indicated that the school did not teach any general studies courses, and that they were taught in Yiddish or Hebrew.  The boys further indicated that they did not have any technology available to them in the school, and did not use computers in their studies.  Moreover, the boys indicated that the only technology of which they knew in the school were the "eyes," by which the boys apparently meant the closed-circuit television cameras in the hallways, which they pointed out to CI-1.

E.     **Yeshiva Chofetz Chaim**

37.     Yeshiva Chofetz Chaim ("Chofetz Chaim") is a school located at 82 Highview Road, Suffern, New York 10901.  82 Highview Road is a large, two-story school building, the exterior of which is primarily red brick with intermittent concrete lattice.  The primary entrance is on the building's west side, and consists of glass and aluminum double doors beneath a permanent awning.  Above the awning, on the brick face of the building's second story, is Hebrew lettering.

38.     Based on documentation that Chofetz Chaim has submitted to USAC, Chofetz Chaim should have, among other things, a stand-alone internet access line costing at least $12,568 in year 2015, three additional lines of Lit Fiber service each capable of transmitting 10 megabytes per second, and 23 lines of PRI service (in addition to 200 lines of voice service requested by a national service provider), for all of which Chofetz Chaim, in conjunction with Multimedia Broadcasting Corporation and NY NJ Telco Corp., sought approximately $98,149, were

23

authorized approximately $90,589, and have thus far received approximately $45,647.53 in E-Rate

year 2015.  Moshe Schwartz served as the consultant for each of the 2015 requests.  From 2009 to

2015, Chofetz Chaim requested approximately $1,078,218.16 (including $773,627.58 using the

Vendors), and received approximately $710,977.75 (including $554,339.66 using the Vendors), in

E-Rate funds for items including maintenance for a DNS server, maintenance for a media master

system, wiring and electronic infrastructure, PBX and PRI telephone system maintenance, and

various forms of internet connectivity, in conjunction with, among others, Hashomer, Satteline,

NY NJ, and Multimedia Broadcasting Corporation.  Moshe Schwartz served as the consultant for

each 2014 request.  Moshe Schwartz and Simon Goldbrenner served as the consultants for the

2013 requests.

   39. On or about February 2, 2016, CI-1 visited Chofetz Chaim at 82 Highview Road.

CI-1 spoke with two school personnel who gave CI-1 a phone number and told CI-1 to call a ▆▆▆

▆▆▆▆▆▆▆▆  to inquire further about the school.  CI-1 called ▆▆▆▆▆ the same day at the

provided number, under the guise of inquiring about possible schooling for children belonging to

CI-1's friends.  CI-1 discussed a number of topics with ▆▆▆▆▆, and learned, among other things,

that the school is a pre-school program for children ages two to five, and that the school maintains

a second location also for children of that age.  CI-1 inquired about the use of technology for

instructional purposes at Chofetz Chaim and was told that the school did not employ any

information technology for instructional purposes.  I believe that ▆▆ is accurately describing the

absence of such technology at Chofetz Chaim because (1) I am aware of no incentive for ▆ to

provide inaccurate information to CI-1; (2) the other information ▆ provided concerning Chofetz

Chaim appears to be accurate; and (3) as discussed elsewhere in this affidavit, there is probable

cause to believe that the Vendors (to include Hashomer, ███████, and Multimedia Broadcasting Corporation) and Consultants (Goldbrenner and Schwartz) through which Chofetz Chaim purportedly received E-Rate funded communications and information technology have not provided such equipment and technology to other Schools despite purporting to do so.

### F.     Teacher Mommy Daycare Center

40.     Teacher Mommy Daycare Center ("Teacher Mommy") is a day-care facility located at 230 West Route 59, Suite 10-11, Spring Valley, New York 10977.  According to records provided by USAC, ███████████████████ is the director of Teacher Mommy.  230 West Route 59 is a strip mall located on the north side of West Route 59 in Spring Valley.  Teacher Mommy is located in a brown brick building with a peaked roof adjacent to a parking lot, to the right of the driveway as one enters 230 West Route 59 from West Route 59.  The entrance to Teacher Mommy is a glass door with a glass window above the door labeled "230-10."  A sign in the window next to the door reads "Teacher Mommy Day Care."  According to documents that Teacher Mommy submitted to USAC, Teacher Mommy was located at 71 West Route 59, Suite C, Monsey, New York 10952 in 2011 and 2012, then moved to 230 West Route 59.

41.     Teacher Mommy has represented to USAC that it is a school as defined by New York State Education Law, which I understand to be required in order for Teacher Mommy to receive USAC funding.  According to the Rockland County Department of Social Services ("RCDSS"), Teacher Mommy has represented to the RCDSS that it has 24 students, and that the school is run by ██████████████ and her son, ████████████████.  Also according to RCDSS, Teacher Mommy first qualified as a Head Start program in September 2015, and, as a Head Start program, it qualifies for additional federal subsidies.

25

42.     According to documentation that Teacher Mommy submitted to USAC, Teacher Mommy's administrative office is located at 174 Maple Avenue, Monsey, New York 10952.  On or about February 24, 2014, ███████████████ submitted an application with the Town of Ramapo's Assessor's Office seeking a real property tax exemption for 174 Maple Avenue.  According to that application, 174 Maple Avenue is used as the residence of the officiating clergy and a study hall for Congregation Ohr Yitzchok Inc., and that it is not used for any other reasons.  The Certificate of Occupancy/Use for 174 Maple Avenue zones 174 Maple Avenue as a single-occupancy house with a home professional office.  174 Maple Avenue is a raised ranch building at the northwest corner of Maple Avenue and Jeffrey Place in Monsey with what appears from the outside to be a full basement with a garage, as well as a light-red/pink brick façade on the Maple Avenue face of the building and around the garage on the Jeffrey Place face of the building.  Above the northern garage entrance on Jeffrey Place is a sign, largely in Hebrew lettering, that also has the name of a congregation and "174 Maple Ave. Monsey NY" on it.  On the Jeffrey Place side, above the lower level—with the garages—is what appears to be light wood paneling.

43.     Based on documentation that Teacher Mommy submitted to USAC, Teacher Mommy should have, among other things, a Panasonic KXT telephone system with a voicemail system; a Dell PowerEdge T-710 server; a Dell PowerEdge T-620 server; a Firewall/Sonicwall; 20 cellular telephones; a Media Master Multimedia system; internet access; access to and a network with 25 terminals, each of which had software licenses, for all of which Teacher Mommy, in conjunction with SLD Interim, Selectcell, Central Telecom, Communications Pioneer, Discount Cellular Plus, and PSI Access LLC, had sought over $637,000, and received over $111,000, to

purchase, install, and maintain between 2011 and 2014.  In addition, in 2013 and 2014, Teacher

Mommy sought, in conjunction with Velocity Streaming Inc., a total of $126,870.62 in funding

for a distance-learning/monthly-video-streaming and conferencing service and $8,954.71 for

access to a homework hotline.  In 2015, Teacher Mommy submitted requests for $46,488.50 in E-

Rate funds, all using Cheap Talk as the service provider.

44.     On or about July 30, 2015, CI-1 entered Teacher Mommy at 230 West Route 59,

purporting to seek information in order to enroll CI-1's grandchild.  CI-1 made an audio/video

recording at my direction.  CI-1 spoke with an individual who called herself ███████  ██████  told

CI-1 that Teacher Mommy is a Head Start program, and children are only eligible to enroll if they

meet Head Start income requirements.  ██████  explained that Teacher Mommy has one class for

infants (3-18 months old) and three classes for toddlers (up to three years old), and that there are

two teachers for the toddlers, who are responsible for four children apiece.  ██████  stated that the

program is run under the direction of ██████████████ .

