

*Ilana Haramati*
*Partner*
Direct (646) 860-3130
Fax (212) 655-3535
ih@msf-law.com

February 21, 2023

**VIA ECF**

Hon. Kenneth M. Karas
United States District Court Judge
Southern District of New York
300 Quarropas St.
Courtroom 521
White Plains, New York 10601

    Re:    *United States v. Aron Melber,* No. 18-cr-614 (KMK)

Dear Judge Karas:

    We represent defendant Aron Melber in the above-referenced case. We write in advance of Mr. Melber's February 28, 2023 sentencing to provide the Court with supplemental and updated information regarding Mr. Melber's health, rehabilitation and family responsibilities in further support of our request for a sentence of six months home confinement and 300 hours of community service as a special condition of his supervised release.

**I.**    **Mr. Melber's Health has Recently Deteriorated**



Hon. Kenneth M. Karas
February 21, 2023
Page 2 of 7

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

A prison sentence would only compound the already profound risk to Aron's health. The deleterious impact of prison sentences on cardiovascular health is well documented. "Cardiovascular disease is a leading cause of death among individuals incarcerated, and those recently released have a higher risk of being hospitalized and dying of cardiovascular disease compared with the general population, even after accounting for differences in racial identity and socioeconomic status." Emily Wang, MD, et al., "Cardiovascular Disease in Incarcerated Populations," *Journal of American College of Cardiology* (June 20, 2017);[1] *accord* Leah Wang, "Chronic Punishment: The unmet health needs of people in state prisons," *Prison Policy Initiative* (June 2022) ("people recently released from prison have a higher risk of hospitalization and death from heart disease than the average person").[2] Indeed, incarcerated defendants are more than twice as likely to suffer a stroke than the general U.S. population. *Id.* (while .7% of the U.S. population has suffered a stroke, 1.% of sentenced prisoners, and 2.3% of pretrial detainees have suffered a stroke); *accord id.* ("Studies from 2 large prospective cohort studies that did include questions related to incarceration history indicate that individuals who have recent contact with the criminal justice system have higher rates of hypertension and uncontrolled blood pressure. Furthermore, individuals recently released from correctional facilities have a higher risk of hospitalization and, in some studies, an increased risk for mortality due to CVD and its risk factors compared with the general population.") (citations omitted).

Studies show that "[w]hile an incarcerated individual's health issues may begin before arrest, incarceration often exacerbates problems or creates new ones. Being locked up in and of itself causes lasting damage to one's health . . . ." Leah Wang, "Chronic Punishment: The unmet health needs of people in state prisons," *Prison Policy Initiative* (June 2022).[3] That is a real risk for Aron. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See, e.g.,* Leah Wang, "Chronic Punishment: The unmet health needs of people in state prisons," *Prison Policy Initiative* (June 2022) ("While heart disease is a leading cause of death both inside and outside of prison, the carceral environment makes it difficult for people inside to pursue a lifestyle and diet that staves off these problems").[4]

The limited availability of healthy foods, and the high calorie, salt, sugar and fat content of the average prison diet is well documented. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[1] Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6342510/.

[2] Available at: https://www.prisonpolicy.org/reports/chronicpunishment.html.

[3] Available at: https://www.prisonpolicy.org/reports/chronicpunishment.html.

[4] Available at: https://www.prisonpolicy.org/reports/chronicpunishment.html.

██████████████████████████████████████████████████████████ As one recent report explains, "[n]ationwide, the prevailing trends are clear: prisons serve mostly carb-heavy meals high in salt and sugar, with few or no fresh fruits and vegetables and a scarcity of quality protein. Incarcerated people are fed a diet that everyone else has been advised to avoid for decades." Impact Justice, "When Food Harms" (Nov. 2020).[5]

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

We respectfully request that the Court impose a non-custodial sentence accordingly.

## II. Aron is On the Path of Lasting Rehabilitation: He Has Obtained Stable Employment and Achieved Professional Success

Aron has also recently overcome challenges in his employment, finally finding a stable position in his brother's adult education company where he has thrived professionally, so that he can continue to support his large family. Aron's professional success is a meaningful hallmark of his rehabilitation since his arrest more than four and a half years ago. Incarceration would only disrupt his progress, further warranting a non-custodial sentence.

For years, Aron was the primary administrator and educational program director at the small elementary school, Imrei Shufer. Aron's children attended the school, and ensuring that the school maintained a warm educational environment was a foremost priority for Aron. The lasting impact that his welcoming philosophy made on children and families otherwise shunned from the close-knit Hassidic community was described in Mr. Melber's initial sentencing submission, and remains a point of pride for Aron. *See* Melber Sentencing Mem., ECF Doc. 160 at 3-17 (Oct. 27, 2020).