45.     CI-1's conversation with ██████  took place in what appeared to be the main room

of Teacher Mommy, which is visible from the outside.  CI-1 saw day-care-aged children playing

in the main room.  It appeared that there might be an office in the back, but the structure of the

building and behavior of its occupants was such that there did not appear to be any other significant

rooms used by Teacher Mommy.  CI-1 did not see any technology in the room with the children.

I have watched the recording CI-1 made, and spoken to law enforcement agents who have looked

through the front window, and neither I nor the other law enforcement agents have seen any

technology in the room with the children.

### G.     Shaar Ephraim

46.     Shaar Ephraim is a school located at 5 Acer Court, Monsey, New York 10952. According to records maintained by USAC, ███████████████ is an administrator for Shaar Ephraim.  5 Acer Court is a two-story brick building in a cul-de-sac with two entrances that appear, based on the structure of the building, to enter a single, unitary school.  According to documents that Shaar Ephraim submitted to USAC in 2010, Shaar Ephraim also operated at a second site: 176 Maple Avenue, Monsey, New York 10952.  However, last week, I drove by 176 Maple Avenue, and saw that the building had been demolished; the presence of dumpsters and an excavator indicated that it had likely been demolished very recently.  In 2009, Shaar Ephraim submitted paperwork purportedly received from Hashomer listing an additional Shaar Ephraim location at 178 Maple Avenue, Monsey, New York 10952.  178 Maple Avenue—which is next door to 176 Maple Avenue—has since been razed, and a new school building is being built there.

47.     Based on documentation that Shaar Ephraim submitted to USAC, Shaar Ephraim should have, among other things, a PBX telephone system with Primary Rate Interface including 23 voice lines, some of which are in the classrooms at both 5 Acer Court and 176 Maple Avenue (which, as discussed above, was recently demolished); 10 additional local and long distance telephone lines; one or more servers, including a DNS server; technological infrastructure for all, including DSL connectivity, digital transmission service, Lit Fiber Service, and 2.0 MB Point to Point/Data Ethernet, for all of which Shaar Ephraim, in conjunction with Central Telecom, J.S. Security, Inc., Selectcell, Hashomer, IP Connect, Ptop Communication, Inc., Safe Zone, and Xchange had sought over $950,000, and received over $335,000, since 2009 to purchase, install, and maintain.  In 2015 alone, Shaar Ephraim sought $75,369.00 in E-Rate funds in conjunction with Central Telecom, $10,500.00 in E-Rate funds in conjunction with Selectcell, and $22,104.25

28

in E-Rate funds in conjunction with J.S. Security, Inc.  Simon Goldbrenner is listed as the consultant for each of the 2015 requests.

48.     On or about February 20, 2015, a confidential informant ("CI-2"[12]) met with ███ ███ in ████████'s office at 5 Acer Court.  ████████ told CI-2 that the only computers in the school are in his office, and that the school planned on introducing computers in the future, but was not yet ready to do so.  ████████ took CI-2 on a tour of 5 Acer Court.  During that tour, CI-2 did not see any computers in the classrooms.

### H.     Ohr Yochanan

49.     According to documents filed with USAC, Ohr Yochanan is a school located at 97 Highview Road, Suffern, New York 10901.  97 Highview Road is a large house in a residential neighborhood.  The house has light grey or beige siding on the lower floor facing the street, and a large black A-frame roof.  The lower floor has six large, similar windows each with dark brown shutters facing Highview Road.  The front entrance consists of dark brown double doors with a small window in the center of each.

50.     Based on documentation that Ohr Yochanan filed with USAC, Ohr Yochanan should have, among other things, PBX, PRI, and standard telephone systems; a local area network (LAN) with server; wiring and infrastructure for computer systems; PBX service to its classrooms; a homework hotline; and over $16,000 in smartphones with data and voice plans, for all of which Ohr Yochanan, in conjunction with Hashomer, Central Telecom, SelectCell, Satteline, IP Connect,

---

[12] CI-2 has been providing information to law enforcement for more than one year.  CI-2 began working with law enforcement in hopes of receiving leniency for possible complicity in a fraudulent scheme unrelated to the scheme that is the subject of this Affidavit.  CI-2's information has proven reliable in the past and has been corroborated by reports of previous frauds that were subsequently confirmed by law enforcement investigation, as well as audio and video recordings.

XChange Telecom, Safe Zone, Talkspan Inc., and Digitech Communications Incorporated, received over $224,734.17.  In 2015 and 2014 alone, Ohr Yochanan received approximately $54,651 for services and equipment purportedly provided by Central Telecom, SelectCell, and Digitech Communications Incorporated.  Simon Goldbrenner is the listed consulted for each of Ohr Yochanan's 2014 and 2015 E-Rate requests.

51.     On or about January 21, 2015, CI-1 visited 97 Highview Road under the guise of inquiring about Ohr Yochanan's educational capabilities.  CI-1 spoke with an unidentified female voice ("UF-1") over an intercom system at the front door to 97 Highview Road.  UF-1 informed CI-1 that although Ohr Yochanan's students attend school at 97 Highview Road, the School currently has its offices at 93 Highview Road. CI-1 then proceeded to 93 Highview Road.

52.     93 Highview Road, Suffern, New York 10901, is a ranch style residential house that has been modified to serve as a school.  The house has green siding, windows with white trim, and a dark shingled roof.  The front entrance to 93 Highview Road is a large white door underneath a small windowed gable.

53.     Continuing on or about January 21, 2015, at 93 Highview Road, CI-1 spoke with an adult male who introduced himself as ███████ and represented himself as an employee of Ohr Yochanan.  ██████ stated that the School's menahel, purportedly named ████████ was unavailable.  ██████ provided certain details about Ohr Yochanan's students and educational capabilities.  ██████ confirmed that the school is currently housed at 97 Highview Road, but stated that upon receiving approval from an unspecified local authority, Ohr Yochanan intended to begin educating its younger students at 93 Highview Road.  In response to questions from CI-1 concerning Ohr Yochanan's use of information technology, ██████ stated that computers and

similar technology were not even mentioned at Ohr Yochanan, and that in fact the students are not allowed to use electronics.

### I.   Yeshiva Talpiot

54.     According to documents filed with USAC, Yeshiva Talpiot ("Talpiot") is a school located at 93 College Road, Monsey, New York 10901.  93 College Road is a large house in a residential neighborhood.  The house is two stories, with blue siding and a detached garage.  The house is entered by a white door flanked by two white columns.[13]  The detached garage has garage doors and a pedestrian door facing the house.

55.     Based on documentation that Talpiot submitted to USAC, Talpiot should have, among other things, a PBX telephone system, a DNS server, approximately seven standard telephone lines, 26 lines for cellular service,[14] distance learning and video conferencing equipment, and internet access through an ethernet, for all of which Talpiot, in conjunction with Trust Corp., Selectcell, Wolfson, and CTI, had sought over $472,000, and received over $249,000, since 2012 to purchase, install, and maintain.  In 2015 alone, Talpiot sought over $39,000 and received over

---

[13] In addition to the 93 College Road address, Talpiot's filing with USAC indicate two other locations.  In its 2015 submission to USAC, Talpiot indicated that it had administrative offices at 2 Lawrence Street, Nanuet, New York, and Talpiot's earlier E-Rate filings have previously listed its location as 354 Viola Road, New Hempstead, New York (as well as listing a PO Box).  I have spoken with a law enforcement officer who has interviewed the current occupants of these locations and determined that no schools or administrative offices are presently found at either location.