In the intervening years, Aron left his position at Imrei Shufer. The turmoil of the Covid-19 pandemic, and the stresses it wrought on the nation's educational institutions are well-documented.[6] Imrei Shufer, and Aron as its principal, were not spared. "In 2021, in the middle of the pandemic, [Aron] left his position as principal of the school Imrei Shufer due to significant

---

[5] Available at: https://impactjustice.org/wp-content/uploads/IJ-Eating-Behind-Bars-Release2.pdf.

[6] *See, e.g.,* Liam Stack and Nate Schweber, "Hasidic School With 60 Children Is Closed for Violating Virus Ban," *New York Times* (Sept. 25, 2020), available at: https://www.nytimes.com/2020/05/18/nyregion/coronavirus-nypd-brooklyn-yeshiva-school.html; Paul Bernstein, et al., "Beginning another year with COVID in Jewish education," e*Jewish Philanthropy* (Sept. 9, 2021), available at: https://ejewishphilanthropy.com/beginning-another-year-with-covid-in-jewish-education/; Ben Sales, "As COVID spikes in NYC, Jewish schools and synagogues are going remote again," *The Times of Israel* (Dec. 17, 2021), available at: https://www.timesofisrael.com/as-covid-spikes-in-nyc-jewish-schools-and-synagogues-are-going-remote-again/.

differences with the administration regarding Covid-related protocols." Ex. B, Yeedle Melber 2023 Ltr. at 1.

Thereafter, Aron struggled to find a job to support his large family. As his brother Yeedle recounts:

> I personally witnessed Aron Melber, my dear brother, trying to get a job. He got many great offers, but after a background check, no company was willing to hire him, due to the pending criminal case against him. . . . Since all of this took place in the midst of the Covid-19 pandemic, where everyone was struggling, it was especially heart wrenching to see Aron's family falling apart. He had no job, no income and unfortunately no hope for another job. Aron was stuck in limbo. There was no money to pay for the essentials like rent, food, and for running the household with 7 children at home.

*Id*.

After months of struggling, Aron's brother, Yeedle, who runs an adult education company, hired Aron to work in client services and administration at the company. Aron has invested his efforts in his brother's company, and excels at his job. As Yeedle's letter makes clear, Aron's work is far more than just one brother helping another secure employment. Aron has become integral to the company. Yeedle clearly tells the Court as much:

> Of course, Aron is my brother. But beyond that he has become in the last 6 months, a valuable member of the organization that I spent years building. Aron's dedication to our customers, personally making sure they get the information that they need to utilize our services allows us to assist many members of the Chasidic community develop their communication and leadership skills. Aron is also able to bring the best out of the employees he manages because he treats everyone with the utmost care and respect.
>
> Aron's services [are] vital to the success and growth, development and management of Lehasig Inc. I am lucky to have my brother working for my company. I am really looking forward to having his skills, knowledge and professionalism serve our clients and our company for many years to come.

*Id*. at 2. Aron too wants nothing more than to continue his gainful employment and support his family. A custodial sentence would only hamper the rehabilitation that he has already begun to achieve. *See generally United States v. Bannister*, 786 F. Supp. 2d 617, 674 (E.D.N.Y. 2011) (imposing five-year mandatory minimum, but finding it "excessive" and explaining that "a five-year sentence serves only to diminish his potential for rehabilitation.").

### III. Aron is the Mainstay of his Large Family

In the time since his arrest in 2018, Aron's familial responsibilities have also only increased—and substantially. Aron is the father of 9 children, ages 4 to 26. Seven of his children still live at home, and four are minors who require Aron's daily care and diligent support. Aron and his wife Rivka are also primarily responsible for providing assistance to their elderly widowed parents. Since the onset of the Covid-19 pandemic, Aron's mother has passed away leaving his father alone and grieving; his father-in-law also passed away, and his 89-year-old mother-in-law lives alone and requires daily care with even basic tasks. Aron is also a very involved grandfather to his two baby grandsons. Like many young parents, Aron's daughters are adjusting to their new roles, and rely on Aron and Rivka for assistance and respite from exhaustion of parenting small babies. Aron relishes the opportunity to help out as a grandfather, and provide his daughters with some relief. Aron has not let his struggles, whether professional or legal, impact his investment in his family. Whatever difficulties Aron endures, his family knows that they can count on him, and they do.

Aron is first and foremost, a superlative father, caring for the individual needs of each of his children. He remains particularly involved in the daily care of his youngest children, ages 4 to 16. Although Aron and his wife share the childcare work, Aron's wife is often occupied tending to her elderly mother and debilitated sister who suffered an ▮▮▮▮ several years ago. Aron is thus the parent who gets his young children ready for school, feeds them breakfast, and often makes them dinner and helps them with homework. As Rivka describes, while she cares for her elderly mother in the evenings, "Aron [is] alone many nights to look after our younger children who are 4.5, 8, 11, and 16 to make sure that their homework is done, they've eaten their dinners, they're bathed and ready for bed. Of course, the kids love to be with Aron. He is a special father and he makes every lesson and chore into a fun family activity with songs and stories and games suited to each child." Ex. A, Rivka Melber Ltr. at 3.