[14] From 2012 to 2015, Talpiot has sought funds for varied numbers of both standard landlines (requested as "POTS," an acronym for "plain old telephone service") and cellular phones, despite purportedly possessing a PBX telephone system which would render at least the standard landlines redundant.

$18,000 in E-Rate funds in conjunction with Trust Corp.  Simon Goldbrenner is the listed consultant for many of the E-Rate requests, including requests made in 2015.

56.     On or about January 13, 2016, CI-1 toured Talpiot's facility at 93 College Road. CI-1 viewed the entrance area, the main classroom, the basement, a conference or studying room, and the school's office (which, contrary to Talpiot's USAC filings, discussed above, appears to be located in the school and not at a separate location).  The only telecommunications and information technology CI-1 observed were two standard telephones and one to two computers in the school's office.

57.     I have reviewed tax filings by Talpiot purporting to describe its facilities.  Based on those filings, CI-1 has viewed the entirety of those facilities with the exception of a secondary classroom purportedly located in the stand-alone garage.  I have spoken to a law enforcement officer who examined the exterior of the stand-alone garage and observed only what appears to be a single 110-volt power line running to the stand-alone garage with no other cables or connections for power or communication.  Based on my understanding of the telecommunications and information technology requested by Talpiot, I believe it is highly unlikely that any of that technology would be located in a stand-alone garage, where items such as a PBX telephone system, video conferencing center, and Ethernet system would be of little or no utility if not connected to the telephone system or Internet via cables.

58.     I have viewed a video created by Talpiot, advertising the education it provides, which was posted on the Internet on or about August 8, 2015.  This video depicts the school's interior from various angles, to include numerous images of classroom instruction and multiple images of what appears to be the interior of the stand-alone garage.  None of the portions of the

school depicted in the video appeared to contain any of the technology that had purportedly been purchased with E-Rate funds at that time.

### J.     Bais Chana Malka

59.     According to documents filed with USAC, Bais Chana Malka ("Chana Malka") is a school located at 185 North Main Street, Spring Valley, New York 10977. 185 North Main Street is a large red brick school building with two and a half stories and numerous large windows with white trim. I know from conducting surveillance of Chana Malka and from the account of a fire inspector ("Inspector-1") who has been inside 185 North Main Street that at least two schools operate inside 185 North Main Street. The principal entrance to Chana Malka is located near the northeast corner of 185 North Main Street, close to the intersection of South Orchard Street and Linden Avenue. The entrance consists of double doors facing South Orchard Street, from which the entrance is separated by a parking lot. A covered walkway leads from the parking lot to the doors, which are raised above street level by approximately four steps. Once inside the doors, stairs lead to the second floor of 185 North Main Street. Chana Malka occupies the structure's entire top story, and does not occupy any other portion of the building.

60.     Based on documentation that Chana Malka submitted to USAC, Chana Malka should have, among other things, a homework hotline, point-to-point fiber connectivity, a primary rate interface (PRI) digital phone system with 24 lines, 15 local and long distance standard telephone lines, 21 cellular telephones with voice and data plans, distance learning and video conferencing capabilities in each room (presumably, each classroom), and a managed data Ethernet system. In 2014 and 2015, Chana Malka sought approximately $544,229.35 in E-Rate funds. In 2014 and 2015, Chana Malka, in conjunction with Cheap Talk, Daas Media Broadcasting, Ptop Communication Inc., and Commas Communications Inc., received

approximately $179,534.61 in E-Rate funds.  Simon Goldbrenner is the listed consultant for all of Chana Malka's 2014 E-Rate requests, and Moshe Schwartz is the listed consultant for all but one of Chana Malka's 2015 E-Rate requests.

61.     I have spoken with a law enforcement officer who interviewed Inspector-1. According to Inspector-1, on or about August 27, 2015, Inspector-1 had inspected 185 North Main Street for fire code violations and related issues, and learned or confirmed the following:  Chana Malka operates on the second floor of 185 North Main Street.  Chana Malka's classrooms are very plain, and do not contain any signs of telecommunications or information technology, to include any wiring or infrastructure for telecommunications or information technology.  Chana Malka appears to have one small administrative office, in which Inspector-1 observed only "a few" computers and standard phone sets.

### K.     Congregation Machzikei Hadas of Belz

62.     Congregation Machzikei Hadas of Belz ("Belz") is a school located at 3 North Cole Avenue, Spring Valley, New York 10977.[15]

63.     Based on documentation that Belz submitted to USAC, Belz should have, among other things, a PBX telephone system with Primary Rate Interface for 23 voice lines, 12 additional local and long distance lines, 25 cellular telephones, a Dell PowerEdge R710 server with 80 terminals and multiple uninterruptible power supplies, a multi-media video system, a firewall, wireless connectivity, technological infrastructure for all, including DSL connectivity, Lit Fiber

---

[15] Because, as described below, it appears that Belz has some—though not most—technology similar to the types of technology for which it has sought funding, the Government is not seeking a warrant to search these premises at this time.  Belz is nonetheless included in this Affidavit because its relationship to various Vendors and a Consultant makes it relevant to probable cause to search other premises.

service, and Dark Fiber/point-to-point service, and access to a homework hotline service, for all of which Belz, in conjunction with the purported service providers for these goods and services, Selectcentral, Inc. ("Selectcentral"), Selectcell, Central Telecom, IP Connect, Satteline, Prime Security & Communication, Inc., Xchange, Safe Zone, Platinum, Talkspan Inc., and ID-Tech Solutions, Inc., had sought approximately $1,096,735, and received over $535,000, since 2009 to purchase, install, and maintain.  In 2015 alone, Belz sought approximately $179,075 in E-Rate funds, to include $120,666 in E-Rate funds in conjunction with Selectcentral, approximately $48,118 in E-Rate funds in conjunction with Central Telecom, and approximately $10,290 in E-Rate funds in conjunction with Selectcell.  Documents submitted to USAC indicate that Simon Goldbrenner served as an E-Rate consultant for each of the 2015 E-Rate requests.

64.     On or about December 29, 2015, CI-1—who had recently been hired as a teacher by Belz—working at the direction of law enforcement toured Belz.  CI-1 did not observe any information technology, telephones, or signs of operative networks in any of the Belz classrooms. At that time, CI-1 did not see any video conferencing equipment either.  The only such equipment CI-1 observed anywhere in the Belz facility was a single desktop computer, copier, and basic telephone in the school's administrative office, and one more basic telephone outside the administrative office.  Also on or about December 29, 2015, CI-1 spoke with an individual known by CI-1 to be the principal of the school, ▮▮▮▮▮▮▮▮.  ▮▮▮▮▮▮▮ informed CI-1, in substance and in part, that Belz "does not get involved in technology and science."

65.     In or about February 2016, CI-1 saw projectors mounted in some classrooms and asked another Belz employee about the projectors; that employee told CI-1, in substance and in part, that the projector was used to watch a rabbi at a celebration in Israel.  CI-1 also learned that

Belz uses the "Belz network" for certain functions, such as connecting the projector, though he has not learned any other details about the "Belz network."  To date, CI-1 still has not seen any computers, telephones, or information technology in any of the classrooms, although he has seen what appear to be five to seven terminals set up for administrative use.