Aron prioritizes providing each child the special care and attention they need. Aron's recent investment in his 11-year-old child, ▮▮▮▮, who struggled terribly in school, is illustrative. As Aron's wife recounts:

> The transition to a new school was very hard on ▮▮▮▮. He had a very hard time sitting through all those hours and behaving properly at school. Earlier this year, the school sent ▮▮▮▮ home on suspension for a week, and ▮▮▮▮ was devastated. . . . [H]e was really struggling to keep up, pay attention, and sit still during the lessons. We were advised that ▮▮▮▮ troubles were likely because of developmental delays . . . .
>
> Aron inquired about a therapist for ▮▮▮▮ and drives him to the therapist weekly to help with developmental delays which affect his behaviors in class. We are glad about the results. Finally ▮▮▮▮ is allowed into class to participate fully.

*Id.* at 1-2.

---

Although heartened by ▓▓▓ improvement, Aron remains vigilant. He is always there to support his son and ensure he receives the assistance and attention he needs to thrive:

> Aron is in daily communication with ▓▓▓ school to make sure that we are doing everything we can to support ▓▓▓ so he can progress and enjoy school. Aron also takes ▓▓▓ to an extra learning program in the evening to make sure ▓▓▓ is caught up on his studies. And Aron is the one who makes ▓▓▓ meals and gets him to bed on time. Aron is the main parent looking after ▓▓▓. And ▓▓▓ feels safe because he knows Aron is always there to help.

*Id*. at 1-2. ▓▓▓ and all of Aron's minor children rely on him daily.

Although some of Aron's children are now grown, in the years since Aron's Indictment in 2018, Aron's family responsibilities have nonetheless increased. Both Aron's mother and his father-in-law passed away during the Covid-19 pandemic. Aron's widowed father and his widowed mother-in-law—both of whom are well into their 80s—are exceptionally dependent on Aron and Rivka. Aron's wife cares for many of her mother's daily needs, as Rivka explains: "[M]y mother relies on me and Aron too to help her throughout the day . . . . I also spend time every day running to care for and do errands for my mother . . . Often my mother also needs help in the evenings, preparing dinner, cleaning up and getting ready for bed." *Id*. at 2-3. Because they have small children at home, "Aron is always available to make sure our children at home are cared for when I have to run out to be with my mother." *Id*. at 3. As Rivka details, caring for their aging and infirm parents, while still providing the nurturing support and attention to their young children is a daily struggle.

Aron's wife Rivka is candid: "I really cannot manage all the responsibilities without Aron." *Id*. at 1. Aron's family needs him to manage the immense responsibilities of caring for a large, and multigenerational family, warranting a significant downward variance. *See, e.g., United States v. Sloane,* 308 F.R.D. 85, 88 (E.D.N.Y. 2015) (varying below the Guidelines at least in part based on the court's recognition that "any imposed incarceration will cause distress and difficulties to [defendant's] two sisters"); *United States v. Salvador*, No. 98-CR-484 (LMM), 2006 WL 2034637, at *5 n.7 (S.D.N.Y. July 19, 2006) ("family ties and responsibilities" are relevant "as determining the "'history and characteristics of the defendant' as required by 18 U.S.C. § 3553(a)(1).") (quotation marks and citations omitted).

Hon. Kenneth M. Karas
February 21, 2023
Page 7 of 7

For these reasons, and for the reasons discussed in Aron Melber's initial sentencing memorandum dated October 27, 2020, ECF Doc. 160, we respectfully request that the Court impose a non-custodial sentence of six months home confinement and 300 hours of community service.[7]

                                        Respectfully Submitted,

                                        MEISTER SEELIG & FEIN PLLC

                                        /s/ IH

                                        Henry E. Mazurek
                                        Ilana Haramati

                                        *Counsel for Defendant Aron Melber*

cc:    Counsel of Record (*via ECF*)

---

[7] Mr. Melber is the last defendant to be sentenced in this case, and a non-custodial sentence is warranted so as to avoid creating an unwarranted disparity among the sentences that the Court has already imposed on his co-defendants. Aron Melber's advisory Guidelines range is 18-24 months. *See* PSR ¶ 105. Co-defendant Susan Klein likewise had an 18-24 month advisory Guideline, and received a sentence of time-served and one year of supervised release. The Court also imposed the following, largely non-Guidelines sentences on the remaining co-defendants in this case: Sholem Steinberg received a sentence of a year and a day on a 24-30 month Guideline; Simon Goldbrenner received a 24 month sentence on a 30-37 month Guideline; Ben Klein received a 27 month sentence on a 27-33 month Guideline; Moshe Schwartz received a 27 month sentence on a 30-37 month Guideline; and Peretz Klein received a 48 month sentence on a 60 month Guideline, the statutory maximum capped Klein's Guidelines, which otherwise would have been 63-71 months. A sentence of 6 moths home confinement, considering Aron's advisory Guidelines range and applicable § 3553(a) factors, is consistent with the sentences the Court has already imposed.