### L.    Community Enrichment Center

66.    The Community Enrichment Center ("CEC") is a day-care facility located at 9 Zeissner Lane, Spring Valley, New York 10977.[16]  According to records provided by USAC, █████ ██████ is the proprietor of CEC.  9 Zeissner Lane is a two-story single-family home.  In documents it filed, CEC has represented to Rockland County that it is a day-care facility, but to USAC and NYSED that it is a school.  Based on my review of USAC regulations and conversations with FCC employees, I know that USAC will only provide E-Rate funding to a "qualified educational facility."  Absent certain exceptions not applicable to CEC, a day-care facility is not a qualified educational facility.

67.    Based on documentation that CEC submitted to USAC, CEC should have, among other things, a PBX telephone system; a Dell PowerEdge R710 server;[17] and a network with 25 terminals, each of which has software licenses, for all of which CEC, in conjunction with Crystal

---

[16] Because, as described below, law enforcement officers searched CEC less than one year ago, the Government is not seeking a warrant to search these premises at this time.  CEC is nonetheless included in this Affidavit because its relationship to various Vendors and the larger fraudulent scheme makes it relevant to probable cause to search other premises.

[17] In documents that the subjects of this investigation provided to USAC, the funding sought from USAC for a given item of equipment often appears to be significantly higher than the market value of the corresponding equipment.  For example, in 2013, CEC sought and received $25,033.50 for a Dell PowerEdge R710 server, to be provided by CCCI.  According to a website maintained by Dell, which I have reviewed, a Dell PowerEdge R730 server—which the website describes as the successor to the R710 server—sells for $2,019.00.

Clear Communication, Inc. ("CCCI") and CSI, had sought over $175,000 to purchase, install, and maintain.

68.     On or about April 13, 2015, the Rockland County District Attorney's Office executed a search warrant on 9 Zeissner Lane in order to investigate a separate fraudulent scheme. I executed the search warrant along with others, and from our observations, learned that: (1) the first floor was used as a day-care facility; (2) the second floor was a personal residence used by ███████████████████████████; (3) a Panasonic KX-TDE200 PBX telephone system was located in a closet in the basement, with approximately ten handsets throughout the building, approximately half in each of the first and second floors; (4) a single desktop computer, a single laptop computer, and a single laser printer were in an office on the first floor.  During the search, law enforcement agents did not see any indication of a server, a network, or any technology other than the PBX telephone system, which serviced the residence as well as the day-care center, and the desktop computer, laptop computer, and laser printer in the office.  An attendance summary for March 2015 was found in the office, setting forth the names of 34 children, ranging in age from three to eleven years old.  According to that summary, only 22 of those children had attended CEC at all that month, and only 13 of those children—all three to five years old—had attended more than three days that month.

**M.     Noiam Mgodim**

69.     Noiam Mgodim is a school located at 766 North Main Street, Spring Valley, New York.[18]   According to records maintained by USAC, ████████████████ is the contact for

---

[18] Because, as described below, it appears that Noiam Mgodim has some—though not most—technology similar to the types of technology for which it has sought funding, the Government is not seeking a warrant to search these premises at this time.  Noaim Mgodim is nonetheless included

Noiam Mgodim.  Noiam Mgodim has submitted paperwork to USAC listing ████████ 's contact address as 766 North Main Street, Suite 114, Spring Valley, New York 10952.  According to records maintained by NYSED, Noiam Mgodim occupies the entire fourth floor of 766 North Main Street.

70.      According to documents filed with USAC, until approximately one year ago, Noiam Mgodim was located at 5 Lane Street, Monsey, New York.  5 Lane Street was a single-family red-brick home with a single trailer attached.  As of 2013, three schools—totaling over 600 students—that sought and obtained E-Rate funds purported, in their paperwork, to be located at 5 Lane Street: (1) Noiam Mgodim; (2) Congregation Talmud Torah; and (3) Imrei Shufer.[19]  The paperwork that Noiam Mgodim has recently submitted to USAC continues to list Noiam Mgodim's location as 5 Lane Street, Monsey, New York 10952; however, the single-family home located at 5 Lane Street was boarded up more than one year ago, and was demolished in the spring of 2015.  I have learned from representatives of the NYSED that Noiam Mgodim now receives funding at 766 North Main Street.

71.      I have reviewed records from the Town of Ramapo, records from the New York State Board of Real Property Services, and a Renewal Application for Real Property Tax Exemption for Non Profit Organizations dated February 23, 2015, relating to Congregation Noiam Mgodim.  I believe that Noiam Mgodim and Congregation Noiam Mgodim are related to one

---

in this Affidavit because its relationship to various Vendors and a Consultant makes it relevant to probable cause to search other premises.

[19] According to documents provided by the New York State Department of State Division of Corporations and the NYSED, in 2008, Noaim Mgodim filed paperwork permitting it to operate under the name Congregation Talmud Torah.  After that time, both Noaim Mgodim and Congregation Talmud Torah sought both federal and state funds.

another, both because of the similarity in names and because Noiam Mgodim filed a corporate document with the New York State Department of State Division of Corporations under the name of Congregation Noaim Mgodim.

72.     Based on documentation that Noiam Mgodim submitted to USAC, Noiam Mgodim should have, among other things, a PBX telephone system with Primary Rate Interface; a DNS server; technological infrastructure for both, including DSL connectivity and eight telephone lines; and at least 15 cellular telephones, for all of which Noiam Mgodim, in conjunction with Cheap Talk, Central Telecom, CSI, Selectcell, Xchange, Wolfson, Satteline, and Broadview Networks Holdings, Inc. ("Broadview"), had sought over $726,000, and received over $526,000, since 2009 to purchase, install, and maintain; and a homework hotline, for which Noiam Mgodim, in conjunction with Selectcentral, Inc., had received over $42,000 since 2011 to maintain.  In 2015, Noiam Mgodim submitted funding requests to USAC, all using one vendor—Cheap Talk—for various goods and services, including distance learning, fiber internet services, 18 cellular phone lines, cables and connectors, seeking a total of $118,599.45.  As discussed above, Cheap Talk is owned by ██████████████████████████████████████████

██████.  For each of the 2014 and 2015 E-Rate funding applications, the listed consultant is Simon Goldbrenner.

73.     On or about January 23, 2014, the NYSED and the Director of Rockland County Fire and Emergency Services performed an inspection of 5 Lane Street—the location at the time of Noiam Mgodim.  I have spoken with law enforcement officers who interviewed an individual who performed that inspection, and reviewed photographs taken during that inspection, and learned that: (1) there were no signs of computers or PBX telephone systems anywhere in the main

building or the trailer; (2) there were no signs of network connections or wiring, or computer terminals; (3) the building and trailer themselves were in significant disrepair, and did not appear to have the infrastructure necessary to sustain technology like that described in Noiam Mgodim's submissions to USAC; and (4) there was no visible cellular or wireless technology.

74. On or about March 1, 2016, CI-1 visited 766 North Main Street, and spoke with ████████. ████████ told CI-1 that Noiam Mgodim does use technology—using a filter in order to allow internet access without violating religious prohibitions on certain outside information—and brought CI-1 to a classroom on the fourth floor of 766 North Main Street. CI-1 did not see any computers, telephones, or information technology in that classroom. CI-1 did see a computer and a telephone in ████████'s office. CI-1 asked Rabinowitz if there was a system to run live broadcasts from elsewhere; ████████ showed CI-1 a room where there was a camera system and flat-screen and confirmed that Noiam Mgodim could run live broadcasts using that system.

**N.      Talmud Torah D'Chasidei Bobov of Monsey**

75. Talmud Torah D'Chasidei Bobov of Monsey ("TTDBM") is a school located on the top floor of 49 South Main Street, Spring Valley, New York 10952.[20] According to records maintained by USAC, ████████ is the contact for TTDBM. From my investigation, I have learned that at least two schools are located in 49 South Main Street: TTDBM and Congregation Munkasch.

---

[20] Because, as described below, CI-1 only had the opportunity to see a relatively limited portion of TTDBM when CI-1 visited, the Government is not seeking a warrant to search these premises at this time. TTDBM is nonetheless included in this Affidavit because its relationship to various Vendors and a Consultant makes it relevant to probable cause to search other premises.

76.     Based on documentation that TTDBM submitted to USAC, TTDBM should have, among other things, a telephone system with Primary Rate Interface for 23 voice lines; 15 additional local and long distance telephone lines; 28 cellular telephones; multiple servers, including a Dell PowerEdge R710 DNS server and a Dell PowerEdge R510 Windows Server; technological infrastructure for all, including DSL connectivity, a 10-megabyte T1 point-to-point connection, and wireless data distribution; and access to a Homework Hotline and Video Conferencing and a Distance Learning Service, for all of which TTDBM, in conjunction with Cheap Talk, Selectcentral, Inc., Selectcell, SLD Interim, Discount Cellular Plus, Dynalink Communications, Birns Telecommunications Inc., Satteline, Safe Zone, and Broadview, had sought over $1.47 million, and received over $500,000, since 2009 to purchase, install, and maintain.  In 2015 alone, TTDBM has sought $193,247.70 in E-Rate funds in conjunction with Cheap Talk, $68,136 in E-Rate funds in conjunction with Selectcentral, and $8,400 in E-Rate funds in conjunction with Selectcell.  For each of these 2015 requests, the listed consultant is Simon Goldbrenner.

77.     On or about August 27, 2015, CI-1 entered 49 South Main Street, purporting to ask questions about the educational needs of TTDBM's students.  While visiting TTDBM, CI-1 surreptitiously made a video recording of the facility at the request of law enforcement.  CI-1 entered through the main entrance, onto what CI-1 believed to be the main floor, and was told by an individual that that floor was Congregation Munkasch, and that TTDBM was located upstairs. CI-1 then walked up a set of stairs to what he believed to be the top floor, and spoke with an individual who indicated that that floor was TTDBM.  CI-1 spoke with a man who called himself ███████ who said that there are approximately 300 students at TTDBM.  (In 2014, TTDBM

submitted paperwork to USAC, in connection with its request for funds, indicating that it had 684 students.)  CI-1 also spoke with a man who identified himself as ▮▮▮▮▮▮▮, and toured a portion of the school, including its office and its hallways, where he had a partial view of one or more classrooms.  CI-1 did not observe, and the video made by CI-1 does not reflect, the presence of any of the information technology or telecommunications equipment which TTBDM purportedly purchased and maintained using E-Rate funds.

V.    THE VENDORS

    A.    **Hashomer Alarm System Inc.**

78.    Hashomer Alarm System Inc. ("Hashomer") is a New York State Corporation. According to Hashomer's website, its business address is 29 Robert Pitt Drive, Monsey, New York 10952.  29 Robert Pitt Drive is located within an office park complex marked by a large sign reading "Robert Pitt Professional Plaza."  The entrance to 29 Robert Pitt Drive is a single door with a glass window, raised approximately five steps above street level.  A green awning above the door is clearly marked "29" in white numbers.

79.    According to documents provided by the New York State Department of State Division of Corporations, Hashomer's CEO is Peretz Klein, who lives at 44 Ellish Parkway, Spring Valley, New York 10977.  According to records obtained from Wachovia Bank (now Wells Fargo) Hashomer also maintains a business address at 44 Ellish Parkway.  44 Ellish Parkway is a large, two-story house in a residential neighborhood.  The front of the house, as viewed from Ellish Parkway, is largely covered by white siding.  The area surrounding the front door is, however, covered by red brick.  The front door is located on a concrete porch raised approximately four steps above street level, with a small white awning immediately above the door. The door appears to be constructed of a light-colored wood.

80.     From in or about 2009 up to and including in or about 2014, Hashomer was the vendor for approximately $19,098,910.90 in E-rate requests, and received approximately $6,904,479.07 in E-rate funds.  In or about 2015, Hashomer appears to have stopped listing itself directly as the service provider for E-Rate requests, and has continued to do E-Rate business in conjunction with interrelated companies.  For example, in March and April of 2015, Princeton Video Conferencing received two $21,000 E-Rate payments from USAC, and within days of those payments made multiple transfers of $10,000 to Hashomer.  According to documents submitted to USAC, ███████████ is the owner of Princeton Video Conferencing.  Bank records for Princeton Video Conferencing list ███████████'s address as 44 Ellish Parkway, Spring Valley, New York 10977, which as discussed above is a business address for Hashomer and Hashomer's owner, Peretz Klein.

81.     From my review of bank records and other financial documents, I have learned that Hashomer has business relationships with Lion Communications (a Vendor described below), NY NJ TelCo Corp. (a Vendor described below), S. Goldbrenner LTD (an E-rate Consultant described below), Com Com Communications, Steady Connections, Inc., Lina Hatzedek Foundation, and National Medical Alert, in that money is transferred to and from bank accounts with those entities. In addition, according to documents provided by the New York Department of State, Peretz Klein is the CEO of Lion Communications.

82.     As set forth above, there is probable cause to believe that at least three of the Schools (CMZH, Bais Yehuda, and Shaar Ephraim), did not receive the products and services for which Hashomer and those Schools billed E-Rate.  In addition, and also for the reasons discussed above, there is probable cause to believe that other parties with which Hashomer has business

43

relationships, to include Princeton Video Conferencing, NY NJ Telco Corp., Lion Communications, and S. Goldbrenner LTD, have billed E-Rate for goods and services purportedly, but not actually, provided to Schools.

### B.    Lion Communications Inc.

83.    According to a document filed with the FCC, Lion Communications Inc. ("Lion Communications"), is an E-Rate service provider located at 5418 16th Avenue, Brooklyn, New York.  5418 16th Avenue is a three-story brick residential apartment building. On the front entrance there are three door bells. Pasted on the bottom bell is an address label reading ███ ███████ 5418 16th Ave Brooklyn, NY."[21]  Also according to the New York Department of State, Peretz Klein—the CEO of Hashomer, as discussed above—is the CEO of Lion Communications.

84.    I have reviewed bank records for Lion Communications.  Those records show that when Lion Communications' bank account received E-Rate funds, Lion Communications' bank account consistently transferred approximately the same amount of money to the bank account of Hashomer Alarms within several days of receiving the E-Rate funds.

85.    According to a USAC database, in 2012 and 2013 a school named Bais Chinuch Hayoshen ("BCH") purchased $226,250.01 in wiring, infrastructure, and maintenance for information technology from Lion Communications using E-Rate funds.  According to documents submitted to USAC and the New York State Education Department ("NYSED"), including bills

---

[21] Because I have not determined with certainty which unit at 5418 16th Avenue is used by Lion Communications, Inc., the Government is not seeking a warrant to search these premises at this time.  Lion Communications is nonetheless included in this Affidavit because its relationship to Hashomer, Peretz Klein, and several Schools makes it relevant to probable cause to search other premises.

for services purportedly provided by Lion Communications, BCH was located at 486 Saddle River Road, Monsey, New York, in 2012 and 2013.[22]  I have spoken with a law enforcement officer who has interviewed the Postmaster of the Monsey Post Office.  That Postmaster has stated that no such address exists, or has ever existed, to his knowledge.  No other address for BCH presently appears to exist, as documents filed with NYSED indicate that BCH was supposedly absorbed into another school in November 2013.

86.     From 2009 to 2015, Lion sought approximately $4,402,934.91 in E-Rate funds and received approximately $900,118.86 in E-Rate funds.[23]  In 2015 alone, Lion sought approximately $626,296 in E-Rate funds and received approximately $40,810 in E-Rate funds.  (In more recent years, USAC has generally had less funding available for E-Rate.  For that reason, many of the Vendors have received smaller disbursements in recent years than in earlier years.)

### C.     Multimedia Broadcasting Corporation

87.     Multimedia Broadcasting Corporation ("MBC") is a New York State Corporation created on or about November 14, 2011.  According to a public-records search, the president of MBC is ████████, and the secretary is ██████.  ███ is also the contact listed on documents submitted to USAC.  According to documents that MBC submitted to USAC, MBC is

---

[22] According to correspondence sent to NYSED purportedly from BCH, in 2012 BCH also had two other locations in Monsey, at 16 Suzanne Drive and 9 Leon Drive.  These were not, however, the addresses at which Lion Communication purportedly maintained technology equipment.  In addition, 16 Suzanne Drive is in fact the listed address of another school (YOT) which as discussed below is a separate school also believed to be involved in the Subject Offenses, and 9 Leon Drive was described by BCH solely as an administrative office.

[23] E-Rate disbursements for E-Rate year 2015 are not yet complete, so the total funds received by those Vendors that received 2015 E-Rate disbursements may be higher than the numbers reflected in this Affidavit.

located at 1645 Grand Avenue, Suite 1DN, in the Bronx, New York 10453.  1645 Grand Avenue

is an apartment building in the Bronx on the southwest corner of Grand Avenue and West 174th

Street.  According to public records, 1645 Grand Avenue is owned by Bridgestone Group LLC,

and Peretz Klein, the CEO of Hashomer, is the managing member of Bridgestone Group LLC.[24]

88.     According to bank records for MBC, from 2013 through 2015, MBC received

$2,144,525.21 in E-Rate Funds from USAC; during the same time period, MBC transferred

$1,615,100 to Hashomer, and wrote checks totaling $13,000 to "P. Klein," $30,000 to

"Bridgestone Group LLC," and $5,000 to "Moshe Schwartz & Associates."  Moshe Schwartz is

an E-Rate Consultant, further discussed below, who under FCC conflict of interest rules described

above must remain independent of Vendors engaged in the E-Rate program.  In addition, on or

about June 3, 2014, MBC made a wire transfer to a company named "GPS Com Inc." at the address

of 4 Zlotchev Way, Monroe, New York.  As discussed below, 4 Zlotchev Way is a residential

building listed by Moshe Schwartz as his business address on E-Rate submissions.  Based on my

training and experience in investigating frauds, I believe the $5,000 payment from MBC to

Schwartz and the separate $30,000 payment MBC sent to a company sharing his address to be

"kickbacks" for Schwartz's participation in the E-Rate scheme.  That is, the payments from MBC

to Schwartz and a company sharing Schwartz's address are likely a method by which Schwartz

receives his "cut" for participating in the scheme to direct E-Rate funds to MBC for goods and

services that MBC did not actually provide.

---

[24] The Government is not seeking a warrant to search MBC at this time.  MBC is nonetheless included in this Affidavit because its relationship to Hashomer, Peretz Klein, Yeshiva Chofetz Chaim, and Moshe Schwartz makes it relevant to probable cause to search other premises.

89.     Among the schools that MBC purported to serve was Yeshiva Chofetz Chaim.  For the reasons set forth above, there is probable cause to believe that Choftez Chaim did not receive the products and services for which it sought funding in connection with MBC.

90.     From 2009 to 2015, MBC sought approximately $3,028,645.57 in E-Rate funds and received approximately $2,108,173.70 in E-Rate funds.   In 2015 alone, MBC sought approximately $517,380 in E-Rate funds and received approximately $59,220 in E-Rate funds.

**D.     IP Connect Inc.**

91.     IP Connect Inc. ("IP Connect") is a New York State Corporation located at 13 Mosier Court, Monsey, New York 10952.  IP Connect has submitted a document to USAC stating that it is located at 13 Mosier Court.  13 Mosier Court is a split-level single-family home located on the west side of Mosier Court, south of the intersection of Mosier Court and Wilsher Drive in Monsey, New York.  There are steps passing between two columns leading up to the main entrance on Mosier Court, which is a red wooden door with a pattern in the middle and light tan-colored stone surrounding the entrance and the window above the front door.  The lower level of the building appears to have stone siding, and the upper level appears to have tan hardy-plank siding.  According to documents that IP Connect submitted to KeyBank, the president is ███████████ and the secretary is ██████████.  According to records maintained by the Rockland County Clerk's Office, 13 Mosier Court is owned by ███████████████████.

92.     In or about 2012, IP Connect and Hashomer electronically submitted documents to USAC.  USAC recorded the IP addresses from which those documents were submitted and determined they were submitted from the same IP address.  Accordingly, I believe that Hashomer and IP Connect are using the same computer system and are acting in concert with one another.

93.     Among the E-Rate applicants that IP Connect purported to serve is Bais Yehuda, which is one of the Schools discussed above.  In funding year 2012, IP Connect and Bais Yehuda sought $134,238.34 in E-Rate funds, and received $122,474.30.  In funding year 2013, IP Connect and Bais Yehuda sought $23,829.44 in E-Rate funds, but did not receive any funds.  In funding year 2014, IP Connect and Bais Yehuda sought $23,829.44 in E-Rate funds, but did not receive any funds.  As set forth above, there is probable cause to believe that Bais Yehuda did not receive products or services for which it billed USAC in connection with IP Connect.

94.     Medex Supply Distributors Inc. ("Medex") is a medical supply company. According to KeyBank records, Medex's address is 13 Mosier Court, and its owners are █████ ████████████, meaning that Medex has the same address as IP Connect and one of the same owners.  I have reviewed bank records showing that Medex and IP Connect have made transfers of cash between the two corporations, with the net balance showing funds moving to IP Connect. In January and February 2013, Medex transferred approximately $65,000 to ████████████, which is one of the Schools.  As further discussed above, from 2009 to 2014 IP Connect and Hashomer— which appears to be acting in concert with IP Connect—received over $█████ in E-Rate funds based on requests by ████████████ for goods and services which there is probable cause to believe ████████████ did not receive.  For those reasons, based on my training and experience in fraud cases, I believe the payments from Medex to ████████████ constitute a "kickback" for ████████ 's participation in the E-Rate scheme.  That is, the payment from Medex (a medical supply company) to ████████████ (a school) is likely the method by which ████████████ received its "cut" for participating in the scheme to direct E-Rate funds to IP Connect and Hashomer for goods and services that IP Connect and Hashomer did not actually provide.

48

95. From 2012 to 2014, IP Connect sought approximately $609,443.67 in E-Rate funds and received approximately $358,954.33 in E-Rate funds. IP Connect did not seek any E-Rate funds in 2015, although as discussed above FCC regulations require IP Connect to maintain its documentation for 2012 to 2014 as of the date of this Affidavit.

**E. Crystal Clear Communication Inc.**

96. Crystal Clear Communications Inc. ("CCCI") is a New York State corporation. According to documents maintained by the Rockland County Clerk, CCCI was incorporated by ███████████, who provided the service address of 16 Laura Drive, Airmont, New York 10952, which is also the address that CCCI provided to USAC in documents CCCI filed as an E-Rate service provider.

97. 16 Laura Drive is a split-level house with off-white siding and green shutters by the second-level windows. The front door has two decorated glass windows, with two more decorated glass windows on either side of the door, and a decorated octagonal window above the front door. The bottom level is red brick, and extends from the left of the front door, as seen from the street. There are two steps leading to the front door, each of which are red brick with a white/gray stone top.

98. According to documents filed with USAC, in 2011 and 2012, one of the Schools, CEC, sought approximately $119,000 in E-Rate funds to pay for telecommunications and information technology equipment and services from CCCI, and CCCI received approximately $105,000 in E-Rate funds as a result. As discussed above, there is probable cause to believe that CEC did not in fact receive the equipment and services for which CCCI and CEC billed E-Rate. In 2014, CEC requested approximately $11,500 to maintain telecommunications and information technology equipment—to include the equipment purportedly provided by CCCI—although E-

49

Rate did not in fact allocate any of those funds.  As discussed above, there is probable cause to believe that CEC did not in fact possess the equipment for which CCCI and CEC billed E-Rate.

99.     From 2009 to 2014, CCCI sought approximately $4,223,636.82 in E-Rate funds and received approximately $1,617,462.93 in E-Rate funds.  CCCI did not seek any E-Rate funds in 2015, although as discussed above FCC regulations would require CCCI Connect to maintain its documentation for 2011 to 2014 as of the date of this Affidavit.







### I.      NY NJ Telco Corp

111.    According to documents filed with USAC, NY NJ Telco Corp ("NY NJ") is an E-Rate service provider located at 21 Robert Pitt Drive, Suite 224, Monsey, New York 10952.  USAC documents list Peretz Klein, who, as discussed above, is also the CEO of Hashomer and Lion Communications, as the President of NY NJ.  Documents provided by the New York State Department of State Division of Corporations also indicate that NY NJ is located at 21 Robert Pitt Drive, Suite 224, Monsey, New York and also list Peretz Klein as the CEO of NY NJ.

112.    21 Robert Pitt Drive is located within an office park complex marked by a large sign reading "Robert Pitt Professional Plaza" (within which Hashomer, described above, is also located).  The entrance to 21 Robert Pitt drive is a set of gray metallic double doors, each with three glass panes running the length of the door.  The number "21" is clearly written above the doors.  Inside 21 Robert Pitt Drive, Suite 224 is located on the second floor.  Suite 224 is one of several suites off a common hallway.  The plain wooden door to Suite 224 is marked by a small sign reading "224."

113.    In 2015, one of the Schools, Chofetz Chaim, sought approximately $31,600 and received approximately $18,400 in E-Rate funds for telecommunications and information technology equipment purportedly provided by NY NJ.  Between 2012 and 2015 Chofetz Chaim requested a total of approximately $118,000 and received a total of approximately $101,300 in E-Rate funds for telecommunications and information technology equipment purportedly provided by NY NJ.  For reasons discussed above, there is probable cause to believe that Chofetz Chaim did not receive the goods and services for which Chofetz Chaim and NY NJ billed E-Rate.

114. From 2012 to 2015, NY NJ sought approximately $1,727,213.66 in E-Rate funds and received approximately $1,175,669.40 in E-Rate funds. In 2015 alone, NY NJ sought approximately $487,815 in E-Rate funds and received approximately $164,615 in E-Rate funds

**J.    SIMI Securities and CSI Communications & Security Inc.**

115. According to documents filed with USAC, SIMI Securities ("SIMI") is an E-Rate service provider located at 6 Carlton Lane, Monsey, New York 10952 and SIMI's president is ███████████. Six Carlton Lane is a single-story, single family house in a residential neighborhood. The exterior of the house is predominately covered by white siding. The exterior of the house in the immediate area of the front door is red brick, and the front door is white with a central window in the door. The door is flanked by two white columns that appear to be made of wood.

116. CSI Communication & Security Inc. ("CSI") is a New York State corporation. According to documents submitted to USAC, CSI is an E-Rate service provider also located at 6 Carlton Lane, Monsey, New York 10952.[27] New York State Department of State Division of Corporations documents list Sholem Steinberg, who I believe to be related to ███████████, as the CEO of CSI, and Sholem Steinberg is also the listed point of contact in documents CSI filed with USAC. An FCC form filed with USAC lists ███████████ as the president of CSI.

117. In 2014, one of the Schools, Imrei Shufer, requested and received approximately $97,000 in E-Rate funds for distance learning and video conferencing equipment purportedly provided by SIMI. In 2015, Imrei Shufer requested approximately $23,400 and received

---

[27] Documents provided by the New York State Department of State Division of Corporations list the address for CSI as 943 51st Brooklyn New York 11219, but that is not the address CSI provided to USAC and CSI has not used that address in correspondence with USAC.

approximately $5,850 in E-Rate funds for Lit Fiber digital transmission service for distance learning and video conferencing, purportedly provided by SIMI.  As discussed above, there is probable cause to believe that Imrei Shufer did not in fact receive the goods and services for which Imrei Shufer and SIMI billed E-Rate.

118.     According to documents filed with USAC, Imrei Shufer also requested "managed broadband" services supplied by CSI for equipment that Imrei Shufer purportedly already possessed.  USAC authorized that disbursement to CSI, although based on the documents I have received at the time of this Affidavit it is unclear whether that disbursement has yet occurred or will occur.  Imrei Shufer has previously sought and received E-Rate funds for goods and services purportedly supplied by CSI, to include requesting approximately $75,000 and receiving approximately $71,000 in 2011.  As discussed above, there is probable cause to believe that Imrei Shufer did not in fact receive the goods and services for which Imrei Shufer and CSI billed and attempted to bill E-Rate.

119.     According to documents filed with USAC, in 2013 and 2014, another School, Noaim Mgodim, sought a total of approximately $39,000 in E-Rate funds for maintenance of information technology and telecommunications equipment to be conducted by CSI, although E-Rate did not in fact award these funds.  As discussed above, there is probable cause to believe that Noaim Mgodim did not in fact possess the equipment for which Noaim Mgodim and CSI sought to bill E-Rate to maintain.

120.     From 2013 to 2015, SIMI sought approximately $748,430.92 in E-Rate funds and received approximately $360,322.53 in E-Rate funds.  In 2015 alone, SIMI sought approximately $269,027 in E-Rate funds and received approximately $60,311 in E-Rate funds.

121.    From 2011 to 2015, CSI sought approximately $893,155.21 in E-Rate funds and received approximately $96,968.05 in E-Rate funds.  In 2015 alone, CSI sought approximately $115,935 in E-Rate funds and received approximately $8,287 in E-Rate funds.

## VI.    THE CONSULTANTS

### A.    S. Goldbrenner Ltd.

122.    According to documents filed with USAC, S. Goldbrenner Ltd. is a registered USAC consultant that provides consulting services to schools seeking to avail themselves of E-Rate funding, located at 5 Yale Drive, Monsey, New York 10952.  USAC and Bank records indicate that Simon Goldbrenner is the owner of S. Goldbrenner LLC.  I have spoken with CI-1, who visited 5 Yale Drive and spoke with an unidentified female ("UF-2") there.  UF-2 stated that she was Simon Goldbrenner's ███ and that Simon Goldbrenner lives at 5 Yale Drive.  I have also viewed records provided by the New York State Department of Motor Vehicles indicating that Simon Goldbrenner's address is 5 Yale Drive, Monsey, New York.

123.    5 Yale Drive is a two-story house located in a residential neighborhood.  The house has beige siding and a light brown roof.  The single front entrance is a large brown door raised above street level by approximately four steps.  The front door is flanked by small, narrow glass panes.  A large, hemispherical window sits immediately atop the door.

124.    As discussed above, applicants for E-Rate funds may employ consultants but those consultants must be independent from the service providers, and are expressly forbidden from associating with any service provider, or steering contracts to service providers.  Also as discussed above, however, bank records reflect an ongoing business relationship involving transfers of funds between Hashomer, a Vendor, and S. Goldbrenner Ltd.

57

125.    As further discussed above, documents obtained from USAC indicate that S. Goldbrenner Ltd. and/or Simon Goldbrenner acted as the consultant for numerous E-Rate funding requests in which the School did not apparently receive the goods or services for which the School and the purported Vendor billed USAC, to include requests by the Schools Noiam Mgodim, TTBDM, Imrei Shufer, Belz, Shaar Ephraim, Talpiot, and Chana Malka, with such requests being made as recently as E-Rate year 2015.

**B.      Moshe Schwartz**

126.    According to documents filed with USAC, Moshe Schwartz is a registered USAC consultant providing consulting services to schools seeking to avail themselves of E-Rate funding, who does business at 4 Zlotchev Way, Unit 201, Monroe, New York 10950.  4 Zlotchev Way is a multi-unit residential building with beige siding and windows with white trim.  The building is prominently marked "4."   Unit 201 is a residential unit on the second story, with an exterior entrance accessed via a full flight of stone stairs with a white railing.  The beige door has a single window and is marked "201."

127.    Despite the requirement that E-Rate consultants must be independent from service providers, and are expressly forbidden from associating with any service provider, or steering contracts to service providers, as discussed above, bank records reflect that MBC, an E-Rate Service Provider, wrote a check totaling $5,000 to "Moshe Schwartz & Associates" on or about January 15, 2015.  In addition, on or about June 3, 2014, MBC made a wire transfer to a company named "GPS Com Inc." which also lists its address as 4 Zlotchev Way, Monroe, New York.   As also discussed above, based on my training and experience in investigating frauds, I believe the $5,000 payment from MBC to Schwartz and the separate $30,000 payment MBC sent to a company sharing his address to be "kickbacks" for Schwartz's participation in the E-Rate scheme.

That is, the payments from MBC to Schwartz and a company sharing Schwartz's address are likely a method by which Schwartz receives his "cut" for participating in the scheme to direct E-Rate funds to MBC for goods and services that MBC did not actually provide.

128.    As discussed above, documents obtained from USAC indicate that Moshe Schwarz acted as the consultant for numerous E-Rate funding requests in which the School did not apparently receive the goods or services for which the School and the purported Vendor billed USAC, to include requests by the Schools Chofetz Chaim, Talpiot, and Chana Malka,. with such requests being made as recently as E-Rate year 2015.

VII.    FRUITS, EVIDENCE, AND INSTRUMENTALITIES OF THE SUBJECT OFFENSES

129.    In light of the foregoing, I expect the Subject Premises to contain both physical documents and electronic files (collectively, "documents") and other evidence of a fraudulent scheme to obtain E-Rate funds for goods and services that the Schools did not in fact receive or use, and which the Vendors did not in fact purchase or provide, as well as fruits and instrumentalities of that scheme, to include: Correspondence between and among the Vendors, Schools, and Consultants concerning the E-Rate Program; forms and letters sent to and from USAC and E-Rate administrators; documents and physical evidence concerning the Schools' actual and purported need for telecommunications and information technology goods and services (including the number, age, and ability of students actually and purportedly attending the Schools as manifested in documents such as attendance lists and tuition records); bills, notes, other documents, and cash reflecting or resulting from the transfer of funds between and among the Vendors, Schools, and Consultants; documents indicating the person or persons responsible for filing fraudulent requests and certifications to USAC; documents reflecting and describing the bidding process (if any) used to select Service Providers; and documents and other forms of

information, including IP addresses, reflecting the identity of individual persons participating in the Subject Offenses; all as further detailed at Attachment A, which Attachment is broken down by subject premises.

130.    I further expect that, with respect to the Schools, search of the subject premises will reveal evidence of the Subject Offenses by demonstrating the absence of the above-described physical items that the Schools, Vendors, and Consultants have billed E-Rate to obtain or maintain, as well as the absence of infrastructure (such as wiring and conduits for wiring) necessary for the use and maintenance of those times.

## VIII.   PROCEDURES FOR SEARCHING ELECTRONICALLY STORED INFORMATION (ESI)

### A.    Execution of Warrant for ESI

133.    Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

134.    As discussed herein, the Schools are operating institutions that are attended by children of varying ages.  In addition, it is possible that some of the Vendors and Consultants conduct some legitimate business.  The seizure of the Schools', Vendors', and Consultants' computers or other storage media may limit their ability to conduct legitimate business. In order to execute the warrant in the most reasonable fashion, law enforcement personnel will attempt to determine on the scene what computers or storage media must be seized or copied, and what computers or storage media need not be seized or copied. Law enforcement personnel will speak with Schools', Vendors', and Consultants' personnel on the scene as may be appropriate to this goal.

135.    Law enforcement personnel will, however, physically seize computers and other electronic storage media, rather than attempt to copy or search them on-site.  I have spoken to law enforcement personnel who have previously conducted law enforcement operations in the areas where the Schools, Vendors, and Consultants are located.  From those law enforcement personnel I have learned that in those areas even relatively modest law enforcement operations, such as service of a subpoena, have often drawn a significant hostile reaction, including crowds that physically interfered with law enforcement officers.  This is consistent with my personal experience conducting surveillance as part of this investigation, during which the presence of law enforcement personnel aroused apparent hostility on several occasions.  To avoid the risks to all concerned should large crowds gather during the course of an extended search, it is necessary that personnel executing the warrants do so as rapidly as possible, which requires removing electronic

storage media from the searched premises rather than attempting to copy (or "image") ESI at the premises.  If employees of the School, Vendor, or Consultant in question so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continued functioning of the School's, Vendor's, or Consultant's legitimate business as soon as possible, but in no event longer than ten days, after any seizure.

136.   If, after inspecting the seized computers and other electronic storage media off-site, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.  Moreover, law enforcement officers will attempt to copy (or "image") the ESI once the ESI is in the custody and control of those law enforcement officers, so that ether the ESI or copies of the ESI can be expeditiously returned to Schools, Vendors, or Consultants who seek its return.

**B.     Review of ESI**

137.   Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

138.   In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

62

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[28]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

139.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

C.    **Return of ESI**

140.    If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of

---

[28] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

142.    In light of the confidential nature of the continuing investigation, I respectfully

request that this affidavit and all papers submitted herewith be maintained under seal until the

Court orders otherwise.


_____

Martin Ancin
Detective
Rockland County District Attorney's Office
Federal Task Force Officer

Sworn to before me on
March 15, 2016


_____
HON. JUDITH C. McCARTHY
UNITED STATES MAGISTRATE JUDGE


65